**BAKER & HOSTETLER LLP**
David J. Richardson (SBN168592)
(drichardson@bakerlaw.com)
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067
Telephone: (310) 820-8800
Facsimile: (310) 820-8859

and

Jorian L. Rose (*pro hac vice*)
(jrose@bakerlaw.com)
45 Rockefeller Plaza
New York, NY 10111-0100
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC and Overseas Charters Inc.*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| VOIP GUARDIAN PARTNERS I, LLC,<br><br>Debtor. | Case No.: 2:19-bk-12607-BR<br><br>Chapter 7 |
| TIMOTHY YOO, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>VOIP GUARDIAN LLC, *et al.*,<br><br>Defendants. | Adv. No. 21-ap-01044-BR<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND (H)**<br><br>Hearing Date: TBD<br>Time: TBD<br>Courtroom: TBD |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, THE PLAINTIFF AND HIS COUNSEL, ALL NAMED DEFENDANTS AND THEIR COUNSEL, AND ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Mark Proto, Youssef "Joseph" Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc. (collectively, the "Defendants"), all named as defendants in the *Second Amended Complaint for: 1. Breach of Fiduciary Duty; 2. Aiding and Abetting Breach of Fiduciary Duty; 3. Avoidance of 2-Year Fraudulent Transfers (Actual Intent); 4. Avoidance of 2-Year Fraudulent Transfers (Constructive Fraud); 5. Avoidance of 4-Year Fraudulent Transfers (Actual Intent); 6. Avoidance of 4-Year Fraudulent Transfers (Constructive Fraud); 7. Avoidance of Preferential Transfers; 8. Avoidance of Postpetition Transfers; 9. Recovery of Avoided Transfers; 10. Breach of Contract; 11. Unjust Enrichment; and 12. Claim Disallowance* (the "Complaint"), filed by the chapter 7 trustee Timothy Yoo (the "Trustee"), on August 17, 2021, hereby move by this motion (the "Motion") requesting that this Court dismiss the Trustee's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (h), on the grounds that the Trustee lacks Article III and/or prudential standing to pursue the claims stated in the Complaint which seek to recover a secured creditor's collateral, and that this Court (or any federal court overseeing the above-captioned bankruptcy case or adversary proceeding), therefore, lacks subject matter jurisdiction over the Complaint.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Statement of Uncontroverted Facts, the Omnibus Declaration of David J. Richardson filed herewith, and all documents in the record of the above-captioned adversary proceeding and chapter 7 bankruptcy case.

**PLEASE TAKE FURTHER NOTICE** that no hearing has been set for this Motion, nor for a companion motion for summary judgment filed herewith, pursuant to the Court's local procedures for dispositive motions, and that Defendants will request that this Motion be transferred to the United States District Court for the Central District of California for a ruling in connection with pre-trial and trial matters.

Dated: September 30, 2024

**BAKER & HOSTETLER LLP**

By: */s/ David J. Richardson*
David J. Richardson

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc..*

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ..... 1

II. FACTUAL BACKGROUND ..... 3

A. The Debtor's Business and Operating Agreements ..... 3

B. DLI's Funding Arrangements ..... 3

C. DLI Controlled All Disbursements of DLI's Loan Advances ..... 4

D. The DLI Stipulation ..... 5

E. The Trustee's Claim to Be Working for the Benefit of Unsecured Creditors ..... 6

F. The Claims for Relief Pleaded in the Complaint ..... 8

III. LEGAL STANDARDS ..... 8

A. Jurisdictional Statement ..... 8

B. Standard for Dismissal of the Complaint ..... 9

IV. THE TRUSTEE'S LACK OF STANDING, AND THE COURT'S LACK OF SUBJECT MATTER JURISDICTION ..... 9

A. The Trustee Does Not Have Article III Standing to File Litigation to Recover DLI's Secured and Perfected Collateral ..... 9

1. A Trustee's Article III Standing Requires an "Injury in Fact" ..... 9

2. Article III Standing Requires an Injury In Fact to the Debtor that is Distinct from a Specific Injury to a Creditor ..... 12

B. The Trustee Lacks Article III and Prudential Standing to Pursue His Breach of Fiduciary Duty Claims ..... 14

C. The DLI Stipulation Does Not Provide the Trustee with Article III Standing ..... 18

V. CONCLUSION ..... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Arch Wood Protection, Inc. (In re Wood Treaters, LLC)*, 491 B.R. 591 (Bankr. M.D. Fla. 2013) .......... 14

*Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988) .......... 16

*Butner v. United States*, 440 U.S. 48 (1979) .......... 13

*Demas Wai Yan v. Fu (In re Dong Xing Fu)*, No. 17-41205 CN, 2019 Bankr. LEXIS 963 (Bankr. N.D. Cal. March 26, 2019) .......... 9

*E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979 (11th Cir. 1990) .......... 15

*Fidelity National Title Insurance Co. v. Schroeder*, 179 Cal. App. 4th 834 (2009) .......... 14

*Finkel v. Polichuk (In re Polichuk)*, 506 B.R. 405 (Bankr. E.D. Pa. 2014) .......... 14

*Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) .......... 10

*Hirsch v. Arthur Andersen & Co. (In re Colonial Ltd. Pshp. Litig.)*, 178 B.R. 40 (D. Conn. 1994), *aff'd Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085 (2d Cir. 1995) .......... 14

*Ill. Inv. Trust No. 92-7163 v. Allied Waste Indus., Inc. (In re Resource Tech. Corp.)*, 624 F.3d 376 (7th Cir. 2010) .......... 10

*In re Christensen*, 561 B.R. 195 (Bankr. D. Utah 2016) .......... 17

*In re Consolidated Pioneer Mortg. Entities*, 166 F.3d 342 (9th Cir. 1999) .......... 13

