**BAKER & HOSTETLER LLP**
David J. Richardson (SBN168592)
(drichardson@bakerlaw.com)
Lauren Attard (SBN 320898)
(lattard@bakerlaw.com)
Jack Koehn (SBN 358542)
(jkoehn@bakerlaw.com)
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067
Telephone: (310) 820-8800
Facsimile: (310) 820-8859

and

Jorian L. Rose (*pro hac vice*)
(jrose@bakerlaw.com)
45 Rockefeller Plaza
New York, NY 10111-0100
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC and Overseas Charters Inc.*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| VOIP GUARDIAN PARTNERS I, LLC,<br><br>Debtor. | Case No.: 2:19-bk-12607-BR |
| TIMOTHY YOO, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>VOIP GUARDIAN LLC, *et al*.,<br><br>Defendants. | Adv. No. 21-ap-01044-BR<br><br>**NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR SUMMARY JUDGMENT ON SECOND AMENDED COMPLAINT**<br><br>**[STATEMENT OF UNCONTROVERTED FACTS, PROPOSED JUDGMENT, DECLARATION OF DAVID J. RICHARDSON FILED HEREWITH]**<br><br>Hearing Date: TBD<br>Time: TBD<br>Courtroom: TBD |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, THE PLAINTIFF AND HIS COUNSEL, ALL NAMED DEFENDANTS AND THEIR COUNSEL, AND ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Mark Proto, Youssef "Joseph" Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc. (collectively, the "Defendants"), all named as defendants in the *Second Amended Complaint for: 1. Breach of Fiduciary Duty; 2. Aiding and Abetting Breach of Fiduciary Duty; 3. Avoidance of 2-Year Fraudulent Transfers (Actual Intent); 4. Avoidance of 2-Year Fraudulent Transfers (Constructive Fraud); 5. Avoidance of 4-Year Fraudulent Transfers (Actual Intent); 6. Avoidance of 4-Year Fraudulent Transfers (Constructive Fraud); 7. Avoidance of Preferential Transfers; 8. Avoidance of Postpetition Transfers; 9. Recovery of Avoided Transfers; 10. Breach of Contract; 11. Unjust Enrichment; and 12. Claim Disallowance* (the "Complaint"), filed by the chapter 7 trustee Timothy Yoo (the "Trustee"), on August 17, 2021, hereby move by this amended motion (the "Motion") requesting that this Court enter judgment in favor of the Defendants on all claims pleaded in the Complaint against the Defendants, pursuant to Fed. R. Civ. P. 56, on the grounds that uncontroverted evidence shows that the Trustee cannot show that his avoidance claims seek to recover transfers of property of VoIP Guardian Partners I, LLC (the "Debtor"), or that his fiduciary duty claims seek to recover damages for injury to the Debtor.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Statement of Uncontroverted Facts, the Declaration of David J. Richardson filed herewith, and all documents in the record of the above-captioned adversary proceeding and chapter 7 bankruptcy case.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the local procedures of the Honorable Barry Russell, United States Bankruptcy Court Judge, Defendants have not scheduled a hearing on the Motion. Notice of any hearing will be provided in accordance with the Court's applicable rules.

Dated: October 8, 2024

**BAKER & HOSTETLER LLP**

By: *_/s/ David J. Richardson_*
David J. Richardson

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc.*

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT .......... 1

II. FACTUAL BACKGROUND .......... 4

A. The Debtor's Business and Operating Agreements .......... 4

B. DLI's Funding Arrangements .......... 4

C. DLI Controlled All Disbursements of DLI's Loan Advances .......... 5

D. The DLI Stipulation .......... 6

E. The Factoring Clients .......... 6

F. Payment of Factoring Invoices .......... 7

G. Collection of Factored Invoices .......... 11

H. The Trustee's Avoidance Claims .......... 12

I. The Trustee's Fiduciary Duty Claims .......... 13

J. Rodney Omanoff's Compromised Testimony .......... 14

III. LEGAL STANDARDS .......... 15

A. Jurisdictional Statement .......... 15

B. Standard for Summary Judgment .......... 15

IV. THE MERITS OF THE TRUSTEE'S AVOIDANCE CLAIMS FAIL .......... 16

A. The Trustee's Section 544, 547, 548 and 550 Claims Fail Because the Trustee Cannot Show that the Challenged Transfers Were Made With an Interest of the Debtor in Property .......... 16

1. The Debtor could not have used one dollar of the "transfers" to pay any of its creditors .......... 17

2. Every transfer from the Debtor's Operating Account was paid in accordance with the parties' contracts, and no evidence shows any "recycling" or "recirculation" of funds .......... 20

3. Bank records show a proper factoring business .......... 25

B. The Trustee's Section 549 Claims Fail as a Matter of Law .......... 28

C. The Trustee's Claim that the Debtor was a Ponzi Scheme and Therefore that the Ponzi Presumption Should Apply to His Claims Fails as a Matter of Law .......... 29

1. There Was No "Funneling" of Money Between Parties .......... 30

2. The Debtor Had a Single Investor .......... 30

3. A "Ponzi-like" Scheme Cannot Obtain a Ponzi Presumption .......... 31

D. The Trustee Cannot Show that the Debtor Incurred Any Damages as a Result of Alleged Breaches of Fiduciary Duties .......... 32

V. CONCLUSION .......... 34

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aalfs v. Wirum (In re Straightline Invs.)*,
525 F.3d 870 (9th Cir. 2008) ... 19

*Alexander v. Compton (In re Bonham)*,
229 F.3d 750 (9th Cir. 2000) ... 30

*Aliera LT, LLC v. Wells Fargo Bank, N.A. (In re Aliera Cos.)*,
2025 WL 2599852, 2025 Bankr. LEXIS 2227 (Bankr. N.D. Ga. Sept. 5, 2025) ... 32

*Am. Cancer Soc'y v. Cook*,
675 F.3d 524 (5th Cir. 2012) ... 30, 32

*Bartson v. Marroquin (In re Marroquin)*,
441 B.R. 586 (Bankr. N.D. Ohio 2010) ... 31

*In re Bullion Reserve of North America*,
836 F.2d 1214 (9th Cir. 1988) ... 17, 18, 23, 24

*Butner v. United States*,
440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ... 17

*Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*,
437 F.3d 457 (5th Cir. 2006) ... 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ... 16

*Cheung v. Daley*,
35 Cal.App.4th 1673 (1995) ... 34

*In re Consolidated Pioneer Mortg. Entities*,
166 F.3d 342 (9th Cir. 1999) ... 19

*Cooper v. Centar Investments Ltd. (In re TriGem Am. Corp.)*,
431 B.R. 855 (Bankr. C.D. Cal. 2010) ... 19

*In re Costas*,
555 F.3d 790 (9th Cir. 2009) ... 17

*Davis & Cox v. Summa Corp.*,
751 F.2d 1507 (9th Cir. 1985) ... 33

*De La Pena Stettner v. Smith (In re IFS Fin. Corp.)*,
669 F.3d 255 (5th Cir. 2012) ... 23

*Donell v. Mojtahedian*,
976 F. Supp. 2d 1183 (C.D. Cal. 2013) ..... 16

*Ehrlich v. Commercial Factors of Atlanta*,
567 B.R. 684 (N.D.N.Y. 2017) ..... 31

*In re Flooring Concepts, Inc.*,
37 B.R. 957 (9th Cir. B.A.P. 1984) ..... 28, 29

*In re Fuqua Indus., Inc.*,
2005 WL 1138744, 2005 Del. Ch. LEXIS 60 (Del. Ch. May 6, 2005) ..... 33

*Hirsch v. Arthur Andersen & Co.*,
72 F.3d 1085 (2d Cir. 1995) ..... 31

*Houghton v. South*,
965 F.2d 1532 (9th Cir. 1992) ..... 16

*In re Indep. Clearing House Co.*,
77 B.R. 843 (D. Utah 1987) ..... 30

*Kirkland v. Rund (In re EPD Inv. Co., LLC)*,
114 F.4th 1148 (9th Cir. 2024) ..... 29, 30, 31

*Krommenhoek v. A-Mark Precious Metals, Inc. (In re Bybee)*,
945 F.2d 309 (9th Cir. 1991) ..... 18

*Kupetz v. United States (In re California Trade Technical Schools, Inc.)*,
923 F.2d 641 (9th Cir. 1991) ..... 17, 18

*Laser Tone Bus. Sys., LLC v. Del. Micro-Computer LLC*,
2019 WL 6726305, 2019 Del. Ch. LEXIS 1393 (Del. Ch. Nov. 27, 2019) ..... 33

*Pearlman v. Reliance Ins. Co.*,
371 U.S. 132, 83 S. Ct. 232, 9 L. Ed. 2d 190 (1962) ..... 24

*In re Pioneer Liquidating Corp.*,
211 B.R. 704 (S.D. Cal. 1997) ..... 19

*Rainsdon v. Davisco Foods Int'l, Inc. (In re Azevedo)*,
497 B.R. 590 (Bankr. D. Idaho 2013) ..... 28

*Ravenswood Inv. Co., L.P. v. Estate of Winmill*,
2018 Del. Ch. LEXIS 96, 2018 WL 1410860 (Del. Ch. Mar. 21, 2018) ..... 34

*RBC Cap. Markets, LLC v. Jervis*,
129 A.3d 816 (Del. 2015) ..... 33

*SEC v. Management Solutions, Inc.*,
2013 WL 4501088, 2013 U.S. Dist. LEXIS 120277 (D. Utah Aug. 22, 2013) ..... 32

*In re Slatkin*,
525 F.3d 805 (9th Cir. 2008) ..... 30

*Spear v. Global Forest Prods. (In re Heddings Lumber & Bldg. Supply)*,
228 B.R. 727 (9th Cir. BAP 1998) ..... 24

*Stephenson v. Capano Dev., Inc.*,
462 A.2d 1069 (Del. 1983) ..... 34

*In re Tag Entm't Corp.*,
2016 WL 5947304, 2016 U.S. Dist. LEXIS 146406 (C.D. Cal., Oct. 5, 2016) ..... 18

*Templeton v. O'Cheskey (In re Am. Hous. Found.)*,
785 F.3d 143 (5th Cir. 2015) ..... 32

*Tzung v. State Farm Fire & Casualty Co.*,
873 F.2d 1338 (9th Cir. 1989) ..... 16

*Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Incomnet, Inc.)*,
463 F.3d 1064 (9t h Cir. 2006) ..... 9

*Weil v. United States (In re Tag Entm't Corp.)*,
2016 WL 1239519, 2016 Bankr. LEXIS 982 (Bankr. C.D. Cal. March 29, 2016) ..... 18, 22, 29

**Statutes**

11 U.S.C. § 549 ..... 13, 28, 29, 35

11. U.S.C § 549(a) ..... 28

Civ. Code, § 3439.01, subd. (1)(a) ..... 19, 20

**Rules**

Fed. R. Civ. P. 56(a) ..... 16

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

For four-and-a-half five years, this Court has been told repeatedly that VoIP Guardian Partners I, LLC (the "Debtor") ran a fake telecom factoring business where funds borrowed from Direct Lending Income Fund, LP ("DLI"), were "recirculated" and "recycled" in the style of a Ponzi scheme.