*In re Ozark Restaurant Equip. Co.*, 816 F.2d 1222 (8th Cir. 1987) .......... 15

*In re Pioneer Liquidating Corp.*, 211 B.R. 704 (S.D. Cal. 1997) .......... 13

*Iten v. Cnty. of Los Angeles*,
81 F.4th 979 (9th Cir. 2023) .......... 12

*Kaur v. Rathinam (In re Kaur)*,
BAP No. WW-13-1391-JuKuPa, 2014 WL 3361432 (9th Cir. BAP July 9, 2014) .......... 10, 13

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 12, 18

*McMichael v. County of Napa*,
709 F.2d 1268 (9th Cir. 1983) .......... 9

*Mehrtash v. Mehrtash*,
93 Cal.App.4th 75 (2001) .......... 13, 14

*Nathan v. Brownstone Plastics, LLC*,
511 B.R. 863 (E.D. Mich. 2014) .......... 13

*Pepper v. Apple Inc. (In re Apple iPhone Antitrust Litig.)*,
846 F.3d 313 (9th Cir. 2017) .......... 9

*Picard v. JPMorgan Chase & Co.*,
460 B.R. 84 (S.D.N.Y. 2011) .......... 16

*Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
721 F.3d 54 (2d Cir. 2013) .......... 16

*Raines v. Byrd*,
521 U.S. 811 (1977) .......... 10

*Righthaven LLC v. Hoehn*,
716 F.3d 1166 (9th Cir. 2013) .......... 18

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) .......... 9

*Sec. Investor Prot. Corp. v. Capital City Bank (In re Meridian Asset Mgmt., Inc.)*,
296 B.R. 243 (Bankr. N.D. Fla. 2003) .......... 16

*Smith v. Arthur Andersen LLP*,
421 F.3d 989 (9th Cir. 2005) .......... 13, 15

*Spokeo Inc. v. Robins*,
578 U.S. 330 (2016) .......... 12

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 11, 12

*Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838 (6th Cir. 2002) .... 16

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) .... 10

*Tru Le v. Dienvy Nguyen (In re Dienvy Nguyen)*, No. SACV-13-1404-MWF, 2014 U.S. Dist. LEXIS 56126 (C.D. Cal. April 22, 2014) .... 10

*Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982) .... 15

*Weaver's Cove Energy, LLC v. Rhode Island Res. Mgmt. Counsel*, 589 F.3d 458 (1st Cir. 2009) .... 8

*Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56 (9th Cir. 1994) .... 9

*Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir. 1988) .... 15, 18

**Statutes**

Cal. Civ. Code, § 3439.01(a)(1) .... 13

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**PRELIMINARY STATEMENT**

Every plaintiff seeking relief in a federal court must possess standing in each of its required forms. One of those is Article III standing, including its necessary requirement that the plaintiff must have experienced an "injury in fact" that is distinct from any third party's injury.

This issue is not commonly litigated in chapter 7 bankruptcy cases. A trustee will typically have uncontested standing to pursue litigation, because one of the trustee's jobs is to recover funds belonging to the debtor, and trustee's rarely attempt to recover funds that were a creditor's property.

But this is not a common case. This case involves a non-debtor company, VoIP Guardian LLC (the "Parent Company"), which operated a business locating and coordinating factoring investments for its funding clients in the complex field of voice-over-internet-protocol ("VoIP") telephony. The Parent Company set up a subsidiary special purpose vehicle for each investor, and one of those SPVs was the debtor in this case, VoIP Guardian Partners I, LLC (the "Debtor").

The Debtor was a mere conduit for the funds of a single investor, Direct Lending Income Fund, LP (defined below as "DLI"). DLI's funds were advanced under a loan agreement that authorized the Debtor to use the funds for only two purposes: (i) investing in VoIP telecom factoring transactions approved by DLI; and (ii) repaying DLI. In addition to limiting usage of the funds, the Loan Agreement gave DLI a security interest in all of the Debtor's assets, even though the Debtor had no assets of its own other than its bare legal title to DLI's funds and any related accounts receivable. And as the Trustee has testified in this case, that security interest was properly perfected and encumbers all of the Debtor's assets, leaving no funds for unsecured creditors. In addition to DLI's perfected security interest, every transfer of every dollar was controlled by DLI. Not one dollar could leave any of the Debtor's segregated and DACA-controlled accounts unless DLI's Controller logged onto First Republic Bank's website and physically clicked the proper buttons to release DLI's funds to an investment recipient. And once those funds left the Debtor's DLI-controlled accounts, DLI held a security interest in all accounts receivable, all cash and accounts, and every other means by which its funds could be recovered.

When two major investment clients did not return millions of dollars in early 2019, the Debtor's "loss" was not personal to the Debtor. The Debtor could not have withdrawn or used DLI's funds for any purpose unless DLI released the transfer. So, when DLI's funds passed through the account of the conduit-Debtor and were not returned, the loss was to DLI. This is not a case where multiple investors' funds were commingled in a debtor's account, over which the debtor had control and could purchase office supplies or a yacht. By design, this Debtor could not use one dollar of DLI's funds to purchase anything unless DLI carried out the necessary transfer of its own funds using the Debtor's accounts as a conduit.

As a result, the Debtor did not experience its own unique and independent "injury in fact" when DLI's funds were lost. Chapter 7 trustee Timothy Yoo (the "Trustee") plainly recognized after his appointment that every dollar he might try to recover in the Debtor's name would be a dollar that belonged to DLI. But instead of dismissing this case as a no-asset case, the Trustee made a deal with DLI. He entered into a stipulation with DLI that would allow him to keep a portion of litigation recoveries for his own fees, for his professionals' fees, and for the Debtor's few unsecured creditors (the "DLI Stipulation"). In the course of seeking approval for the DLI Stipulation, he stated under oath that DLI's "security interest was properly perfected," that it "fully encumbered" all of the Debtor's assets, and that absent his fee agreement with DLI, there was "no avenue for the Estate's unsecured creditors to receive any distribution whatsoever." Statement of Uncontroverted Facts ("SUF"), ¶¶ 35-36 (emphasis added).