For those same years, Defendants have waited for the Trustee to produce evidence that would prove his allegations, since his allegations have no connection to their own understanding of the Debtor, and no connection to their own separate telecom business interests.

Discovery is now over, the relevant evidence is remarkably plain though voluminous, and the lack of evidence supporting the Trustee's allegations and claims for relief is even plainer.

VoIP Guardian LLC's factoring business collapsed because two entities that owed a combined approx. $170 million on factored invoices – Indigo11 Services and IKBS – failed to pay the invoices and disappeared. The Trustee claims that it was the finale to a massive multi-year conspiracy. But bank records show that throughout the Debtor's operations, until January 2019, each transfer that was sent from the Debtor's account to a factoring client was paid to the entity that was supposed to receive it under the parties' contracts, whether that was the client itself, or the "Approved Terminator" that was the next VoIP telecom company in the chain of transmission. And bank records show that when the factored invoices were paid to the Debtor's accounts, they were paid by the "Approved Originator" obligated to pay the invoices, with their own "new" money.

The Trustee has no evidence to show that funds transferred out of the Debtor's accounts were somehow "recirculated" to Indigo11 or IKBS, or any other "Approved Originator," for payment back to the Debtor's account in furtherance of a "Ponzi" scheme. Bank records show that the factoring business run by VoIP Guardian LLC for three years, using the Debtor as its SPV, operated just as it was intended and just as it was documented. The Trustee's litigation theory of "recirculation" is not based on evidence, but on a *lack* of evidence, and an apparent belief that he can substitute speculation for evidence to fill this gap.

If any funds sent from the Debtor's account to a factoring client were instead transferred to

one of these Defendants or any other incorrect recipient, the ultimate terminator of the VoIP traffic would not continue to carry the traffic because of non-payment. Every party in the transmission chain would receive a signal indicating that the calls were not completed, and the consequences would be immediate. In other words, the multi-year scheme that the Trustee has imagined in his Complaint would collapse in a day.

The only way the Trustee's "scheme" could work would be if every company in the VoIP telecom chains for every factored relationship – dozens and dozens of companies throughout the world, large and small – were an active part of the scheme, and perpetuated that scheme for five years or more, dating back to the Debtor's predecessor that first ran DLI's factoring business.

But there are no bank records that support the Trustee's allegations, as there are no bank records or other relevant and admissible evidence documenting "recirculation" or "recycling" of funds from the terminating side of the factoring equation around to the originating side of the factoring equation. Because each factoring transaction was carried out as intended, there were no other funds of the Debtor transferred out of the multi-party DealDefenders escrow account to any of these Defendants. Without question, each of these Defendants carried out other telecom business using the same DealDefenders escrow account, as they had been doing long before the Debtor even existed; just as dozens of other telecom companies had used the same DealDefenders account, depositing, transferring and withdrawing funds – *none* of which were the Debtor's.

The Trustee's case is not built on evidence of "recirculated" funds. Rather, the Trustee hopes to circumvent his burden by convincing this Court that the "scheme" he has alleged is far too confusing to document, and by convincing this Court to rule without evidence that every dollar transferred into and out of every DealDefenders account be declared property of the Debtor.

It is a theory that fails as a matter of uncontroverted evidence and as a matter of law. The Trustee is pushing his "Ponzi" scheme theories because it is the only path he has to any possible recovery. If the Court can presume "recirculation" of funds despite a complete lack of evidence, and therefore find that the Debtor was a "Ponzi" scheme, the Trustee can benefit from certain presumptions that he cannot obtain by evidence alone.

But the requirements for a Ponzi scheme are exacting and they cannot include a business

where there is zero evidence of alleged "recycled" funds, nor where there was only a single investor or lender. The Ninth Circuit has never endorsed the Trustee's theory that there is a "close enough" rule for Ponzi scheme presumptions.

All evidence shows that the "Approved Originator" entities paid factored invoices with new funds – *their* funds. The Trustee's mantras of "recycled" funds and "fake CDRs" and "masterminds" running a "Ponzi" scheme have sustained his case through to the end of all discovery. But now, evidence – or a complete lack of evidence – must take precedence over litigation theatrics.

The Trustee's lack of evidence is particularly striking with respect to his claims for avoidance of alleged post-petition transfers that two Defendants received from the business they conducted through a second DealDefenders escrow account that was opened shortly before the Debtor ceased business. The same bank statements that the Trustee would have consulted to tabulate the amounts of the challenged transfers show on their face that no funds were ever transferred into that escrow account from any account of the Debtor, directly or indirectly.

No one disputes that a large amount of DLI's money was lost when Indigo11 and IKBS failed to pay large invoices in early 2019. Those two U.K. companies disappeared, as did the Hong Kong entity that owed funds to each of them for the same VoIP traffic. But there is, or course, zero evidence connecting those entities to these Defendants, and zero evidence those entities were "recirculating" factoring payments at any time.

A lack of evidence is not the only fatal flaw to the Trustee's claims, as they also fail under the law. The DLI loan proceeds that were used to pay factoring clients were never funds that the Debtor could have used to pay a single creditor of its choosing. And for that reason alone, the Trustee's avoidance claims fail as a matter of law.

For similar reasons, the Trustee's fiduciary duty claims also fail. Every dollar that was lost when the Debtor's business collapsed was DLI's collateral. The Debtor never had any property of its own that wasn't DLI's collateral, and the Debtor never had one dollar that it could have paid to any other creditor. If every invoice had been paid in full, and the Debtor had repaid DLI's secured loan, its bank balance would still have been "$0.00," because the Debtor never had any funds of its

own by design. It was always intended to serve as a conduit for a single lender's segregated investments. Any recovery of "damages" by this Debtor would be the sort of windfall that is not permitted for compensatory damages, as it would provide the Debtor with funds that it had never had, did not lose, and could never had used to pay creditors even if the funds had sat in its accounts. Compensatory damages can only compensate a plaintiff's actual loss, not the loss of collateral passing through a conduit's accounts.

The Trustee's Second Amended Complaint fails as a matter of law because the evidence shows that no funds belonging the Debtor were paid to these Defendants instead of factoring clients identified in the Debtor's Factoring Agreements, because none of the funds could have been used to pay any creditors of the Debtor's choosing, and because the Debtor was a mere conduit for DLI's investments that never lost anything it could have used to pay another creditor.

## II. FACTUAL BACKGROUND

The following factual background is derived from the Statement of Uncontroverted Facts filed herewith (the "SUF"), and each citation to such facts appears as "SUF ¶ *xx*."

### A. The Debtor's Business and Operating Agreements

On September 25, 2015, Rodney Omanoff caused the incorporation of VoIP Guardian, LLC. SUF ¶ 1. On October 9, 2015, Mr. Omanoff caused the incorporation of the Debtor as a subsidiary limited liability company, and special purpose vehicle. SUF ¶ 2.

The Debtor served as the vehicle for factoring investments made by DLI. SUF ¶ 6.

### B. DLI's Funding Arrangements

#### 1. The Loan Agreement

DLI's factoring investments were funded under a Loan and Security Agreement (the "Loan Agreement"), dated October 1, 2015, between Direct Lending Income Fund, LP, by and through Millenium Trust Company, LLC FBO Direct Lending Income Fund, LP (collectively, and with other affiliates, "DLI") as "Lender," and the Debtor as "Borrower," with initial available credit of $20,000,000 (the "Maximum Facility Amount"). SUF ¶¶ 10-11. The Loan Agreement authorized the Debtor to use the DLI funds for only two purposes: (i) to engage in the VoIP factoring business by purchasing "Eligible Collateral Assets," or (ii) to repay DLI's note. SUF ¶ 12. The definition

of "Eligible Collateral Assets" states that any such loans required DLI's approval, which means that DLI loan proceeds could only be used by the Debtor to fund factoring deals approved by DLI, or to repay DLI. SUF ¶ 13. The Loan Agreement was amended on five occasions, primarily to increase the Maximum Facility Amount in various stages to $250,000,000, and to revise various terms related to DLI's collateral and security interest. SUF ¶¶ 16-24.

By the Loan Agreement, and again by the Third Amendment to the Loan Agreement, dated April 1, 2017, the parties confirmed that all DLI funds would be held in segregated accounts, subject to a Deposit Account Control Agreement, defined as "an agreement providing the Lender with control over the Segregated Account within the meaning of Section 104(a)(2) of the UCC, in a form acceptable to the Account Bank, as applicable." SUF ¶¶ 14 and 20.

The Loan Agreement provided that the Debtor would be the owner of the loan proceeds. SUF ¶ 27. This is merely a necessary term to provide the Debtor with a sufficient legal interest to grant DLI a security interest, rather than proceed under a bailment or trust relationship.

### C. <u>DLI Controlled All Disbursements of DLI's Loan Advances</u>

The funds that DLI deposited into the Debtor's DACA-controlled and segregated "Operating Account" at First Republic Bank ("<u>FRB</u>") ending in 9399 (the "<u>Operating Account</u>"), could not be used by the Debtor for any purpose of its own. The Debtor could not transfer the funds to a factoring client, could not transfer the funds between accounts, and could not withdraw any funds to purchase anything such as office supplies. SUF ¶¶ 38-48.

Under a procedure established with FRB, funds could only be transferred from the Operating Account, or transferred between the Debtor's FRB accounts, if DLI's Controller, Mandy Isaac (the "<u>DLI Controller</u>"), logged onto the FRB website, approved proposed transfers, and physically clicked the correct buttons to release the transfer, in the case of U.S. dollar transfers. SUF ¶¶ 42-44. In the case of Euro transfers, FRB did not have the website availability for wire transfers, and so any transfers of Euros were approved by a telephone call or email between an FRB representative and the DLI Controller. SUF ¶ 43.

The DLI Controller, the Debtor's own Controller, and Rodney Omanoff, the majority owner, and CEO/COO of VoIP Guardian, LLC, have confirmed in depositions in this case that the

Debtor had no dominion over DLI's funds, as the Debtor could not use even one dollar of the DLI funds to purchase office supplies, or any other item, unless the DLI Controller caused the withdrawal to happen. SUF ¶¶ 38-48.