The DLI Stipulation may have appeared to be a worthwhile business decision for the Trustee. But it was executed without regard for the Trustee's lack of Article III standing to pursue any claims to recover DLI's funds (among other fatal deficiencies to the claims). Because every dollar that was lost was DLI's property, the Debtor did not experience an "injury in fact," and therefore the Trustee lacks Article III standing to file litigation to recover those funds, whether as avoidable transfers or as damages. DLI made a choice to have this Trustee pursue its claims rather than pursue those claims itself in a court of competent jurisdiction. But Article III standing cannot be obtained by contract. The DLI Stipulation is merely an employment agreement that splits DLI's recoveries in exchange for the Trustee's services as plaintiff.

Finally, with respect to the Trustee's fiduciary duty claims, the Trustee also lacks prudential standing, in addition to Article III standing, as he is pursuing third-party claims that belong to DLI to recover damages for an injury to DLI. Because the Trustee lacks standing to pursue his claims, this Court lacks subject matter jurisdiction over the Trustee's Complaint, and the Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(h).

## II.

## FACTUAL BACKGROUND

### A. The Debtor's Business and Operating Agreements

On September 25, 2015, Rodney Omanoff caused the incorporation of the Parent Company, VoIP Guardian, LLC. SUF ¶ 1. On October 9, 2015, Mr. Omanoff caused the incorporation of the Debtor as a subsidiary limited liability company, and special purpose vehicle. SUF ¶ 2.

The Debtor served as the vehicle for factoring investments made by DLI. SUF ¶ 6.

Prior to 2015, DLI's factoring investments had been handled by Mr. Omanoff's prior entity, Talking Capital LLC. SUF ¶ 7. The motivation to incorporate the Parent Company and the Debtor was Mr. Omanoff's belief that Forefront Partners, LLC ("Forefront"), one of the partners in Talking Capital, was engaged in fraudulent activity. SUF ¶ 8. Forefront was not permitted to become an owner of the Parent Company when DLI's investment business was transferred to the Parent Company and Debtor. SUF ¶ 9.

### B. DLI's Funding Arrangements

#### 1. The Loan Agreement

DLI's factoring investments were funded under a Loan and Security Agreement (the "Loan Agreement"), dated October 1, 2015, between Direct Lending Income Fund, LP, by and through Millenium Trust Company, LLC FBO Direct Lending Income Fund, LP (collectively, and with other affiliates, "DLI") as "Lender," and the Debtor as "Borrower," with initial available credit of $20,000,000 (the "Maximum Facility Amount"). SUF ¶¶ 11-12. The Loan Agreement authorized the Debtor to use the DLI funds for two purposes: (i) to engage in the VoIP factoring business by purchasing "Eligible Collateral Assets," or (ii) to repay DLI's note. SUF ¶ 13. The Loan Agreement was amended on five occasions, primarily to increase the Maximum Facility Amount

in various stages to $250,000,000, and to revise various terms related to DLI's collateral and security interest. SUF ¶¶ 17-19, 23-24.

By the Loan Agreement, and again in more detail by the Third Amendment to the Loan Agreement, dated April 1, 2017, the parties confirmed that all DLI funds would be held in segregated accounts, and would each be subject to a Deposit Account Control Agreement, defined as "an agreement providing the Lender with control over the Segregated Account within the meaning of Section 104(a)(2) of the UCC, in a form acceptable to the Account Bank, as applicable." SUF ¶¶ 15 and 20-21.

The Loan Agreement provided that the Debtor would be the owner of the loan proceeds. SUF ¶ 16. The Trustee will make much of this statement, but it was merely a necessary term to provide the Debtor with a sufficient legal interest to grant DLI a security interest, rather than proceed under a bailment or trust relationship. Once that security interest was simultaneously granted and then perfected, such property interest was nothing more than bare legal title, which is insufficient to support the Trustee's claims, as addressed below.

### C. DLI Controlled All Disbursements of DLI's Loan Advances

The funds that DLI deposited into the Debtor's DACA-controlled and segregated "Operations Account," ending in 9399 (the "Operations Account"), could not be used by the Debtor for any purpose of its own. The Debtor could not transfer the funds to a factoring client, could not transfer the funds between accounts, and could not withdraw any funds to purchase paper clips or a yacht. SUF ¶¶ 41-46.

Under a procedure established with FRB, funds could only be transferred from the Operations Account, or transferred between FRB accounts, if DLI's Controller, Mandy Isaac (the "DLI Controller"), logged onto the FRB website, approved proposed transfers, and physically clicked the correct buttons to release the transfer, in the case of U.S. dollar transfers. SUF ¶¶ 43-45. In the case of Euro transfers, FRB did not have the website availability for wire transfers, and so any transfers of Euros were approved by a telephone call or email between an FRB representative and the DLI Controller. SUF ¶ 44.

The DLI Controller, and the Debtor's own Controller, have both confirmed in depositions in this case that the Debtor had no dominion or control over DLI's funds. SUF ¶¶ 41-46. And the Debtor's former President and CEO, Rodney Omanoff, gave the same testimony in a deposition taken in related litigation, and admissible in this litigation under F.R.C.P. 32(a)(8). SUF ¶ 43 (citing Exhibit K).