**D. The DLI Stipulation**

Early in the Debtor's chapter 7 case, the Trustee confirmed by a sworn declaration that because DLI has a perfected security interest in all of the Debtor's assets, the estate had no interest in any recoveries of the DLI funds that could be shared with unsecured creditors, absent a deal with DLI to share recoveries with the estate:

> Prior to agreeing to the terms of the Stipulation, my counsel and I conducted an independent investigation on the validity of the DLI Fund's claim against the Estate. My counsel ran a search for any and all UCC filings related to the Debtor and in so doing, confirmed that DLI Fund is the only creditor with a security interest in the Debtor's assets. My counsel also confirmed that the UCC's requirements for the creation and attachment of DLI Fund's security interest had been satisfied and that **DLI Fund's security interest was properly perfected**. …
>
> Indeed, **without the agreement with DLI** Fund and based upon the available assets in this Estate, **there is no avenue for the Estate's unsecured creditors to receive any distribution whatsoever** – let alone the 30% provided for under the Stipulation. The Estate's assets are fully encumbered by DLI Fund's $203,459,871.69 secured claim.

SUF ¶¶ 31-35 (the "Yoo Declaration") (emphasis added). The Trustee's counsel, Andy S. Kong, also submitted a declaration testifying, among other things, that he and his associate had researched and confirmed that DLI's security interest was properly perfected. SUF ¶¶ 33 and 36.

DLI's perfected security interest covers "[a]ll assets of the Debtor," with specific reference to "accounts," "deposit accounts," "commercial tort claims," "cash proceeds," "accounts receivable," "rights to payment of any and every kind," and "other forms of obligations and receivables," among other categories. SUF ¶¶ 25 and 28.

**E. The Factoring Clients**

In the words of Mr. Omanoff, the business of "VoIP Guardian LLC" was to provide "trade finance and factoring services to selected small and medium-sized Wholesale Telecom Carriers that have been granted Carrier Service Agreements to engage in the routing and termination of international calls and other communication services for major Tier 1 Telecom Carriers and other Originators of traffic." SUF ¶ 100.

In each factoring relationship, the Debtor and the "Wholesale Telecom Carrier" signed a Factoring Agreement that laid out the terms for the financing. SUF ¶¶ 105, 136, 164, 184, 202, 221, 245, 271, 293, 311, 335, 350. Each contract identified the "Approved Originator" that was liable for the factored invoices. For example, the Debtor and TelAcme Limited ("TelAcme") signed a *Factoring Agreement Between TelAcme Limited and VoIP Guardian Partners I, LLC* (the "TelAcme Factoring Agreement") as of August 22, 2016, providing for the factoring of TelAcme's wholesale telecom invoices. SUF ¶ 136. The TelAcme Factoring Agreement identifies Indigo 11 Services ("Indigo11") as the "Approved Originator" for TelAcme's factored invoices. SUF ¶ 138.

Factoring Agreements, or related notices, often identified an "Approved Terminator" that was authorized to receive the factoring financing as the next terminator in the VoIP wholesale chain of traffic and payments. For example, the TelAcme Factoring Agreement identifies AcornTech Limited ("AcornTech") as the "Approved Terminator" for TelAcme's factoring transactions. SUF ¶ 138. In other cases, an "Approved Terminator" was identified after the signing of the Factoring Agreement. For example, the Debtor and HILF Telecom, B.V. ("HILF") signed a *Factoring Agreement Between HILF Telecom, B.V. and VoIP Guardian Partners I, LLC* (the "HILF Factoring Agreement") as of March 10, 2016, which identified BT Nederland, NV ("British Telecom") as the "Approved Originator" for HILF's factored invoices. A few months later, HILF sent two letters to the Debtor, first designating HCT VoIP BV ("HCT") as an "Approved Terminator," and then replacing HCT with MYCORE-4-WHOLESALE BV ("MyCore") as the "Approved Terminator," and authorizing the Debtor to make direct payment to both entities of amounts owed by HILF to HCT and MyCore. SUF ¶¶ 224 and 225.

With one exception authorized by Mr. Omanoff, each factoring client also signed a Notice of Assignment addressed to the Approved Originator, assigning the right to payment of factored invoices to the Debtor, and identifying the account for deposit of payments by the "Approved Originator." SUF ¶¶ 113, 142, 168, 190, 207, 228, 251, 276, 298, 317, 340, 354.

## F. Payment of Factoring Invoices

Each night, either Mr. Omanoff or VoIP Guardian, LLC's Controller, Kenneth Delgado, received a "Daily Statement" from the software program operated by Zoom Telecom ("Zoom")

detailing the total VoIP telecom minutes to be factored for that day's traffic. SUF ¶¶ 118, 147, 174, 195, 212, 236, 258, 283, 304, 325, 345, 357. Mr. Omanoff or Mr. Delgado would then set up the wire transfers on the FRB web portal for that day's traffic and send an email to the DLI Controller to inform her that there were wire transfers waiting for her approval and release. SUF ¶ 39.

If the DLI Controller approved the transfers upon her review the following morning, she would click the necessary box and buttons on the FRB web portal for the Debtor's bank accounts, and release the funds to the factored clients. SUF ¶ 42.

In nearly all cases, the funds were transferred through a multi-client third-party escrow platform called DealDefenders, LLC ("DealDefenders"). In two cases – TelAcme and Najd Technologies, Ltd. ("Najd") – the first few months of payments were made directly to their respective accounts, until each established an account relationship with DealDefenders. SUF ¶¶ 117-18, and 148-149. The factoring payments were sent to a single DealDefenders Bank of America account, ending in 5992 (the "DD Account 5992") that served as DealDefenders' main escrow account for U.S. dollar transactions by dozens of different telecom clients. SUF ¶¶ 118, 149, 172, 193, 210, 231, 255, 280, 302, 323, 343, 347, 355. By acting as a multi-party escrow account, the DealDefenders platform could perform instant ledger transfers between clients, allowing for immediate payment of invoices. SUF ¶ 119. This allowed funds that were transferred from the Debtor's account to DD Account 5992 to be transferred to the next "terminator" client in the chain of payments and transmission by an immediate ledger transfer or transferred out of DD Account 5992 to a recipient's account at another bank.

For example, each factoring payment for TelAcme was paid from the Debtor's account ending in 9399 (the "Operating Account") into DD Account 5992 (once TelAcme became a client of DealDefenders). SUF ¶ 149. But for a small percentage retained by TelAcme, nearly all of each payment was then sent to the next entity in the payment and transmission chain, AcornTech, who was identified in the TelAcme Factoring Agreement as its "Approved Terminator." AcornTech had each payment transferred to its separate bank account. SUF ¶¶ 139 and 151-153.

Najd also identified an "Approved Terminator" in an amended Factoring Agreement, Brightwork Tel ("Brightwork"), and its obligations to Brightwork were addressed by internal ledger

transfers in DD Account 5992, and then Brightwork would transfer its own obligations to the next terminator in the chain based on invoices that it received in turn. For example, on June 1, 2017, a factoring payment in the amount of $968,031.63 was transferred to Najd from the Debtor's Operating Account to DD Account 5992. That same day, Brightwork transferred $965,068.85 to Softizo Tech ("Softizo"), an entity that was next in the transmission and payment chain, based on invoices that Softizo delivered to Brightwork. SUF ¶¶ 121-122. Such transfers were consistent throughout the Debtor's entire factoring relationship with Najd. SUF ¶ 127.

In some cases, the factoring client identified its "Approved Terminator" and authorized the Debtor to make direct payment to those terminators, avoiding the need for any DealDefenders transfers. An example is HILF, which designated two successive companies as its "Approved Terminators" – HCT and then MyCore. The Debtor divided each factoring payment in advance according to traffic statements submitted by each entity to Mr. Omanoff to support their share of proceeds, paid HILF only the profit that HILF would retain, and then paid the amount due to HCT or MyCore for their services in the chain of transmission. SUF ¶¶ 224-25, 231-34.

As another example, the Debtor had five Factoring Agreements with five separate companies that provided terminating services for Wavecrest (UK) Limited ("Wavecrest"). In each case, bank records show that the factoring payments were made from the Debtor's Operating Account to each of the factored clients' accounts at DealDefenders. SUF ¶¶ 193, 255, 280, 302, 322-23. Although the Trustee has sued Wavecrest, alleging that certain invoices of two factored clients were not paid in full, bank records show that each factored invoice due from early 2016 through the end of 2018 was paid by Wavecrest. SUF ¶¶ 200, 268-69, 291, 309, 333.

One of the Trustee's favorite entities to discuss is Arco Telecom, Limited ("Arco"), an entity formerly owned by Mr. Proto. The Trustee has routinely claimed that Arco was a central figure in the "recycling" of tens of millions of dollars originating from the Debtor's accounts. But as bank records and the Debtor's own records demonstrate, Arco was a very small factoring client.

Arco is owned by Mr. Proto and was engaged in substantial VoIP telecom wholesale business long before the Debtor was even incorporated, including under a Reciprocal Telecommunications Services Agreement that Arco entered into with Phonetime in 2014. SUF ¶

171. Eight months after the Debtor was incorporated, Arco entered into a Factoring Agreement with the Debtor in June 2016, but factored only five months of its traffic with the Debtor – four months in 2016, and a portion of March 2017. SUF ¶¶ 164, 176. Arco's factored transactions resulted in payments from the Debtor's Operating Account to Arco via DD Account 5992 of $18.3 million for those factored months – accounting for less than 1% of the Debtor's entire factoring payments over three years of operations. SUF ¶ 183. And the factored invoices were paid in full with profit by Phonetime's parent, Tellza Corporation, with $19.3 million in payments back to the Debtor's Collection Account. *Id.* The factoring relationship ran as the contracts required, it was profitable for the Debtor, and there are no other transfers from the Debtor's accounts to Arco that appear in any bank records.

This is the structure that was established by the Debtor's Factoring Agreements and by the Debtor's Loan Agreement with DLI. And it is the structure that was carried out for the entirety of the Debtor's operations. Contrary to the Trustee's repetitive allegations of "recycled" funds, there are no bank records that show any circular transfers of funds from the Debtor's Operating Account through DD Account 5992, and then around to any of the "Approved Originators" who paid the factored invoices into the Debtor's Collection Account. SUF ¶¶ 87, 134, 162, 182, 201, 220, 270, 292, 310, 334, 349.

Do we know who Softizo paid after it was paid by Najd and Brightwork, or who AcornTech paid after it was paid by TelAcme? No, because the Trustee has not obtained any of those "Approved Terminators'" bank records. The Trustee tries to fill this gap with speculation. But the bank records he has obtained and produced show that outgoing payments from the Debtor's Operating Account went to the proper and intended recipients. If Softizo or AcornTech had not paid the next terminating entity in the chain of VoIP traffic transmission, the traffic would have stopped, and the entities who paid the factored invoices would not have received a "200 OK" signal indicating that their traffic was properly terminated. SUF ¶ 104. If the traffic was not terminated, the Originators would have not have paid invoices for the services. Instead, the "Approved Originators" paid the invoices because the "Approved Originators" received the appropriate signal on their switches to confirm that their traffic was being connected as their contracts required.