The DLI Controller approved transfers on almost all weekdays, for near-daily factoring investments to existing clients that had been pre-approved by DLI under a separate due diligence procedure. SUF ¶ 47. Thus, on each day when the DLI Controller would be asked to review and release proposed wire transfers to investment clients, it was not for the DLI Controller to approve the client, itself, but to review the amount relative to the factored invoice, the approved recipient, and then release the funds. SUF ¶ 48. Without the DLI Controller's physical release of the funds, no transfers or withdrawals of DLI's funds from any of the Debtor's FRB accounts could take place. ¶¶ 43-45.

**D. The DLI Stipulation**

As of the Petition Date, every dollar that the Trustee could possibly recover in this chapter 7 case would have been the property of DLI, leaving nothing for unsecured creditors. This isn't argument. It is the Trustee's sworn testimony provided in support of the DLI Stipulation:

> Prior to agreeing to the terms of the Stipulation, my counsel and I conducted an independent investigation on the validity of the DLI Fund's claim against the Estate. My counsel ran a search for any and all UCC filings related to the Debtor and in so doing, confirmed that DLI Fund is the only creditor with a security interest in the Debtor's assets. My counsel also confirmed that the UCC's requirements for the creation and attachment of DLI Fund's security interest had been satisfied and that **DLI Fund's security interest was properly perfected**. …
>
> Indeed, **without the agreement with DLI** Fund and based upon the available assets in this Estate, **there is no avenue for the Estate's unsecured creditors to receive any distribution whatsoever** – let alone the 30% provided for under the

Stipulation. The Estate's assets are fully encumbered by DLI Fund's $203,459,871.69 secured claim.

SUF ¶¶ 33, 35, 36 (the "Yoo Declaration") (emphasis added). The Trustee's counsel, Andy S. Kong, also submitted a declaration in support of the DLI Stipulation, testifying among other things that he and his associate had researched and confirmed that DLI's security interest was properly perfected. SUF ¶¶ 34, 37.

This series of admissions, alone, should resolve this Motion by confirming that any transfer of DLI's funds was not a transfer of an "interest of the debtor in property," and therefore was not an injury to the Debtor in any manner.

DLI's perfected security interest is far-reaching. It covers "[a]ll assets of the Debtor," with specific reference to "accounts," "deposit accounts," "commercial tort claims," "cash proceeds," "accounts receivable," "rights to payment of any and every kind," and "other forms of obligations and receivables," among other categories. SUF ¶¶ 26-29. DLI filed its UCC-1 to perfect its security interest on or about January 11, 2016. SUF ¶ 29.

**E. The Trustee's Claim to Be Working for the Benefit of Unsecured Creditors**

The phrase "for the benefit of unsecured creditors" is utilized in bankruptcy cases as a natural justification for any recovery effort a trustee might pursue, and this case has been no exception. For that reason, it is worthwhile to note the nature of the "unsecured creditors" the Trustee claims to be working for, and has held up as his reason to enter into the DLI Stipulation.

Nine proofs of claim were originally filed in this case, though the ninth was promptly withdrawn. SUF ¶ 51. Two of the proofs of claim are identical DLI secured claims. SUF ¶¶ 52-54. Two of the remaining claims are filed by the Franchise Tax Board ("FTB"), one of which seeks an administrative claim for postpetition amounts that were not paid by the Trustee, and one of which is a mixed priority/unsecured claim for $32,089.64. SUF ¶¶ 55-56. Thus, of these first five proofs of claim, only one is an unsecured claim, and is in the amount of $32,089.64. *Id.*

Two of the remaining four unsecured claims have been settled by the Trustee. One is a claim filed by the Parent Company for its profits, or management fees, but it has been subordinated below DLI's secured claim under the terms of a settlement agreement between the Trustee and

Rodney Omanoff, the Debtor's former President, CEO and sole officer.  SUF ¶¶ 57-58.  Under that nuisance-value settlement, the Debtor's CEO and his entities settled all claims for a single payment of $3 million, amounting to 1.5% of the amount sought by the Trustee in this litigation.  SUF ¶¶ 71-72.

The other settled claim was filed by the Debtor's D&O insurer, Those Certain Underwriters at Lloyd's, London ("Lloyds").  SUF ¶ 60.  The Lloyds claim has been erased in a settlement with Lloyds to address the Debtor's claims under its D&O insurance policy, resulting in a recovery for the Trustee's fiduciary duty claims that is less than 0.15% of the amount sought by the Trustee in this litigation (the settlement also encompasses other lawsuits for the combined $300,000 recovery). SUF ¶¶ 71 and 73.

An unsecured claim filed by HILF Telecom for approx. $450,000 appears to be subject to complete disallowance, as the claim states on its face that the Debtor owes the funds to HILF if British Telecom Netherlands repays the full amount of withheld funds.  SUF ¶ 59.  The Trustee recently settlement with British Telecom Netherlands and the Dutch government, and recovered less than half of those funds from British Telecom Netherlands.  SUF ¶¶ 74-75.

The final unsecured proof of claim is the claim of Forefront, now assigned to Talking Capital (under the amended name, Talking Capital Windup, LLC), for its share of the Parent Company's management fees earned from coordinating DLI's factoring investments.  SUF ¶ 61. Forefront was a co-owner of Talking Capital, which was the predecessor business that invested DLI's funds in VoIP telecom factoring, and alleged that it introduced DLI's business to Talking Capital.  SUF ¶¶ 62-63.  Forefront sued the Parent Company's principles, and the Debtor, for diversion of a corporate opportunity when DLI's business was moved to the Parent Company and the Debtor, but Forefront was not permitted to own a member interest.  SUF ¶¶ 64-65.  A New York jury awarded Forefront a judgment in the amount of $36,732,540.87 against multiple parties that include Mr. Omanoff and several of his entities, which is now an amended claim in the name of Talking Capital.  SUF ¶¶ 66-68.