In other words, the system ran as it was supposed to run for more than three years, until two Approved Originators – Indigo11 and IKBS (defined below) – failed to pay large invoices in January 2019.

**G. Collection of Factored Invoices**

Each month, the factoring client would send to Mr. Omanoff an invoice for the prior month's services between the factoring client and the Approved Originator, for payment by the Approved Originator to one of three accounts for the Debtor's benefit. The primary payment account was the Debtor's "Collection Account" at FRB ending in 6458 (the "Collection Account"). SUF ¶¶ 115, 132, 144, 181, 200, 230, 242, 253, 269, 278, 291, 300, 319, 333, 341, 348. In the case of the two Indigo11 entities – Indigo11 Services Ltd. ("Indigo11") and Indigo11 Services LLC ("Indigo11 LLC") – Mr. Omanoff set up a separate FRB account ending in 2260 (the "Indigo11 DACA Account") in order to obtain a Deposit Account Control Agreement over the deposits. SUF ¶ 156. And in the case of deposits in Euros, deposits were made to a "Vostro" account held by FRB at DeutscheBank, ending in 8900 (the "FRB Vostro Account"). SUF ¶¶ 83, 209, 219, 264, 268, 291, 300, 319, 362.

With only one material exception, each Approved Originator paid each factored invoice for more than three years of factoring operations by payment into the appropriate account of the Debtor, until Indigo11 and Ikarim Business Services, LLC ("IKBS") failed to pay amounts due under their respective invoices in January 2019, leading to the instant chapter 7 case. SUF ¶¶ 132, 159, 161.

That one material exception was BT Nederland NV's ("British Telecom") decision to stop payment on a factored invoice in 2017 after British Telecom raised concerns about the nature of the VoIP traffic it transmitted to HILF. SUF ¶ 242. The resulting investigation by Dutch authorities has fueled this Trustee's litigation. But despite years of investigation and serious allegations, a Dutch criminal court acquitted HILF and its principal of the VAT fraud charges in July 2025. SUF ¶¶ 243-44. Rather than continue the Debtor's prepetition defense of British Telecom's and Dutch authorities' allegations, the Trustee abandoned the Debtor's defense and signed a settlement agreement with Dutch prosecutors in 2024 to recover about one half of the withheld funds in exchange for stating that he has no evidence to contest the allegations of VAT fraud. SUF ¶ 242.

Other than the British Telecom exception, and until January 2019, the Approved Originators paid factored invoices with their own funds. Payments were <u>not</u> made through DealDefenders, despite the Trustee's allegations claiming that DealDefenders was the facilitator of a "recycling" of funds. Rather, FRB bank statements for the Debtor's Collection Account, the Indigo11 DACA Account, and the FRB Vostro Account, show payments made to the Debtor by the Approved Originators or their payment platform (escrows other than DealDefenders). SUF ¶¶ 132, 133, 158-61, 181, 200, 219, 242, 268-69, 291, 309, 333, 348, 362. To give one example of how bank records document the payments, the December 2016 statement for the Debtor's Collection Account, and FRB wire transfer confirmation pages for the FRB Vostro Account shows payments made by British Telecom, IKBS, Wavecrest, Indigo11, and Tellza Inc. (the parent company of Phonetime), as well as transfers from the Indigo11 DACA Account that had received payments from Indigo11 – paying every factored invoice that the Debtor had under then-pending Factoring Agreements. SUF ¶¶ 130, 157, 178, 198, 216-17, 240, 360.

Nowhere in these bank records is there any evidence that any funds paid out from the Debtor's Operating Account were somehow "recycled" or "recirculated" from the factored entity to the "Approved Originator" for payment back to the Debtor.

Transfers that any of these Defendants made into DD Account 5992, or received from DD Account 5992, were not funds belonging to the Debtor, because any funds transferred from the Debtor's Operating Account went to their intended recipients. Any other transactions that other DealDefenders clients transferred through DD Account 5992 were transactions involving their own funds. The Trustee cannot show otherwise, so he has argued that the Debtor's entire business was a "Ponzi" scheme based on fictional "recirculation" of funds, he has argued that all funds in the third-party DD Account 5992 must have belonged to the Debtor no matter how many dozens of companies used the same escrow platform, and therefore, he has argued, all business conducted by these Defendants must be business that received the Debtor's funds. Evidence says otherwise.

**H. <u>The Trustee's Avoidance Claims</u>**

The Trustee filed his operative Complaint on August 17, 2021. SUF ¶ 88. The Complaint's claims for relief that name one or more of the Defendants fall into two primary categories.

The Trustee has sued certain Defendants for a variety of avoidance claims under 11 U.S.C. §§ 544(b), 547, 548, and 550 (the "Avoidance Claims"), theorizing that funds going in and out of DD Account 5992 must have been the "Debtor's" funds at all times. SUF ¶¶ 89-95. The Trustee has also alleged an Eighth Claim for Relief for Avoidance of Post-Petition Transfers under 11 U.S.C. § 549 (the "Section 549 Claim") against two of these Defendants: Mr. Proto and Tee Telecommunications. The Trustee's Complaint alleges that Mr. Proto received $676,970.00 between April 8, 2019 and September 15, 2020 from DealDefenders's Citibank account ending in 2558 (the "DD Citi Account 2558"), and that Tee Telecommunications received $680,449.06 between April 12, 2019 and July 20, 2020 from DD Citi Account 2558. SUF ¶¶ 96, 364-65.

DealDefenders opened DD Citi Account 2558 in November 2018. SUF ¶ 366. There are no deposits to be found on any of the Citibank account statements for DD Citi Account 2558 that show any transfers into the account from any of the Debtor's accounts, from DLI, or from VoIP Guardian, LLC, whether prior to or after the Petition Date. SUF ¶¶ 367-69. Because there were no payments by the Debtor or the chapter 7 estate into DD Citi Account 2558, transfers made from this multi-party escrow account cannot have been transfers of the post-petition estate.

## I. The Trustee's Fiduciary Duty Claims

The Trustee has also pleaded two fiduciary duty claims. He has sued Mr. Rahman and Mr. Proto for having allegedly "breached their fiduciary duties as both directors and officers of the Debtor," even though neither was a director nor officer of the Debtor. SUF ¶ 89 (the "Direct Fiduciary Duty Claim"). And the Trustee asserts a claim against Mr. Rahman, Mr. Proto and Zoom-Tel for aiding and abetting Mr. Omanoff's alleged breach of fiduciary duties "[t]o the extent they did not owe direct duties of care and loyalty to the Debtor." SUF ¶ 90 (the "Aiding and Abetting Claim") (collectively, the "Fiduciary Duty Claims").

As addressed below, the Debtor was a conduit for DLI's loan proceeds, and the loss of DLI's collateral passing through the Debtor's accounts is not "injury" to the Debtor that can be recovered as compensatory damages. The Debtor had no property to lose, and it lost no property of its own. The Trustee's Fiduciary Duty Claims lack the necessary element of damage to a conduit that had no property of its own that it could have used to pay any creditor of its choosing.

**J. <u>Rodney Omanoff's Compromised Testimony</u>**

Rodney Omanoff was the majority owner of VoIP Guardian, LLC, its CEO/COO, and the sole member of its Board of Managers. SUF ¶¶ 3-5, 102. He had complete control over the Debtor's financial and contractual transactions. SUF ¶ 103.

Yet when the Trustee and Mr. Omanoff entered into a Settlement Agreement in November 2023, Mr. Omanoff agreed to state in the settlement that he "now believes" that the Debtor did business with "empty shells" based on "fraudulent reports," and therefore "the Debtor did not generate legitimate profits." SUF ¶ 78. The reason Mr. Omanoff would be willing to claim that he unwittingly ran a fraudulent scheme is connected to his decision in 2015 to push a former partner out of the business of factoring DLI's funds, and incorporate VoIP Guardian, LLC in its place.

Prior to 2015, DLI's factoring investments had been handled by Mr. Omanoff's prior entity, Talking Capital LLC ("<u>Talking Capital</u>"). SUF ¶ 7. The motivation to incorporate VoIP Guardian, LLC and the Debtor was Mr. Omanoff's belief that Forefront Partners, LLC ("<u>Forefront</u>") and its owner Bradley Reifler ("<u>Reifler</u>"), one of the partners in Talking Capital, was engaged in fraudulent activity. SUF ¶ 8. Forefront was not permitted to become an owner of VoIP Guardian, LLC when DLI's investment business was transferred to VoIP Guardian, LLC and Debtor. SUF ¶ 9.

Mr. Reifler, through Forefront, sued Mr. Omanoff, as well as Mr. Proto and Mr. Rahman, in the New York Supreme Court, Index No. 650973/2017, asserting an interest in the Debtor's profits since he had introduced DLI to Talking Capital. SUF ¶¶ 63-66. Mr. Proto and Mr. Rahman settled the Forefront claims early, but Mr. Omanoff went to trial. He tried to testify before the New York Jury that there were no profits to pay to Forefront/Reifler because he now understands that the company was a fraudulent scheme all along. SUF ¶ 67.

The jury didn't buy this testimony from the Debtor's CEO/COO and majority owner, and entered a judgment against him and in favor of Forefront for $36,732,540.87 in unpaid profits, interest, and costs. SUF ¶ 68. Forefront amended its proof of claim in this case to assert the judgment, giving Forefront an unsecured claim that amounts for more than 99.5% of the unsecured creditor pool (SUF ¶ 69) – assuming that any of the other claims of unsecured creditors would be allowed and paid, which is highly questionable. The Forefront judgment was reversed on an

intermediate appeal and remanded to permit Mr. Omanoff to present further defenses, but it remains subject to a further appeal and a potential retrial. SUF ¶ 70. With Forefront accounting for more than 99.5% of unsecured claims by value, this chapter 7 Trustee who has a duty to work for the benefit of unsecured creditors is suing Mr. Proto to recover "fake" profits so that he can pay those "fake profits" to another who holds a claim for the same dollars, but as actual profits. If Mr. Reifler had remained a partner of VoIP Guardian, LLC, he would now be a defendant, being sued by the Trustee to return his "fake" profits, instead of a beneficiary to receive clawed-back "fake" profits as his own share of actual profits. It is a legal quandary of the Trustee's own making.

Because of Forefront's litigation, Mr. Omanoff could potentially save himself tens of millions of dollars if he can help convince this Court that he unwittingly ran a "Ponzi" scheme, despite being in complete control of the company's finances and contracts. If the Debtor was a "Ponzi" scheme, then he can tell a future New York jury over hearsay objections that this Court has backed up his claim that he can't owe real profits to Forefront, because the Debtor only had "fake" profits.