There are also three scheduled claims that the Debtor has stated in an amount in excess of $0.00, which are the claims of three of the Debtors' prepetition lawyers, in a total amount of

$157,745.94. SUF ¶ 69. Whether these claims remain pending, or have been paid by other co-clients of the same engagement, is not clear at this time, but is not a material fact.

The importance of these facts is one of context. When the Trustee claims that he is pursuing litigation arising from an allegedly fraudulent scheme, for the "benefit of creditors," the reality is that more than 99% of those creditors by amount represent a judgment for unpaid net profits from a legitimate business, confirmed by a New York jury, not damages arising from a fraudulent scheme. This litigation was not filed for unsecured creditors, but to use a bankruptcy case to recover DLI's loss and generate fees under a DLI Stipulation that is nothing more than an employment agreement.

**F. The Claims for Relief Pleaded in the Complaint**

The Trustee filed his operative Complaint on August 17, 2021. SUF ¶ 76. The Complaint's claims for relief that name one or more of the Defendants fall into two primary categories.

The Trustee has sued certain Defendants for a variety of avoidance claims under 11 U.S.C. §§ 544(b), 547, 548, 549, and 550 (the "Avoidance Claims"), theorizing that funds going in and out of a third party's escrow account that serviced dozens of telecom companies from the same commingled account must have been the "Debtor's" funds at all times. SUF ¶¶ 79-86.

The Trustee has also pleaded two fiduciary duty claims. He has sued Mr. Rahman and Mr. Proto for having allegedly "breached their fiduciary duties as both directors and officers of the Debtor," even though neither was a director nor officer of the Debtor. SUF ¶ 77 (the "Direct Fiduciary Duty Claim"). And the Trustee asserts a claim against Mr. Rahman, Mr. Proto and Zoom-Tel for aiding and abetting Mr. Omanoff's alleged breach of fiduciary duties "[t]o the extent they did not owe direct duties of care and loyalty to the Debtor." SUF ¶ 78 (the "Aiding and Abetting Claim") (collectively, the "Fiduciary Duty Claims").

**III.**

**LEGAL STANDARDS**

**A. Jurisdictional Statement**

Defendants argue herein that the Trustee lacks Article III/prudential standing to pursue his claims arising under 11 U.S.C. §§ 544, 547, 548, 549, and 550, and fiduciary duty claims arising

under state law, but the Court has subject matter jurisdiction to make such a ruling.  *Weaver's Cove Energy, LLC v. Rhode Island Res. Mgmt. Counsel*, 589 F.3d 458, 467 (1st Cir. 2009) (courts are "independently obligated" to review issues such as a plaintiff's standing "to see whether we have Article III jurisdiction …").

**B.    Standard for Dismissal of the Complaint**

"A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, including for failure to allege injury sufficient for Article III standing, may be made at any time."  *Pepper v. Apple Inc. (In re Apple iPhone Antitrust Litig.)*, 846 F.3d 313, 319 (9th Cir. 2017).  Where a plaintiff lacks Article III standing, dismissal is mandatory under Fed. R. Civ. P. 12(h).

This Motion presents a "factual attack" on the Trustee's lack of standing and this Court's resulting lack of subject matter jurisdiction.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction").  "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."  *Id.*

However, should the Court determine that "the jurisdictional issue and substantive issues in this case are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits," then the Motion should be determined by the evidentiary standard applicable to a motion brought under Fed. R. Civ. P. 12(b)(6) as a motion for summary judgment.  *Id.*, 373 F.3d at 1040.

**IV.**

**THE TRUSTEE'S LACK OF STANDING, AND THE COURT'S LACK OF SUBJECT MATTER JURISDICTION**

**A.    The Trustee Does Not Have Article III Standing to File Litigation to Recover DLI's Secured and Perfected Collateral**

**1.    A Trustee's Article III Standing Requires an "Injury in Fact"**

A plaintiff's standing in federal court must satisfy the requirements for both: (i) "prudential" standing, and (ii) "Article III" or constitutional standing.  *Wedges/Ledges of Cal., Inc. v. City of*

*Phoenix, Ariz.*, 24 F.3d 56, 61 (9th Cir. 1994); *McMichael v. County of Napa*, 709 F.2d 1268, 1269 (9th Cir. 1983). See also *Demas Wai Yan v. Fu (In re Dong Xing Fu)*, No. 17-41205 CN, 2019 Bankr. LEXIS 963 *3-4 (Bankr. N.D. Cal. March 26, 2019) (explaining that "statutory jurisdiction and Article III jurisdiction do not necessarily overlap, in this instance they are co-extensive," and dismissing adversary proceeding where plaintiff "lacked both statutory standing under § 727(c) and the more fundamental jurisdictional standing under Article III of the Constitution"); *Tru Le v. Dienvy Nguyen (In re Dienvy Nguyen)*, No. SACV-13-1404-MWF, 2014 U.S. Dist. LEXIS 56126 *5-7 (C.D. Cal. April 22, 2014) (explaining distinction between Article III standing, which impacts a court's subject matter jurisdiction, and "power to bring a fraudulent transfer action" which does not implicate the court's jurisdiction).

Article III standing is an absolute minimum for a plaintiff seeking relief from a federal court, including a trustee that is a plaintiff in bankruptcy court. *Ill. Inv. Trust No. 92-7163 v. Allied Waste Indus., Inc. (In re Resource Tech. Corp.)*, 624 F.3d 376, 382 (7th Cir. 2010) ("Article III's standing requirements apply to proceedings in bankruptcy courts just as they do to proceedings in district courts."); *Kaur v. Rathinam (In re Kaur)*, BAP No. WW-13-1391-JuKuPa, 2014 WL 3361432 *4 (9th Cir. BAP July 9, 2014) ("The bankruptcy court as a unit of the Article III district court is a court of limited jurisdiction and is bound by the requirement that, as a preliminary matter, it have before it an actual case or controversy … standing is an essential and unchanging part of the case-or-controversy requirement of Article III.") (citations omitted).