Mr. Omanoff's statements are not evidence that the Debtor was a "Ponzi" scheme. They are evidence of Mr. Omanoff's bias, and the Trustee's willingness to exploit that bias.

## III. LEGAL STANDARDS

### A. Jurisdictional Statement

This Court has subject matter jurisdiction to rule on this Motion pursuant to Fed. R. Civ. P. 56, and 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O), and 1334.

### B. Standard for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To meet their burden for summary judgment, Defendants need to demonstrate that there is an absence of evidence to support a necessary element of the Trustee's claims, which shifts the burden to the Trustee to show that there is a "genuine issue for trial," or alternatively, movants may demonstrate that the Trustee's claims are not based on valid interpretations of applicable

law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339-40 (9th Cir. 1989) (confirming whether district court "applied the relevant substantive law" to summary judgment motion); *Donell v. Mojtahedian*, 976 F. Supp. 2d 1183 (C.D. Cal. 2013) ("because Plaintiff bears the burden of proving a Ponzi scheme to be entitled to summary judgment he 'must come forward with evidence which would entitle [him] to a directed verdict if the evidence went uncontroverted at trial.'") (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

## IV. THE MERITS OF THE TRUSTEE'S AVOIDANCE CLAIMS FAIL

### A. The Trustee's Section 544, 547, 548 and 550 Claims Fail Because the Trustee Cannot Show that the Challenged Transfers Were Made With an Interest of the Debtor in Property

The Trustee's entire lawsuit is based on three false presumptions. The first is the presumption that Mr. Omanoff could have decided at any time to use DLI's loan proceeds to pay the claim of any unsecured creditor, such as Forefront's claim for profits, rather than repay DLI's secured loan. Aside from being a false presumption, it is a necessary element of any avoidance claim. DLI's Loan Agreement barred the Debtor from using DLI's funds for any purpose other than DLI-approved factoring purchases and repayments of DLI's loan, and DLI established controls over every dollar, ensuring that the Debtor could never have used a single dollar of DLI loan proceeds for any purpose such as paying the claim of another creditor. SUF ¶¶ 41-48.

That, alone, is fatal to the Trustee's claims.

The second false presumption underlying the Trustee's case is the presumption that every dollar (or Euro) that was ever paid to anyone from any DealDefenders escrow account is the property of the Debtor or its estate. It is a presumption that is contrary to all applicable law, as the DealDefenders accounts were utilized by dozens of telecom companies for deposits, transfers, and withdrawals. Any other transactions that also utilized the DealDefenders escrow platform involved the funds of third parties, which the Trustee cannot appropriate for payment of DLI's secured claim.

The third false presumption underlying the Trustee's case is the claim that the "Debtor's" funds were "recycled" to pay the factored invoices and thereby perpetuate a Ponzi-like scheme. It

is a presumption that is contrary to applicable law and refuted by all evidence, as all evidence demonstrates that DLI loan proceeds paid from the Debtor's accounts into any DealDefenders account were paid to the party designated in the Debtor's contracts. When transactions were not "recirculated," or pertained to a single lender, there can be no "Ponzi" scheme as a matter of law.

These three false presumptions are addressed as follows:

### 1. The Debtor could not have used one dollar of the "transfers" to pay any of its creditors

The most critical element of any trustee's avoidance claim is that the transferred funds were prepetition property of the debtor that could have been used by the debtor to pay any of its creditors. *Kupetz v. United States (In re California Trade Technical Schools, Inc.)*, 923 F.2d 641, 645 (9th Cir. 1991) (to avoid a transfer, a trustee or other plaintiff must "establish that the property involved was property of the debtor such that the transfer diminishes the fund from which bankruptcy creditors may be paid.")(preference avoidance); *In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir. 1988) (trustee may only avoid and recover funds that "could have been used to pay other creditors").

Although the Bankruptcy Code provides the definition of "transfer," the nature and extent of a debtor's interest in property is determined by reference to state law. *In re Costas*, 555 F.3d 790, 793 (9th Cir. 2009); see also *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law."). Funds transferred from a debtor's account are not avoidable and recoverable unless they were funds the debtor could have used to pay any creditor of its choice, and therefore such transfers diminished the pool of funds available for creditors. *In re California Trade Technical Schools,* 923 F.2d at 645; *Krommenhoek v. A-Mark Precious Metals, Inc. (In re Bybee)*, 945 F.2d 309, 315 (9th Cir. 1991) ("Property in which the debtor possessed only legal title cannot be recovered for the benefit of the bankruptcy estate."); *Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*, 437 F.3d 457, 459-60 (5th Cir. 2006) (a "trustee cannot avoid transfers of property unless the property would have been in the estate and therefore available to the debtor's general creditors").

The Trustee has the burden to come forward with evidence showing that the transfers he seeks to avoid were funds that belonged to the Debtor, and were transferred from one of the Debtor's accounts to the Defendants. *Weil v. United States (In re Tag Entm't Corp.)*, 2016 WL 1239519 *17, 2016 Bankr. LEXIS 982 (Bankr. C.D. Cal. March 29, 2016) ("if a plaintiff presents only attenuated links between the debtor and the ultimate transferee, the evidence is insufficient to make a showing under CUFTA"); adopted by, reference withdrawn by *In re Tag Entm't Corp.*, 2016 WL 5947304, 2016 U.S. Dist. LEXIS 146406 (C.D. Cal., Oct. 5, 2016). "Merely highlighting a series of allegedly irregular transfers is not sufficient to demonstrate that Debtor's funds were used to pay" challenged transfers. *Id*. 2016 WL 1239519 at *27.

DLI's loan proceeds were not deposited into some general, commingled account over which the Debtor had dominion. Rather, the DLI loan proceeds were held in a segregated account, and the DLI Loan Agreement barred the Debtor from using DLI's loan proceeds for any purpose other than: (i) factoring payments approved by DLI; or (ii) repayments to DLI. SUF ¶¶ 12-14. DLI also established protections to ensure that every dollar of its loan proceeds were used solely for factoring payments, and not for any other purpose such as a payment to any other creditor. DLI ensured that the Debtor's segregated bank accounts were subject to Deposit Account Control Agreements, and that every transfer out of any of the accounts – even an account-to-account transfer – could only be accomplished if the DLI Controller carried out it by logging onto the FRB web portal and clicking the necessary buttons on the webpage to approve and release the transfers. SUF ¶ 20, 42-45. Even when management fees, or profits, were paid to VoIP Guardian, LLC, they were transferred only if DLI agreed with the transfer, and only if DLI carried out the transfer on the FRB web portal to release its collateral to VoIP Guardian, LLC. SUF ¶ 44.

There is not one dollar of funds at issue in this case that the Debtor could have used to pay Forefront, pay <u>any</u> other creditor, or purchase office supplies. SUF ¶ 48. The Trustee himself acknowledged this simple fact in the Yoo Declaration at the outset of this case. SUF ¶ 35.

None of the funds that were owed by IKBS or Indigo11 in January 2019 could have been used to pay unsecured creditors. When IKBS and Indigo11 paid each factored invoice, each month prior to January 2019, the payments arrived in the Debtor's DACA-controlled Collection Account

as DLI's collateral. SUF ¶¶ 25-26. The Debtor could not use any of those funds for any purpose that was not approved and physically released by DLI. Any recovery of those funds now, by this chapter 7 estate to pay the same unsecured creditors the Debtor could never have paid, would be a "windfall" for unsecured creditors like Forefront, and therefore is an impermissible claim. *Cooper v. Centar Investments Ltd. (In re TriGem Am. Corp.)*, 431 B.R. 855, 863-64 (Bankr. C.D. Cal. 2010) (following *Aalfs v. Wirum (In re Straightline Invs.)*, 525 F.3d 870 (9th Cir. 2008) and dismissing avoidance claims because unsecured creditors would receive a "windfall" if they could recover funds in which "creditors would not otherwise have had any reasonable expectation" of receiving).

These cases are consistent with California's Uniform Voidable Transactions Act ("UVTA"), which bars the avoidance of any transfer of property "to the extent it is encumbered by a valid lien." Civ. Code, § 3439.01, subd. (1)(a). See also *In re Pioneer Liquidating Corp.*, 211 B.R. 704, 713 (S.D. Cal. 1997) ("The California fraudulent conveyance statute provides that property encumbered by a valid security interest is not subject to recovery under the state fraudulent conveyance statute"), aff'd *In re Consolidated Pioneer Mortg. Entities*, 166 F.3d 342 (9th Cir. 1999).

The Trustee understood this reality when he informed this Court, under oath, that "there was "no avenue for the Estate's unsecured creditors to receive any distribution whatsoever – let alone the 30% provided for under the Stipulation. The Estate's assets are fully encumbered by DLI Fund's $203,459,871.69 secured claim." SUF ¶¶ 34-35.

If DLI or its investors had filed a UVTA action against the Debtor and others to avoid the transfers of its loan proceeds, the Debtor would not have been the initial transferee of DLI's loan proceeds, but would have had a complete conduit defense, as it did not have dominion or control over funds that were fully encumbered and were transferred from its accounts by DLI's Controller. *Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Incomnet, Inc.)*, 463 F.3d 1064, 1070 (9t h Cir. 2006) (explaining that dominion test asks whether potential transferee "had legal authority over the money and the right to use the money however it wished"). Yet somehow the Trustee has managed to turn that conduit into a plaintiff to recover those same funds the conduit could never have used to pay any of its own creditors, but now as property of its own.

The Debtor could never have used one dollar of the DLI loan proceeds to pay any creditor of its choosing. The Debtor's sole other asset was its right to receive payment on factored invoices, but both the A/R and the proceeds were also DLI's collateral. SUF ¶¶ 25-26. The Trustee cannot prove the most critical element of his Avoidance Claims because the Trustee cannot present evidence to show that the Debtor could have used any of the DLI loan proceeds to pay any unsecured creditors of its choosing.

**2. Every transfer from the Debtor's Operating Account was paid in accordance with the parties' contracts, and no evidence shows any "recycling" or "recirculation" of funds**

Even if the Trustee could overcome controlling case law and establish his first false presumption – his claim that the transfers of DLI loan proceeds were funds of the Debtor – all bank records defeat his second false presumption asserting that these Defendants (or any improper recipient) received transfers of the Debtor's funds from DD Account 5992. All bank records demonstrate that factoring payments were made in accordance with each client's Factoring Agreement, and that factored invoices were paid by the identified "Approved Originator." There is no evidence in any bank record or other admissible evidence showing that any funds were diverted or "recycled" in any manner.