Statutory terms, such as language in 11 U.S.C. § 548 stating that a trustee "may avoid any transfer," do not impact Article III standing as it cannot be abrogated by statute. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) ("In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself,' that is likely to be redressed if the requested relief is granted."); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (the injury-in-fact requirement for constitutional standing is "a hard floor of Article III jurisdiction that cannot be removed by statute."); *Raines v. Byrd*, 521 U.S. 811, 820, n.3 (1977) ("It is settled that Congress cannot erase Article III's standing

requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing").

Many cases that address a trustee's standing discuss the issue in general language that erases the distinction between prudential and Article III standing. "Jurisdiction," the Supreme Court has observed, "is a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998). The Trustee is certain to cite cases making grand and general statements about a trustee's exclusive standing to bring claims on behalf of the estate. But such grand statements are usually made when addressing issues such as a creditor's competing assertion of standing, rather than where a trustee's Article III standing is the specific issue before the Court – as it is here. Such cases have no relevance to the issue of Article III standing when a trustee is suing to address injury to a creditor.

With respect to the Trustee's Avoidance Claims, this Motion challenges the Trustee's lack of Article III standing. With respect to the Trustee's Fiduciary Duty Claims, the Trustee lacks both Article III standing and prudential standing.

Article III standing is rarely challenged in bankruptcy. In an ordinary chapter 7 case, the chapter 7 trustee will almost always have Article III standing when filing claims to recover a loss of funds transferred by the debtor because, in almost all cases, the debtor is not a mere conduit for a single investor, but will have the ability to spend funds in its possession however it might wish. For example, in a typical case involving a Ponzi scheme or other fraudulent allegations, the funds of many investors are commingled in the debtor's account, and the debtor has sufficient dominion and control to withdraw or transfer the funds for any purpose it may choose, such as to buy a yacht or lottery tickets. The trustee of *that* chapter 7 case will have both Article III standing and prudential standing to pursue a recovery of fraudulent transfers for the benefit of all creditors.

But the facts of this case are unique. This Debtor was a single-purpose vehicle created to handle the funds of a single investor, and all funds passing through the Debtor's accounts were controlled by DLI, were physically transferred *by* DLI, and were the fully perfected collateral of DLI. Every dollar that was lost was a dollar that belonged to DLI and could never have been

recovered for the benefit of unsecured creditors when this case was filed., according to the Trustee's sworn testimony. SUF ¶¶ 26-38, and 41-46.

The Trustee will likely argue that this raises a "merits" issue. And clearly, when transferred property is fully encumbered, a plaintiff's standing and the merits of the claim can appear remarkably similar and are often confused. As the Ninth Circuit has explained, "[a]lthough a merits question may look similar to the standing question of whether there is an injury in fact traceable to the relevant law under which the plaintiff has brought suit, confusing the two conflate[s] standing with the merits." *Iten v. Cnty. of Los Angeles*, 81 F.4th 979, 985 (9th Cir. 2023). "Whether there is an injury in fact" goes to the plaintiff's standing, while "compensable injury" is necessary to "prevail on the merits." *Id*. (citation omitted).

It is for this reason that Defendants have filed a companion motion for summary judgment that addresses the "merits" side of this issue.

**2. Article III Standing Requires an Injury In Fact to the Debtor that is Distinct from a Specific Injury to a Creditor**

It is black letter law that a plaintiff's Article III standing requires the showing of an "injury in fact," which is the "[f]irst and foremost" requirement for the "irreducible constitutional minimum of standing." *Steel*, 523 U.S. at 103.

To demonstrate "injury in fact," a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Supreme Court has since confirmed that "the injury-in-fact requirement requires an injury that is both "concrete *and* particularized." *Spokeo Inc. v. Robins*, 578 U.S. 330, 334 (2016) (remanding for consideration of both requirements).

"For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339. "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.*, 578 U.S. at 340.

The loss of DLI's funds was a "personal and individual" loss to DLI, but was not "personal and individual" to the Debtor in any manner. Nor was the loss of DLI's funds a "concrete" loss to

the Debtor. If the Debtor's business was a fraudulent scheme or was just poorly run, as the Trustee alternatively alleges, every dollar that was repaid to the Debtor remained DLI's perfected collateral and there would be "no avenue" for creditors to receive one dollar of recoveries, by the Trustee's own admission. SUF ¶¶ 35-36. Conversely, if the Debtor's business was completely successful and returned every invested DLI dollar with all anticipated profits, the outcome would have been identical, because every dollar remained DLI's fully perfected collateral. Only the Parent Company would have had a contract right to recover its share of profits through Management Fees, if DLI released its funds for that purpose. Under either outcome, the Debtor would not have had any funds of its own to pay unsecured creditors, and therefore the Debtor cannot have been injured by DLI's loss of DLI's funds.

As the Ninth Circuit has explained, "when a third party has injured not the bankrupt corporation itself but a creditor of that corporation, the trustee in bankruptcy cannot bring suit against the third party." *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir. 2005). And here, only DLI was injured in a "personal and individual" manner when its funds were not returned.

Avoidance claims are not exempt from this Article III standing requirement. *In re Kaur*, 2014 WL 3361432 at *5 (dismissing adversary proceeding where debtor "had no injury in fact" because avoidable lien had not attached to property, therefore debtor lacked Article III/constitutional standing to avoid the lien). Where the transferred funds would not have been available for general distribution to creditors, the debtor has not experienced an injury in fact. *Nathan v. Brownstone Plastics, LLC*, 511 B.R. 863, 869 (E.D. Mich. 2014) ("where the property transferred has a security interest over and above the value of the property, the weight of authority dictates that a trustee may not recover because the estate would not benefit.").