Bank records from FRB and Bank of America demonstrate that, when the DLI Controller caused daily transfers to be made to TelAcme from the Debtor's Operating Account to DD Account 5992, those funds were not transferred to a Defendant. Instead, those funds were transferred to TelAcme's "Approved Terminator," AcornTech. SUF ¶¶ 139, 152-53. The Trustee may not have located AcornTech or its assets, and the Trustee does not appear to have obtained bank records for AcornTech, but that does not erase the simple fact that every transfer of funds from the Debtor's Operating Account to TelAcme via DD Account 5992 was transferred to the entity that was identified in the TelAcme Factoring Agreement as the next "Terminator" in the VoIP traffic and payment chain. *Id*. The payments were carried out in accordance with the parties' contracts, and there is no evidence those funds were somehow "recirculated" in a fraudulent manner.

When the DLI Controller caused daily transfers to be made to Najd from the Debtor's Operating Account to DD Account 5992, those funds were not transferred to a Defendant (or any

improper recipient). Instead, those funds were transferred to Najd's "Approved Terminator," Brightwork, or its assignees and next terminators in the chain of traffic and payments, Softizo or Options Technologies. SUF ¶¶ 110, 122-24, 126-27. The Trustee may not have obtained bank records for Brightwork, Softizo, or Options Technologies, but that does not erase the simple fact that every transfer of funds from the Debtor's Operating Account to Najd via DD Account 5992 was transferred to the entity that Najd identified as its "Approved Terminator," and thereafter to the entities that invoiced Brightwork in turn. *Id.*

The pattern of contract-compliant payments that applies to all TelAcme and Najd transfers also applies to each of the Debtor's factoring arrangements under each applicable Factoring Agreement. SUF ¶¶ 118, 149, 172, 193, 210, 231, 255, 280, 302, 323, 343, 347, 355.

The factored invoices were then repaid each month with new money of the obligors on each of the factored invoices, including British Telecom, France Telecom/Orange Espana, IKBS, Indigo11, and Wavecrest (UK) Limited. Each invoice was paid by the responsible party through to January 2019, but for British Telecom's decision to cease funding in 2017. SUF ¶¶ 132, 133, 158-61, 181, 200, 219, 242, 268-69, 291, 309, 333, 348, 362.

The Trustee has no evidence that any of the funds paid into the Debtor's Collection Account were paid with funds that belonged to the Debtor or originated in the Debtor's bank accounts. SUF ¶¶ 87, 134, 162, 182, 201, 220, 270, 292, 310, 334, 349. Instead, bank records show that payments went out from the Debtor's Operating Account to the proper beneficiaries in the VoIP transmission chain of traffic and payments, while factored invoices were paid by the "Approved Originators" using their own "new" funds. It is not the Defendants' burden to prove that there was no recycling of funds. It is the Trustee's burden to prove that there was. *In re Tag Entm't*, 2016 WL 1239519 at *13. And the Trustee cannot meet that burden because the bank records show otherwise.

The Trustee has sustained this case for more than four years by repeating his mantra of recycled funds and improper payments from DD Account 5992. But when the funds from the Debtor's Operating Account passed through DD Account 5992 to the intended recipients under their respective Factoring Agreements, no funds were left behind for diversion to inappropriate recipients. Had any funds not been paid to their intended recipient, the terminating services for

calls would have been withdrawn by the entities who had not received their payments, calls would no longer be terminated for the Approved Originators, and their contractual payment arrangement would instantly collapse. SUF ¶ 104. The repeated and ongoing payment of factored invoices by each "Approved Originator" demonstrates that the system functioned as it was intended to function, and each factoring payment continued down the chain of VoIP transmission and payment.

Tellingly, the Trustee's own financial expert confirmed in her deposition that she was not provided with bank records for any of the Debtor's clients, nor any of the companies that paid the factored invoices, and for that reason, she could not say that there was any bank evidence that funds that were paid into the Debtor's Collection Account were recycled or recirculated funds of the Debtor. SUF ¶¶ 86-87. Consistently, Defendants' expert rebuttal witness, David Golbahar, agreed, stating that "[a]pproved funds from DLI to Debtor paid factored invoices approved by DLI … The return of funds from Debtor to DLI was the return of principal and interest from the collection of those factored receivables." Exhibit C-3 to Richardson Decl., at MSJ 1525.

None of this is a surprise to Defendants. Defendants have known for the entirety of this litigation that the Trustee's chorus of "recycled" and "recirculated" funds was nothing more than a false litigation claim, like so many others in this case. But discovery has now closed, the evidence is fixed, and it is clear that the Trustee cannot show that a single dollar that was transferred from the Debtor's accounts to DD Account 5992 was then transferred to any of the Defendants.

If this were a case where a pool of investors' funds were commingled in an account belonging to a fraudulent enterprise, a plaintiff could credibly demand that payments made from that account be paid pro rata in accordance with each party's deposits. But this case is the opposite. This is a case where the Debtor's accounts were not commingled accounts, but were segregated DACA accounts holding nothing but DLI's loan proceeds and collateral. DealDefenders' DD Account 5992 is not an account of the Debtor. It is a third-party escrow platform used by dozens of telecom companies for their telecom businesses. The funds transferred by DLI to pay factoring clients are not sitting in DD Account 5992 waiting to be divided up. They were instantly transferred to the next terminator in the chain of VoIP transmission and payment, as intended under the Debtor's contracts. There were no funds remaining in DD Account 5992 for payment to improper

recipients, and no transfers from DD Account 5992 to any Defendants that were paid in lieu of payments to the proper factored client or its assignee. Mr. Proto, as one example, was using DealDefenders' escrow services to perform under a Reciprocal Services Agreement with Phonetime for nearly a year before the Debtor was even incorporated, and he continued to use DealDefenders' escrow services long after the Debtor ceased operating. SUF ¶¶ 171, 364. In order for the Trustee to prove that any transfers these Defendants received from their separate business operations were the "Debtor's funds," the Trustee would have to prove that the funds transferred from the Debtor's Operating Account to the DD Account 5992 were *not* used to pay intended factoring clients, but instead the same traceable funds were used to pay these Defendants.

The Trustee has been alleging that claim for years. But he cannot prove it with evidence because it is false.

When the commingled funds at issue are funds in a *debtor's* own account, under the debtor's control, there is a presumption that the funds are property of the debtor's estate because they could have been used to pay creditors. *In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir. 1988) ("Because this money could have been used to pay other creditors, it presumptively constitutes property of the debtor's estate). "Control over an account, and its contents, is central to assessing whether they are to form part of a bankruptcy estate." *De La Pena Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255, 264 (5th Cir. 2012). The holding of *Bullion* is limited to accounts of a debtor, over which the debtor has the requisite control and could use the funds to pay any creditor at its discretion. But DealDefenders is a third party over which the Debtor had <u>no</u> <u>control</u> of any kind. DD Account 5992 does not carry a presumption that any funds in the account were property of the Debtor. It is the Trustee's burden to come forward with evidence to show that any funds were the Debtor's property. And in this case, all evidence shows that funds from the Debtor's Operating Account were transferred into and <u>then out of</u> DD Account 5992 to or for the benefit of the Debtor's factoring clients or their assignees.

Even when an account is treated as a possible debtor's account, the *Bullion* holding is not applicable when the debtor does not control the account. In *Spear v. Global Forest Prods. (In re Heddings Lumber & Bldg. Supply)*, 228 B.R. 727 (9th Cir. BAP 1998), the BAP found that *Bullion*

"does not apply here" where it was "questionable whether the Debtor controlled the Account," and whether the debtor owned the funds." 228 B.R. at 730.

There is no legal authority that could transform a third-party, multi-client escrow account into the Debtor's property, erasing third-party property rights, simply because the Debtor deposited the largest volume of funds. As Justice Black put it, "[t]he Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-36, 83 S. Ct. 232, 9 L. Ed. 2d 190 (1962).

The Trustee has not claimed to hold an equitable trust over all funds that passed into and out of DD Account 5992, yet he appears to base his case on the presumption that this is already the law. But it is not. Even if California permitted some form of equitable trust over DD Account 5992 based on sufficient tracing of funds, it would be meaningless, because the same tracing of funds demonstrates that transfers from the Debtor's Operating Account *left* DD Account 5992 for the benefit of the proper factored clients or their approved assignees. There are no funds remaining and no funds transferred elsewhere that could be subject to an equitable trust.

The Trustee did not obtain bank records for further transferees of funds paid from the Debtor's Operating Account, such as "Approved Terminators" AcornTech and Brightwork. SUF ¶¶ 83-85. And the Trustee did not obtain bank records for any of the "Approved Originators" that paid factored invoices. SUF ¶¶ 86-87. As a result, the Trustee cannot prove whether those transfers continued down the proper chain of payments for transmission of VoIP traffic or wholesale minutes, or were somehow "recycled" as he has alleged for years. The abyss of relevant and necessary evidence is remarkable. But it is the Trustee's burden to prove his case, and the bank records that have been obtained show on their face that the Debtor's factoring business operated as it was supposed to operate for three years, until January 2019.

A plaintiff cannot meet their evidentiary burden by failing to obtain necessary evidence supporting a material element of their claim. Speculation is not evidence. And a void in the evidentiary record cannot prove a claim by an absence of evidence.

### 3. **Bank records show a proper factoring business**

The third false presumption underlying the Trustee's case is the claim that funds were "recycled" in the manner of a Ponzi scheme. It, too, fails under the evidence and applicable law.

The TelAcme and Najd factoring relationships represent the vast majority of the Debtor's factoring transfers, and they demonstrate that the Debtor operated as the contracts required for three years, until nonpayment by Indigo11 and IKBS in January 2019 led to the collapse of the business.

Bank of America and FRB bank records demonstrate that factoring payments to TelAcme were paid from the Debtor's Operating Account to DD Account 5992, where they were then transferred to the "Approved Terminator" under the TelAcme Factoring Agreement, AcornTech. SUF ¶¶ 139, 152-53. This is not fraud. It is the structure of payments contemplated in the TelAcme Factoring Agreement. Factored invoices were then paid each month by the "Approved Originator" – Indigo11 – into the Debtor's Indigo11 DACA Account. SUF ¶¶138, 157-61. The Trustee has no evidence to support his allegations that those funds had somehow originated with the Debtor or were transferred to these Defendants. SUF ¶ 162.

Likewise, Bank of America and FRB bank records demonstrate that factoring payments to Najd were paid from the Debtor's Operating Account to DD Account 5992, where they were then transferred to Najd's "Approved Terminator" – Brightwork – who in turn, transferred the funds to its subsequent terminators, Softizo or Options Technologies. SUF ¶¶ 122-24, 126-27. This is not fraud, but is the structure of payments contemplated in the Najd Factoring Agreement. SUF ¶ 110. Factored Najd invoices were then paid each month by the "Approved Originator" – IKBS – into the Debtor's Collection Account. The Trustee has no evidence to support his allegations that those funds had somehow originated with the Debtor or were transferred to these Defendants. SUF ¶ 134.