A debtor's property interests are determined by state law. *Butner v. United States*, 440 U.S. 48, 54-55 (1979). Under California law and each state that has adopted either the Uniform Voidable Transfers Act ("UVTA") or the predecessor Uniform Fraudulent Transfer Act, a debtor's "assets" do not include "[p]roperty to the extent it is encumbered by a valid lien." Cal. Civ. Code, § 3439.01(a)(1). See *In re Pioneer Liquidating Corp.*, 211 B.R. 704, 713 (S.D. Cal. 1997) ("The California fraudulent conveyance statute provides that property encumbered by a valid security

interest is not subject to recovery under the state fraudulent conveyance statute."), aff'd *In re Consolidated Pioneer Mortg. Entities*, 166 F.3d 342 (9th Cir. 1999); *Mehrtash v. Mehrtash*, 93 Cal.App.4th 75, 80 (2001) (granting judgment against plaintiff on fraudulent conveyance claim where transferred interest in home was fully encumbered by liens in excess of home value); *Fidelity National Title Insurance Co. v. Schroeder*, 179 Cal. App. 4th 834, 845 (2009) (following *Mehrtash*, dismissing avoidance claim where value of judgment lien exceeded value of transferred property). While these cases veer toward the "merits" side of the issue, they demonstrate that DLI's funds were not the Debtor's property under California law, and therefore the Debtor cannot have experienced a "personal and individual" loss when DLI's funds were not returned by certain factoring clients.

The loss of DLI's funds was personal and concrete to DLI, but was neither personal nor concrete to the Debtor. The Trustee may have had a business motive to serve as DLI's plaintiff, but he does not have Article III standing to fulfill that intended business. *Finkel v. Polichuk (In re Polichuk)*, 506 B.R. 405, 435 (Bankr. E.D. Pa. 2014) (Avoidance actions are "a debt-collection device and not a revenue generating tool").

The Trustee lacks Article III standing to pursue his Avoidance Claims, and his Avoidance Claims should be dismissed pursuant to F.R.C.P. 12(b)(1) and 12(h).

**B. <u>The Trustee Lacks Article III and Prudential Standing to Pursue His Breach of Fiduciary Duty Claims</u>**

As addressed above, the loss of DLI's funds was an injury that was "personal and individual" to DLI, alone. DLI's perfected security interest and complete control over the use of its funds meant that the Debtor did not lose any funds that it could have used to pay other creditors. Because the Debtor did not experience an "injury in fact," the Trustee also lacks Article III standing to pursue his Breach of Fiduciary Duty Claims. See, *e.g., Hirsch v. Arthur Andersen & Co. (In re Colonial Ltd. Pshp. Litig.)*, 178 B.R. 40, 43 (D. Conn. 1994) (emphasis added) (trustee lacked standing to pursue claims, including fiduciary duty claim, because trustee could not allege any "distinct ways" the debtor was harmed, other than loss of creditor funds, which was "injuries identical to those of the creditors"), *aff'd Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1096 (2d

Cir. 1995) (addressing constitutional nature of standing requirement); *Abbott v. Arch Wood Protection, Inc. (In re Wood Treaters, LLC)*, 491 B.R. 591, 601 (Bankr. M.D. Fla. 2013) (trustee lacked standing to pursue avoidance claim where Trustee could not meet her burden "to show that the specific transfers caused an injury to the estate").

The Trustee also lacks prudential standing. Whether or not a plaintiff is able to satisfy the standards for Article III standing, the plaintiff will lack prudential standing if they fail to satisfy three further requirements: (1) their claim cannot rest "on the legal rights or interests of third parties," (2) their claim cannot assert "generalized grievances," and (3) their claim must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 474 (1982).

This Motion focuses on the first requirement, as the Trustee's claims rest on the legal rights of DLI. "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by" the debtor. *Smith*, 421 F.3d at 1002 (permitting claim to proceed where damages were loss of debtor's own funds caused by delay of bankruptcy filing); see also *Williams v. California 1st Bank*, 859 F.2d 664, 666-67 (9th Cir. 1988) (trustee lacked prudential standing to assert creditors' causes of action on behalf of an estate).

In *Williams*, *supra*, investors in a debtor's scheme had claims against the debtor's bank for its "participation in, knowledge of, or approval of the debtor's 'Ponzi' scheme." *Williams*, 859 F.2d at 665. The trustee appointed in the debtor's bankruptcy case obtained assignments from more than one hundred investors and proceeded to sue the bank to recover funds for the estate, for which the estate would retain administrative costs before passing the funds on to the investors. *Id*. But the Ninth Circuit explained that the trustee could not assert claims to recover funds of another, rendering the debtor's estate a pass-through entity used to establish jurisdiction. *Williams*, 859 F.2d at 666-67. The Ninth Circuit followed *In re Ozark Restaurant Equip. Co.*, 816 F.2d 1222, 1228 (8th Cir. 1987) for the principle that "there is nothing in . . . the liquidation framework of the Code authorizing a Chapter 7 trustee to collect money not owed to the estate." *Id.*

The Ninth Circuit's ruling in *Williams* is consistent with other Circuits holding that claims arising from breaches of fiduciary duty, or other wrongful conduct that injures one or more investors/creditors, belong exclusively to those investors/creditors. *See E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979, 986-87 (11th Cir. 1990) (bankruptcy trustee lacks both Article III and prudential standing to bring claims arising out of Ponzi scheme, as claims belonged only to defrauded investors); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988) (where conduct of debtor's insiders caused monetary damage to a particular creditor rather than the debtor, "the right to recover for that injury belongs, not to [the bankrupt corporation] or its bankrupt estate, but to [the creditor]."); *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 855 (6th Cir. 2002) (trustee lacked standing to pursue common law claims where funds belonged to particular creditors, not the estate). *See also Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 91 (S.D.N.Y. 2011) ("the Trustee lacks standing under the Bankruptcy Court, as incorporated into SIPA, to pursue claims that properly belong to creditors … there is no doubt that the common law causes of action in the Amended Complaints, premised on a Ponzi scheme … belong to the creditors, not to BMIS"), aff'd *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013); *Sec. Investor Prot. Corp. v. Capital City Bank (In re Meridian Asset Mgmt., Inc.)*, 296 B.R. 243, 252 (Bankr. N.D. Fla. 2003) (trustee's claims dismissed for lack of standing where debtor was a mere conduit for investor's defrauded funds).