And this pattern is the same for every factoring relationship of the Debtor. Each "Approved Originator" paid the factored invoices (SUF ¶¶ 132, 133, 158-61, 181, 200, 219, 242, 268-69, 291, 309, 333, 348, 362), and the Trustee has no evidence that any of those payments originated with the Debtor or were transferred to these Defendants (SUF ¶¶ 87, 134, 162, 182, 201, 220, 270, 292, 310, 334, 349).

Without a doubt, the final factored invoices for TelAcme and Najd for 2018 were not paid by Indigo11 and IKBS in January 2019, and that loss of nearly $170 million is the reason that the Debtor's chapter 7 case was filed. But there is no evidence that payments made in the previous three years were somehow "recirculated" or "recycled" through DD Account 5992 or in any other manner. *Id*.

Bank records support the conclusion that funds from the Debtor's Operating Account went down the "terminator" chain of supply and payments as they were supposed to do, and that factored invoices were paid with funds that belonged to the "Approved Originators," not the Debtor. But it bears repeating that, while this is the conclusion supported by the bank records, it is not the Defendants' burden to prove this. It remains the Trustee's burden to prove that the funds transferred by DLI from the Debtor's Operating Account to DD Account 5992 were not used in the intended manner, but instead were paid to these Defendants. And it remains the Trustee's burden to prove his allegation that funds paid by "Approved Originators" were the Debtor's "recycled" funds. The uncontroverted bank records demonstrate that he cannot prove these claims.

The Trustee is certain to hold up British Telecom's refusal to pay a factored invoice in 2017 as an exception not this rule. But it is not. The Debtor's factoring relationship with HILF was short-lived, yet it operated exactly as the parties' contracts intended. For less than six months, the Debtor paid factoring payments to HILF or its "Approved Terminators" – HCT and MyCore – with direct payments from the Debtor's Operating Account to DD Account 5992. SUF ¶¶ 231, 234. And for the first three months, British Telecom paid each factored invoice with its own funds directly into the Debtor's Collection Account. SUF ¶ 242. The Trustee has no evidence to show that funds paid to HILF, HCT or MyCore were "recirculated" or "recycled" as he has alleged.

British Telecom refused to pay an invoice in early 2017 and withheld more than $20 million of funds that it was supposed to pay into the Debtor's Collection Account, triggering a Dutch investigation into potential VAT fraud. *Id*. In July 2025, a Dutch criminal court acquitted HILF and its principal of all charges alleging that they had engaged in VAT fraud, and dismissed the prosecutors' claims that evidence showing computer generation of VoIP traffic (such as

commercial call centers or robo-calls) meant that invoices documenting that traffic were also fake. SUF ¶¶ 243-44.

The British Telecom incident has provided the Trustee with a great deal of litigation theatrics, but it does not provide him with evidence of any fraudulent conduct by the Debtor, nor of payments to any of these Defendants. The Debtor and these Defendants aggressively defended against the claims of the Dutch prosecutors, but this Trustee dropped the defense and agreed to settle with the Dutch government, receiving about half of the withheld British Telecom funds in exchange for stating in the agreement that he has no evidence to dispute the allegations. SUF ¶ 82. The Trustee's willingness to make such a statement is not evidence of fraud by the Debtor.

But for British Telecom's improper actions, all bank records show that funds transferred out of the Debtor's Operating Account went to their proper and intended recipients, and that the factored invoices were paid in full by the "Approved Originators" with their own funds, until Indigo11 and IKBS failed to pay their invoices in January 2019. Defendants' separate telecom business transactions that also utilized DD Account 5992, and had done so long before the Debtor even existed, could not have involved any funds of the Debtor without this entire payment structure collapsing. Instead, bank records demonstrate that the Debtor's business operated as it was supposed to operate under all Factoring Agreements and related contracts until 2019 precisely because no payments were diverted to parties such as these Defendants.

The Trustee's Avoidance Claims fail as a matter of law because the Debtor could never have used a single dollar of DLI's collateral to pay an unsecured creditor. A "recovery" of funds that were never the Debtor's funds in the first place would be an impermissible windfall for the Debtor and its unsecured creditors. The Trustee's Avoidance Claims also fail as a matter of law because all transfers from the Debtor's Operating Account were transferred to the intended recipient, and all related factored invoices were repaid, in full, by the "Approved Originator." There is no recirculation of funds, there is no diversion of funds to any of these Defendants, and the business ran profitably for a single lender's benefit for three years of operations. The Trustee's Avoidance Claims fail as a matter of law.

**B. The Trustee's Section 549 Claims Fail as a Matter of Law**

The Trustee's inability or failure to show that he is challenging transfers of the "Debtor's funds" is even starker with his Section 549 Claims – claims that have been frivolous from the filing of the Trustee's Complaint.

Whether funds transferred post-petition can be recovered under Section 549 "necessarily turns on the issue of whether the funds were 'property of the estate', as provided for by § 549(a)." *In re Flooring Concepts, Inc.*, 37 B.R. 957, 963 (9th Cir. B.A.P. 1984). "[T]he trustee bears the burden of proving that a postpetition transfer of estate property occurred, but the burden of proof as to the validity of the postpetition transfer is on the transferee." *Rainsdon v. Davisco Foods Int'l, Inc. (In re Azevedo)*, 497 B.R. 590, 595 (Bankr. D. Idaho 2013). In this case, there is no need to address the validity of the challenged transfers (though this can readily be done at trial), as the Trustee cannot prove that the challenged transfers were transfers of estate property.

The Trustee's Section 549 Claims allege that Mr. Proto received $676,970.00 between April 8, 2019 and September 15, 2020 from DD Citi Account 2558, and that Tee Telecommunications received $680,449.06 between April 12, 2019 and July 20, 2020 from DD Citi Account 2558. SUF ¶¶ 364-65.

DD Citi Account 2588 was opened by DealDefenders in November 2018. SUF ¶¶ 366. Bank statements for the account have been produced in this litigation. <u>And those bank statements do not show a single deposit from *any* of the Debtor's accounts, at *any* time, in *any* amount</u>. SUF ¶¶ 367-69.

Those same bank statements <u>do</u> show dozens of other telecom companies making deposits and withdrawals over the same period of time, consistent with the use of the primary DD Account 5992 by multiple telecom companies at the same time as the Debtor. But none of the transfers made by these other companies into or out of DD Citi Account 2558 are funds belonging to the Debtor's estate. SUF ¶¶ 367-69. It is hard to imagine what inspired the Trustee to include these Section 549 Claims in his Complaint, when the same research of bank statements required to confirm the amount of the alleged transfers would have informed the Trustee that none of the deposits made into DD Account 2588 were ever made with Debtor/DLI/estate funds.

The Trustee's Section 549 Claims are missing their most important element – transfers of funds belonging to the Debtor's estate – or even any transfers of funds that had once belonged to the prepetition Debtor. *In re Flooring Concepts, Inc.*, 37 B.R. at 963. The Trustee's Section 549 Claim fails as a matter of law.

**C. <u>The Trustee's Claim that the Debtor was a Ponzi Scheme and Therefore that the Ponzi Presumption Should Apply to His Claims Fails as a Matter of Law</u>**

The Trustee has alleged in his Complaint that the Debtor was operated as a Ponzi scheme, and based thereon, claims that the Debtor was insolvent from its inception, and that any transfers he has challenged for avoidance were made with an intent to defraud and delay other creditors.

The Trustee wants the Court to find that the Debtor was a Ponzi scheme because it simplifies his litigation by establishing an intent to defraud. *In re Tag Entm't*, 2016 WL 1239519 at *16. More importantly, the Trustee wants to obtain a "Ponzi" ruling because it obscures the complete lack of evidence supporting his case, discussed above.

Mr. Omanoff, in turn, wants the Court to find that the Debtor was a Ponzi scheme because it could erase his liability to pay millions of dollars of withheld VoIP Guardian LLC profits to former partner Forefront Partners in unrelated litigation by providing a court ruling stating that the Debtor had no profits. SUF ¶ 67.

But neither are correct. The Debtor cannot qualify as a Ponzi scheme as a matter of law for multiple reasons. And therefore, the Trustee cannot rely on the Ponzi scheme presumption as a matter of law.

The Ninth Circuit has explained that "[t]his Circuit's definition of a Ponzi scheme recognizes two essential elements: (1) the funneling of money from new investors to pay old investors, and (2) no legitimate profit-making business opportunity exists for investors." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1159 (9th Cir. 2024). The Ninth Circuit has also defined a Ponzi scheme as "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *In re Slatkin*, 525 F.3d 805, 809 n.1 (9th Cir. 2008) (quoting *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 759 n.1 (9th Cir. 2000)).

The reason a Ponzi scheme obtains a presumption of insolvency or fraudulent intent is because "a Ponzi scheme is doomed to fail by virtue of its pyramid structure. Because a pyramid scheme relies on an impossibility—a limitless pool of new investors—a Ponzi scheme operator 'must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.'" *In re EPD Inv.*, 114 F.4th at 1160 (quoting *In re Indep. Clearing House Co*., 77 B.R. 843, 860 (D. Utah 1987)).

But the evidence demonstrates that the Trustee cannot obtain a proper Ponzi scheme presumption.

**1. <u>There Was No "Funneling" of Money Between Parties</u>**

There was no "funneling of money from new investors to pay old investors" (*In re EPD Inv*., 114 F.4th at 1159), as documented by the Debtor's and DealDefenders' bank records.

The DLI loan proceeds were transferred from the Debtor's Operating Account to DD Account 5992, and to each factoring client or Approved Terminator identified in the Factoring Agreements and related documents. New funds were then received from each Approved Originator on account of the full amount of the factored invoices; exactly as a factoring business is supposed to operate. There is no evidence that any of the funds that went out to factored clients and Approved Terminators were "funneled" in a circular manner to the Approved Originators, or misused in any manner.

The bank statements show that, until the beginning of 2019, the Debtor was an actual "legitimate profit-making business," and therefore cannot qualify as a Ponzi scheme under the Ninth Circuit's definition. *In re EPD Inv.*, 114 F.4th at 1159. See also *Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 528 (5th Cir. 2012) (company could not qualify as an actual Ponzi scheme or benefit from Ponzi presumption because there was no evidence the business "was based on the manufacturing of 'returns' to investors from other investors' contributions."). *See also* Expert Report of David Golbahar, Exhibit C-3 to Richardson Decl., at MSJ 1523 - 1526.

**2. <u>The Debtor Had a Single Investor</u>**

A Ponzi scheme cannot have a single investor or a single lender. The requirement that a Ponzi scheme involve "the funneling of money from new investors to pay old investors" (*In re EPD*

*Inv.*, 114 F.4th at 1159) means that the recycling of money to and from the same investor cannot qualify as a Ponzi scheme.