The unique facts of this case do not provide grounds to distinguish any of these cases in any manner that would favor the Trustee's position. If an alleged insider of the Debtor failed to conduct proper due diligence into an investment recipient, only DLI was injured. If an alleged insider of the Debtor failed to adequately monitor the factored minutes that were financed with DLI's funds, only DLI was injured. The FTB was not injured by the loss of DLI's funds, but because the Parent Company didn't pay all of the taxes that it owed for its wholly-owned pass-through SPV/Debtor that never had any funds of its own. And Forefront has already obtained a judgment on its fiduciary duty claims against some of the same defendants, demonstrating proper creditor standing in state court, as DLI could have done. SUF ¶ 69.

Every action or omission that the Trustee claims was a breach of a duty allegedly owed to the Debtor is an action or omission that led to the loss of DLI's funds, and only DLI's funds. The Trustee will argue that DLI could not sue the same defendants because they did not owe DLI a fiduciary duty. But that places form and labels over substance. The Trustee cannot secure standing simply because DLI's claims would have carried different labels if DLI had opted to pursue its own legal rights in a court of competent jurisdiction.

The Trustee's Second Amended Complaint explains that the Trustee's fiduciary duty theory is based on DLI's injury, not the Debtor's:

> 189. In all, DLI investors invested a total of approximately $192 million in the Debtor (principal). Approximately $21 million has been seized by the Dutch government, but the rest is lost. Indeed, as a direct and proximate result of Omanoff's, Proto's, Rahman's, and Philipson's breaches of the fiduciary duty of care and loyalty, the Debtor quickly found itself on increasingly precarious financial footing, including having lost approximately $160 million invested in the Debtor by DLI. This caused damages to the Debtor by diverting, dissipating and unduly risking the company's assets that may otherwise have been available for creditors.

Exhibit V to Richardson Decl., Second Amended Complaint at ¶ 189. The Trustee's allegations include the statement that such funds were "the company's assets that may otherwise have been available for creditors," but the authorities cited above, and the Trustee's own sworn testimony stating the opposite, confirm that none of DLI's funds were "the company's assets" that could have been available for creditors, because they were all fully encumbered by DLI's perfected lien. SUF ¶¶ 35-37.

The issue here is not the propriety of the DLI Stipulation. If all the Trustee did in this case was negotiate a return of collateral outside of litigation – as he did in a recent settlement that did not involve litigation – his work would not implicate Article III standing, even though he would be carrying out a secured creditor's "dirty work." *In re Christensen*, 561 B.R. 195, 211 (Bankr. D. Utah 2016). But the moment the Trustee filed litigation in a federal court, the requirement to

demonstrate Article III standing and prudential standing came into play, and the Trustee cannot demonstrate either Article III standing or prudential standing to recover transfers or alleged damages that were injury to a secured creditor.

The Trustee lacks standing to pursue his Fiduciary Duty Claims, and the claims must be dismissed pursuant to F.R.C.P. 12(h).

**C. The DLI Stipulation Does Not Provide the Trustee with Article III Standing**

The DLI Stipulation did not provide the Trustee with Article III or prudential standing. Post-petition events do not create a prepetition property right sufficient to create Article III standing, nor can Article III standing be acquired by contract. *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1171 (9th Cir. 2013) ("In general, jurisdiction is based on facts that exist at the time of filing," and while a few exceptions exist, "permitting standing based on a property interest acquired after filing is not one of them.") (citing *Lujan, supra*).

Nor can the Trustee claim that the DLI Stipulation was an implicit assignment of DLI claims. A trustee cannot obtain standing by taking creditors' state law claims by assignment. *Williams*, 859 F.2d at 666-67.

The DLI Stipulation is merely an employment agreement in which the Trustee agreed to try to recover DLI's lost funds in exchange for Trustee and professional fees, along with a cut for the few unsecured creditors (if any) whose claims might survive the Trustee's eventual objections to claim. But it is not an agreement that can create Article III standing.

The Trustee lacks Article III and/or prudential standing to pursue the claims stated in his Complaint, and therefore the Trustee's Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(h).

**V.**

**CONCLUSION**

The Trustee does not have standing to pursue DLI's claims against defendants in Bankruptcy Court, and judgment must be entered dismissing the Complaint for lack of subject matter jurisdiction.

WHEREFORE, for the reasons and applicable law briefed herein, Defendants respectfully request that this Court enter judgment dismissing the Trustee's Complaint for a lack of Article III/prudential standing, and as a result, the Court's lack of subject matter jurisdiction.

Dated: September 30, 2024

**BAKER & HOSTETLER LLP**

By: *\/s/ David J. Richardson*
David J. Richardson

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc..*

CERTIFICATION OF COMPLIANCE

The undersigned, counsel of record for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC and Overseas Charters Inc., certifies that this brief contains 6,991 words, which complies with the word limit of Local Rule 11-6.1 of the United States District Court for the Central District of California.

Dated: September 30, 2024

**BAKER & HOSTETLER LLP**

By: */s/ David J. Richardson*
David J. Richardson

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc..*