In *Ehrlich v. Commercial Factors of Atlanta*, 567 B.R. 684 (N.D.N.Y. 2017), the court dismissed a trustee's Ponzi-scheme complaint where the debtor's business had a single investor, writing:

> There is something Ponzi-like about this scheme—it involved the use of later-acquired funds to pay down previous debts. But appearances can be deceiving when it comes to transactions that look like Ponzi schemes. See Samuel W. Buell, *Capital Offenses: Business Crime & Punishment in America's Corporate Age* 46 (2016) ("For understanding modern corporate fraud, the important thing about the idea of a Ponzi scheme is to see what it's not."). Here, only one investor—CFA—was defrauded in the scheme, and as just noted a Ponzi scheme is defined by the use of funds acquired from later investors to pay off earlier investors. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995) ("A Ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors." (emphasis added)). Thus, a series of transactions designed to defraud only one investor over a period of several months cannot constitute a Ponzi scheme. Since the transactions in this case cannot be classified as a Ponzi scheme, the Ponzi scheme presumption is inapplicable.

*Ehrlich*, 567 B.R. at 693. See also *Bartson v. Marroquin (In re Marroquin)*, 441 B.R. 586, 599 (Bankr. N.D. Ohio 2010) (finding that "the lack of multiple investors does detract from the Plaintiff's position that his investment with the Defendants constituted a Ponzi scheme."). Defendants cannot locate any reported case permitting the finding of a Ponzi scheme where there was a single investor or lender.

If all the bank records are mistaken, and the Trustee could actually prove his allegations, he would still be proving a case where DLI's funds were funneled in a pattern of investments that paid interest returns to DLI, but otherwise would still not resemble an actual Ponzi scheme.

**3. <u>A "Ponzi-like" Scheme Cannot Obtain a Ponzi Presumption</u>**

The Trustee has argued in this case that the Debtor was at least a "Ponzi-like" scheme, and that this should be enough to obtain the Ponzi presumption.

The Ninth Circuit has never accepted the idea that the Ponzi presumption can be extended to any debtor that does not satisfy the requirements for an actual "Ponzi" scheme but has attributes

"like" a Ponzi scheme. But other courts have addressed the issue and have refused to permit the extension of the presumption to "Ponzi-like" debtors.

In *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143 (5th Cir. 2015), the Fifth Circuit rejected a trustee's request to apply the Ponzi presumption to a fraudulent enterprise that paid "Ponzi-like" returns, holding that "[e]xpanding this exception—as no other court, apparently, has done—to cover legitimate businesses in which there were some fraudulent or Ponzi-like transactions is inconsistent with this theory." 785 F.3d at 161. See also *Am. Cancer Soc'y v. Cook*, 675 F.3d 524, 528 (5th Cir. 2012) (rejecting district court's application of Ponzi presumption to a "ponzi-like" scheme, holding that even if company "operated as a fraudulent or at least badly mismanaged drilling investment program," it did not qualify as "a traditional Ponzi scheme."); *SEC v. Management Solutions, Inc.*, 2013 WL 4501088 at *20, 2013 U.S. Dist. LEXIS 120277 (D. Utah Aug. 22, 2013) (in securities case, denying motion requesting application of "Ponzi presumption," noting that "[a]n effort to apply such a 'Ponzi presumption' in all securities fraud cases which have some Ponzi scheme characteristics is inappropriate."); *Aliera LT, LLC v. Wells Fargo Bank, N.A. (In re Aliera Cos.)*, 2025 WL 2599852 at *28, n. 43, 2025 Bankr. LEXIS 2227 (Bankr. N.D. Ga. Sept. 5, 2025) (refusing to apply Ponzi presumption to "Ponzi-like" scheme as "it would open a can of worms if the Court accepted the Aliera Trustee's argument in favor of a sweeping rule that any transfer made by a Ponzi-like entity is per se not made for reasonably equivalent value.").

The evidence in this case, in particular the relevant bank records, demonstrate that the Debtor was a legitimate business, not even a "Ponzi-like" business. But even if the Trustee could overcome the legitimacy of VoIP Guardian, LLC's and the Debtor's factoring business, he cannot show that the Debtor operated as a Ponzi scheme under the Ninth Circuit's requirements, and he cannot obtain the Ponzi presumption for any of his claims.

### D. <u>The Trustee Cannot Show that the Debtor Incurred Any Damages as a Result of Alleged Breaches of Fiduciary Duties</u>

The Trustee's Fiduciary Duty Claims seek recovery of "compensatory damages" from these Defendants, along with a general claim for punitive and exemplary damages, plus attorney's fees and interest. SUF ¶ 87. Damages are a necessary element of a fiduciary duty claim. See *RBC Cap.*

*Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (reciting the elements of aiding and abetting breach of fiduciary duty, including damages).

"The objective of compensatory damages is to place the injured party in as good a position as existed before the injury." *Laser Tone Bus. Sys., LLC v. Del. Micro-Computer LLC*, 2019 WL 6726305, 2019 Del. Ch. LEXIS 1393 *37 (Del. Ch. Nov. 27, 2019). And where a plaintiff was not harmed, a claim for compensatory damages fails as a matter of law. See *In re Fuqua Indus., Inc.*, 2005 WL 1138744 *9, 2005 Del. Ch. LEXIS 60 *29-33 (Del. Ch. May 6, 2005) (granting summary judgment for defendants where plaintiff sought compensatory damages premised on theory that runs counter to Delaware law). [1]

The Trustee cannot show that the Debtor was harmed when DLI's funds passed through its accounts. Before the "injury" alleged by the Trustee, the Debtor was a no-asset conduit. It could not use one dollar of DLI's loan proceeds to pay any creditors because DLI's Loan Agreement and DACA protections forbid any payments other than DLI-approved factoring transactions and repayments of DLI's loan. SUF ¶ 12. Every "asset" the Debtor could claim was under the dominion of DLI, not the Debtor. And after the alleged breaches of duty, the Debtor remained a no-asset conduit. Nothing changed when DLI's funds passed through the Debtor's accounts.

If the Debtor were to recover "damages" for alleged injury to itself, it would recover funds that it never had, that it never could have had, and that it never could have used to pay unsecured creditors. The outcome would not be compensation, it would be a windfall.

The Trustee has repeatedly defended his Fiduciary Duty Claims by arguing that he must have claims for "breach of fiduciary duties" because DLI could not have filed a claim for "breach of fiduciary duties" to recover its lost collateral from these Defendants. But the label on the claim does not excuse a missing material element. DLI was the entity that lost its fully encumbered loan proceeds, and DLI had claims to recover that loss, whatever label might have been used to describe such claims. The label might not have included the term "fiduciary duties," but it would likely have included the element of an injury sufficient to state a claim for relief.

---

[1] "Claims involving 'internal affairs' of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation." *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527 (9th Cir. 1985).

Compensatory damages would provide the Debtor and parties like Forefront with the sort of windfall that is not permitted for compensatory damages. If the IKBS and Indigo11 factored invoices had been repaid in full in January 2019, the Debtor would have had to use every dollar to repay its secured debt to DLI. The Debtor could not have used one dollar to pay Forefront, or any other alleged creditor. Any recovery of "damages" for nonpayment of those funds would be a windfall based on a falsehood.

When a defendant has breached a fiduciary duty, but the plaintiff cannot show actual monetary harm, Delaware law permits nominal damages, usually awarded in a "trivial" amount such as one dollar. See *Ravenswood Inv. Co., L.P. v. Estate of Winmill*, 2018 Del. Ch. LEXIS 96, 2018 WL 1410860, at *25 (Del. Ch. Mar. 21, 2018) (awarding $1 in nominal damages for breach of duty of loyalty where no compensatory damages were proven). But even here, the Trustee cannot obtain a recovery because the Trustee has not requested nominal damages in his Complaint. SUF ¶ 99.

The Trustee's additional demands for punitive or exemplary damages must also fail as a matter of law because the Trustee's Fiduciary Duty Claims lack the critical element of compensable damages, which are a necessary precondition to punitive or exemplary damages. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983) (In Delaware, an "award of punitive damages cannot be made unless the plaintiff also receives compensatory damages."); *Cheung v. Daley*, 35 Cal.App.4th 1673, 1677 (1995) (ruling that there can be no exemplary or punitive damages awarded if there was no award of compensatory damages).

The Trustee cannot demonstrate that his Fiduciary Duty Claims seek to recover damages of the Debtor, rather than damages experienced by DLI through the loss of DLI's funds. His Fiduciary Duty Claims fail as a matter of law.

## V. <u>CONCLUSION</u>

The Trustee cannot meet the most critical element of his Avoidance Claims or his Section 549 Claim, as: (i) the Debtor could not have used any of DLI's fully perfected collateral to pay any alleged creditors such as Forefront, or purchase any item such as office supplies; and (ii) bank records demonstrate that funds transferred from the Debtor's accounts were paid to the proper

factoring clients and/or their "Approved Terminators," leading to full payment of the factored invoices by the "Approved Originators." There is no evidence that funds of the Debtor were used to pay these Defendants from DD Account 5992, and there is no evidence that any funds from the Debtor's accounts were "recycled" or "recirculated" to pay the factored invoices. The Trustee's claims of a "Ponzi" scheme fail under the evidence, and fail as a matter of law.

For similar reasons, the Trustee cannot show that the Debtor experienced an injury of its own when DLI's collateral was transferred from its accounts by DLI, and two factored invoices were not paid by IKBS and Indigo11 in January 2019. Any and all returns on factored invoices were DLI's collateral, solely for repayment to DLI. Any outcome that permits the Debtor to recover so much as one dollar in "damages" would be an impermissible windfall.

WHEREFORE, for the reasons and applicable law briefed herein, Defendants respectfully request that this Court grant the Motion and enter judgment in Defendants' favor on all claims pleaded by the Trustee in his Second Amended Complaint.

Dated: October 8, 2025

**BAKER & HOSTETLER LLP**

By: */s/ David J. Richardson*
David J. Richardson

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc.*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
1900 Avenue of the Stars, Suite 2700, Los Angeles, CA 90067

A true and correct copy of the foregoing document(s) entitled (*specify*):

- **AMENDED MOTION FOR SUMMARY JUDGMENT; STATEMENT OF UNCONTROVERTED FACTS; PROPOSED JUDGMENT; DECLARATION OF DAVID J. RICHARDSON**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 8, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Jonathan Feldman – feldman@katiephang.com
Jessica Bagdanov – jbagdanov@bg.law
Jason Komorsky – jkomorsky@bg.law
Jessica Wellington – jwellington@bg.law
Corey Weber – cweber@bg.law

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) ________________, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 8, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA PERSONAL DELIVERY
Honorable Barry Russell
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

John Philipson - john@philipsonintl.com (by email)

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 8, 2025 | David J. Richardson | */s/ David J. Richardson* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |