**BAKER & HOSTETLER LLP**
David J. Richardson (SBN168592)
(drichardson@bakerlaw.com)
Lauren Attard (SBN 320898)
(lattard@bakerlaw.com)
Jack Koehn (SBN 358542)
(jkoehn@bakerlaw.com)
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067-4301
Telephone: (310) 820-8800
Facsimile: (310) 820-8859

and

Jorian L. Rose (*pro hac vice*)
(jrose@bakerlaw.com)
45 Rockefeller Plaza
New York, NY 90025-0509
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, and Zoom Telecom, Inc.*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| VOIP GUARDIAN PARTNERS I, LLC,<br><br>Debtor. | Case No.: 2:19-bk-12607-BR<br><br>Chapter 7 |
| TIMOTHY YOO, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>VOIP GUARDIAN LLC, *et al*.,<br><br>Defendants. | Adv. No. 21-ap-01044-BR<br><br>**NOTICE OF MOTION AND MOTION OF MARK PROTO, YOUSSEF RAHMAN AND ZOOM TELECOM, INC. FOR PARTIAL SUMMARY JUDGMENT ON SECOND AMENDED COMPLAINT**<br><br>Hearing Date: TBD<br>Time: TBD<br>Courtroom: TBD |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, THE PLAINTIFF AND HIS COUNSEL, ALL NAMED DEFENDANTS AND THEIR COUNSEL, AND ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Mark Proto, Youssef "Joseph" Rahman, and Zoom Telecom, Inc. (collectively, the "Defendants"), all named as defendants in the *Second Amended Complaint for: 1. Breach of Fiduciary Duty; 2. Aiding and Abetting Breach of Fiduciary Duty; 3. Avoidance of 2-Year Fraudulent Transfers (Actual Intent); 4. Avoidance of 2-Year Fraudulent Transfers (Constructive Fraud); 5. Avoidance of 4-Year Fraudulent Transfers (Actual Intent); 6. Avoidance of 4-Year Fraudulent Transfers (Constructive Fraud); 7. Avoidance of Preferential Transfers; 8. Avoidance of Postpetition Transfers; 9. Recovery of Avoided Transfers; 10. Breach of Contract; 11. Unjust Enrichment; and 12. Claim Disallowance* (the "SAC"), filed by the chapter 7 trustee Timothy Yoo (the "Trustee"), on August 17, 2021, hereby move by this motion (the "Motion") requesting that this Court grant partial summary judgment by entering judgment overruling the Trustee's First Claim for Relief for breach of fiduciary duties, and the Trustee's Second Claim for Relief for aiding and abetting a breach of fiduciary duties, on the grounds that none of the Defendants owed VoIP Guardian Partners I, LLC (the "Debtor") a fiduciary duty, and that the in pari delicto defense bars the Trustee's aiding and abetting claim.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Statement of Uncontroverted Facts, and Declaration of David J. Richardson filed herewith, and all documents in the record of the above-captioned adversary proceeding and chapter 7 bankruptcy case.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the local procedures of the Honorable Barry Russell, United States Bankruptcy Court Judge, Defendants have not scheduled a hearing on the Motion. Notice of any hearing will be provided in accordance with the Court's applicable rules.

Dated: November 4, 2025

BAKER & HOSTETLER LLP

By: *__/s/ David J. Richardson__*
David J. Richardson

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, and Zoom Telecom, Inc.*

**TABLE OF CONTENTS**


I. PRELIMINARY STATEMENT ..... 1

II. FACTUAL BACKGROUND ..... 4

A. The Debtor's Business and Operating Agreements ..... 4

1. Incorporation and ownership of VoIP Guardian LLC and the Debtor ..... 4

2. The business of VoIP Guardian LLC ..... 4

3. The use of the Debtor as a vehicle for the business of VoIP Guardian LLC ..... 6

B. DLI's Funding Arrangements ..... 7

C. DLI Controlled All Disbursements of DLI's Loan Advances ..... 8

D. The DLI Stipulation ..... 9

E. The Factoring Clients and their payments to Zoom Telecom ..... 9

F. The Trustee's Fiduciary Duty Claims ..... 10

III. LEGAL STANDARDS ..... 10

A. Jurisdictional Statement ..... 10

B. Standard for Summary Judgment ..... 11

IV. THE TRUSTEE'S FIDUCIARY DUTY CLAIMS FAILS AS A MATTER OF LAW ..... 11

A. The Trustee's Fiduciary Duty Claims Hinge on a Showing of Insolvency from the Debtor's Inception ..... 11

B. The Trustee's Fiduciary Duty Claims Hinge on Actual or De Facto Officer Status ..... 12

1. Mr. Proto and Mr. Rahman Were Not "Officers" of the Debtor ..... 12

2. Delaware Law Will Not Support a Finding that Either Defendant Owed a Fiduciary Duty to the Debtor Under Any Alternative Theory of Liability ..... 14

C. The Trustee's Aiding and Abetting Claims Are Barred by the Doctrine of *In Pari Delicto* ..... 20

1. The *In Pari Delicto* Defense Applies in Bankruptcy to a Trustee's Pursuit of a Debtor's Claims ..... 20

2. The *In Pari Delicto* Defense Is Governed by Delaware Law ..... 21

3. The Breached Fiduciary Duty Alleged by the Trustee is a Breach by the Sole Actor in Control of the Debtor ............................................... 21

4. The Defendants Are Not "Insiders" Under Delaware Law for Purposes of the *In Pari Delicto* Defense ................................................... 24

V. CONCLUSION ........................................................................................................ 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andarko Petroleum Corp. v. Panhandle Eastern Corp.*,
545 A.2d 1171 (Del. 1988) ........ 11

*Anderson Dig., LLC v. ANConnect, LLC (In re Our Alchemy, LLC)*,
2019 WL 4447519, 2019 Bankr. LEXIS 2907 (Bankr. D. Del. Sept. 16, 2019) ........ 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ........ 11

*BAE Sys. N. Am., Inc. v. Lockheed Martin Corp.*,
2004 Del. Ch. LEXIS 119, 2004 WL 1739522 (Del. Ch. Aug. 3, 2004) ........ 17

*Bird's Constr. v. Milton Equestrian Ctr*.,
2001 Del. Ch. LEXIS 140 (Del. Ch. Nov. 16, 2001) ........ 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 11

*Citron v. Fairchild Camera & Instrument Corp.*,
569 A.2d 53 (Del. 1989) ........ 15

*Claybrook v. Broad & Cassel, P.A. (In re Scott Acquisition Corp.)*,
364 B.R. 562 (Bankr. D. Del. 2007) ........ 22

*In re Extended Stay, Inc.*,
No. 09-13764-JLG, 2020 Bankr. LEXIS 2128, 2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) ........ 25

*Friese v. Superior Court*,
134 Cal.App.4th 693 (2005) ........ 21

*Goldman v. Shahmoon*,
42 Del. Ch. 227, 208 A.2d 492 (1965) ........ 13

*Gross v. Univ. of Chi.*,
14 Ill. App. 3d 326, 302 N.E.2d 444, 453-54 (Ill. App. Ct. 1973) ........ 17, 18

*Ivanhoe Partners v. Newmont Mining Corp.*,
535 A.2d 1334 (Del. 1987) ........ 14, 15

*Kahn v. Lynch Comm. Sys., Inc.*,
638 A.2d 1110 (Del. 1994) ........ 15

*In re KDI Holdings, Inc.*,
277 B.R. 493 (Bankr. S.D.N.Y. 1999) ..... 24

*In re KKR Fin. Hldgs. LLC S'holder Litig.*,
101 A.3d 980 (Del. Ch. 2014) ..... 16, 17

*Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Entm't, LLC)*,
520 B.R. 455 (Bankr. D. Del. 2014) ..... 12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ..... 11

*Mattel, Inc. v. MGA Entm't, Inc.*,
705 F.3d 1108 (9th Cir. 2013) ..... 21

*Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.)*,
361 B.R. 747 (Bankr. D. Del. 2007) ..... 20

*In re Morton's Restaurant Group, Inc. Shareholders Litigation*,
74 A.3d 656 (Del. Ch. 2013) ..... 16, 17

*NHB Assignments LLC v. Gen. Atl. LLC (In re PMTS Liquidating Corp.)*,
526 B.R. 536 (D. Del. 2014) ..... 14

*Nieves v. Insight Bldg. Co., LLC*,
2020 WL 4463425, 2020 Del. Ch. LEXIS 256 (Del. Ch. Aug. 4, 2020) ..... 18

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
267 F.3d 340 (3rd Cir. 2001) ..... 22

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*,
356 Fed. Appx. 622 (3d Cir. Dec. 16, 2009) ..... 24

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*,
389 B.R. 357 (D. Del. 2008) ..... 24

*In re PNB Holding Co. S'holders Litig.*,
2006 WL 2403999 (Del. Ch. Aug. 18, 2006) ..... 16

*Prestancia Mgmt. Group, Inc. v. Va. Heritage Found., II LLC*,
2005 Del. Ch. LEXIS 80, 2005 WL 1364616 (Del. Ch. May 27, 2005) ..... 18

*Rund v. Lee (In re Amergence Technology, Inc.)*,
2016 Bankr. LEXIS 2723, 2016 WL 4069550 (Bankr. C.D. Cal. July 27, 2016) ..... 20

*Seror v. Farias (In re L.D.T Invs., Inc.)*,
No.: 1:11-bk-22664-MT, 2017 Bankr. LEXIS 1029 (C.D. Cal. April 13, 2017) ..... 20

*Stewart v. Wilmington Trust SP Servs.*,
112 A.3d 271 (Del. Ch. 2015) ........ 22

*Sugarman v. Taylor (In re Yellow Cab Coop., Inc.)*,
602 B.R. 357 (Bankr. N.D. Cal. 2019) ........ 23

*Trenwick America Litig. Trust v. Ernst & Young, L.L.P.*,
906 A.2d 168 (Del. Ch. 2006) ........ 11, 12

*Triple H Family Limited Partnership v. Neal*,
2018 WL 3650242 (Del. Ch. July 31, 2018) ........ 15

*Tzung v. State Farm Fire & Casualty Co.*,
873 F.2d 1338 (9th Cir. 1989) ........ 11

*Uecker v. Wells Fargo Capital Fin., LLC (In re Mortg. Fund '08 LLC)*,
2014 WL 543685, 2014 Bankr. LEXIS 562 (Bankr. N.D. Cal. Feb. 11, 2014) ........ 22, 23

*US Airways Group v. British Airways PLC*,
989 F. Supp. 482 (S.D.N.Y. 1997) ........ 14

*In re Walt Disney Co. Derivative Litig.*,
2004 WL 2050138, 2004 Del. Ch. LEXIS 132 (Del. Ch. Dec. 10. 2004) ........ 13

*Witmer v. Armistice Cap., LLC*,
2025 WL 2350799, 2025 Del. Ch. LEXIS 207 (Del. Ch. Aug. 14, 2025) ........ 16

*Zazzali v. Hirschler Fleischer, P.C.*,
482 B.R. 495 (D. Del. 2012) ........ 25

**Statutes**

11 U.S.C. § 101(31)(B) ........ 23

28 U.S.C. § 157(b)(2)(A) ........ 10

28 U.S.C. § 157(b)(2)(F) ........ 10

28 U.S.C. § 157(b)(2)(H) ........ 10

28 U.S.C. § 157(b)(2)(O) ........ 10

28 U.S.C. § 1334 ........ 10

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

Defendants Mark Proto, Youssef (Joseph) Rahman, and Zoom Telecom, Inc. (the "Defendants") hereby move this Court for partial summary judgment on the First and Second Claims for Relief pleaded by chapter 7 Trustee Timothy Yoo (the "Trustee") in his Second Amended Complaint.

The Trustee's First and Second Claims for Relief allege a breach of fiduciary duties owed to VoIP Guardian Partners I, LLC (the "Debtor"), either by the Defendants or by Rodney Omanoff. But the claims cannot be properly understood without framing the business that is at issue in this case, and the company that was supposedly owed a fiduciary duty by these Defendants.

For over four years, the Court has heard the Trustee's counsel argue about the "Debtor's business," the "Debtor's Officers and Directors," the "Debtor's customers," and the "Debtor's funds." But all of it has been false.

The actual business is VoIP Guardian LLC, the entity that had at least one Officer, a leased office, computers, other hard assets, and employees that included a financial Controller. To help the business function with a cautious investor, VoIP Guardian LLC set up a special purpose vehicle subsidiary – the Debtor – for the sole purpose of serving as the name on the segregated and DACA-controlled bank accounts for funds invested by DLI (defined below) and to hold the right to receive payments on factored invoices. VoIP Guardian LLC filed the tax returns that included the Debtor as a disregarded entity, signed contracts in the Debtor's name as its Managing Member, and received all gains and profits from the business through DLI loan proceeds that DLI transferred to VoIP Guardian LLC's account. Those DLI loan proceeds, the accounts receivable on factored invoices, and every other asset that the Trustee describes as the Debtor's assets, was the collateral of DLI under a perfected security interest. The Debtor could never spend one dollar of the DLI loan proceeds on office supplies, nor pay one dollar to a creditor of its choosing. Every transfer of funds from any account in the Debtor's name – or even between the Debtor accounts – had to be carried out by DLI's Controller on the First Republic Bank ("FRB") website, or by a telephone call with a FRB employee. The Debtor was a tool of a business, not a "business" unto itself.

The Debtor had no Officers or Directors. It had no employees. It had no hard assets of its own, not even a computer. And it had a single Member, VoIP Guardian, LLC, which in turn had a Managing Member that was Omanoff America, LLC, owned and controlled by Rodney Omanoff. Through his entities, Rodney Omanoff controlled a majority interest in VoIP Guardian, LLC and had complete control over the business of VoIP Guardian LLC and its use of the Debtor to further that business.

Rodney Omanoff explained it best in his own words when he testified that:

> I don't recall there being officers specifically assigned to VoIP Guardian Partners I, the debtor; that the management and officers would have been at the management company level being that VoIP Guardian Partners I was just a sole-purpose vehicle to house Direct Lending's money.[1]

This reality was further explained to the Court early in this case when the Trustee filed an affidavit confirming that, because DLI had a perfected security interest in every asset that the Debtor could have claimed as its own, there was "no avenue" for any unsecured creditor to receive any distribution in this case, unless DLI agreed to share its collateral.[2]

But under the Trustee's ongoing stewardship, the shell entity that was the Debtor was transformed to support the story of his litigation. Suddenly, the Debtor had a "business," it had "assets," it had "officers," it had "moneys" of its own, and it had "damages" to be recovered. And suddenly "Direct Lending's money" had become the "Debtor's" money. This is not because evidence supports these assertions, but because such assertions are necessary to allege standing, subject matter jurisdiction, and the elements of each of the Trustee's claims.

The baseless nature of the Trustee's story about the Debtor lies at the heart of this Motion because it implicates who could have owed a fiduciary duty to an empty shell, who could have controlled that shell, and whether any breach by Mr. Omanoff is imputed to that empty shell.

The Debtor had no "officers," and only its Managing Member – VoIP Guardian LLC – owed it a fiduciary duty under corporate documents. The Trustee's fiduciary duty claim against these Defendants hinges on his claim that they asserted *de facto* control sufficient to create a

---

[1] *See* Statement of Uncontroverted Facts filed herewith at ¶ 42.
[2] *Id.*, ¶¶ 65-69.

fiduciary duty. But as addressed below, none of the Defendants come close to the strict standard of "domination" that applies under Delaware law for a *de facto* fiduciary duty, as a matter of law.

Nor can the Trustee's Second Claim for Relief – for aiding and abetting Mr. Omanoff's alleged breach of fiduciary duties – properly survive to trial. The claim first requires a showing that Mr. Omanoff breached his fiduciary duties to the Debtor in a manner that satisfies the exculpation provision in the Debtor's LLC agreement limiting such liability to "willful misconduct or gross negligence." And because Rodney Omanoff had complete control over the Debtor, and because the Trustee stands in the Debtor's shoes, a proper analysis of his aiding and abetting claim would ask whether Rodney Omanoff could have caused the Debtor to sue these Defendants for aiding and abetting *his* "willful misconduct or gross negligence" or whether a lawsuit for aiding and abetting his breach of fiduciary duties would be barred by *in pari delicto*.

Even if the Trustee could present evidence to support such a claim, the evidence confirms that Rodney Omanoff's complete control over the Debtor and VoIP Guardian LLC renders him the "sole actor" of the Debtor, and therefore bars any aiding and abetting claim against these Defendants. Defendants are not "insiders," because the Trustee cannot establish that they exerted the sort of "control" that is required under Delaware law. Fulfilling important tasks and giving advice do not come close to dominating and controlling a majority shareholder who had sole voting authority, sole power to bind the Debtor, and sole control of its finances.

Few cases come along that are this simple for application of the *in pari delicto* defense. There is no board of directors or large contingent of management. There is only Rodney Omanoff, who was the majority owner of VoIP Guardian LLC and the sole member of its Board of Managers, and thereby the sole Managing Member of the Debtor. None of the Defendants could assert domination and control over the Debtor sufficient to deprive Mr. Omanoff of his sole actor status.

The Trustee cannot show that any exception to the *in pari delicto* defense will be proven by evidence at trial, nor are there disputed material issues of fact that remain for trial. Application of the *in pari delicto* defense is established by plain and unambiguous corporate records such as Operating Agreements. The appropriate remedy to this Motion is entry of judgment overruling the Trustee's First and Second Claim for Relief.

## II.

## FACTUAL BACKGROUND

The following factual background is derived from the Statement of Uncontroverted Facts filed herewith (the "SUF"), and each citation to such facts appears as "SUF ¶ __."

### A. The Debtor's Business and Operating Agreements

#### 1. Incorporation and ownership of VoIP Guardian LLC and the Debtor

On September 25, 2015, Rodney Omanoff caused the incorporation of VoIP Guardian LLC. SUF ¶ 1. On October 9, 2015, Mr. Omanoff caused the incorporation of the Debtor as a subsidiary limited liability company of VoIP Guardian LLC. SUF ¶ 2.

Through two of his entities, Mr. Omanoff owned a controlling voting interest in VoIP Guardian LLC: (i) Omanoff America Telecom LLC, which owned a 40% interest in VoIP Guardian LLC, and (ii) Omanoff America, LLC ("Omanoff America") which owned a 10.01% interest in VoIP Guardian LLC. SUF ¶¶ 7-10. The Trustee also alleges that Mr. Omanoff controlled Contacts & Contracts, Inc., which owned a 4.99% interest in VoIP Guardian LLC. SUF ¶¶ 13 and 91.

The Debtor was incorporated to serve as the vehicle for factoring investments made by DLI. SUF ¶¶ 17, 42. VoIP Guardian LLC was the Sole Member of the Debtor. SUF ¶ 3. In turn, VoIP Guardian LLC's Board of Managers' sole manager was Omanoff America, while Rodney Omanoff is the sole manager of Omanoff America's own board of managers. SUF ¶ 4. The ownership structure of VoIP Guardian LLC provided Mr. Omanoff with complete control over VoIP Guardian LLC and the Debtor.

#### 2. The business of VoIP Guardian LLC

The VoIP Guardian LLC Operating Agreement provides that the "Purpose and Business of the Company" is to:

> provide trade finance and factoring services to small and medium-sized wholesale telecommunications carriers ("Tier 3 Carriers") that have been awarded contracts to engage in the routing and termination of international calls and other communication services for major Tier 1 telecommunications carrier clients ("Tier 1 Carriers") such as Verizon, AT&T, Orange, Vodafone, British Telecom, Deutsche Telekom and their affiliates.

SUF ¶ 16. The VoIP Guardian LLC Operating Agreement further provides that, in order to

accomplish this business, the Company had the authority to "organize one or more entities formed to purchase receivables of Tier 1 Carriers from Tier 3 Carriers on a factoring basis in order to support fulfillment of interconnection contracts between carriers." SUF ¶ 17. In other words, the VoIP Guardian LLC Operating Agreement authorized the Company to form the Debtor as a vehicle for operating the Company's factoring business.

The Company's Members had limited liability under the Company's Operating Agreement. Section 2.10(a) provides that:

> Except as otherwise provided in the Act, no Member or Manager shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract or otherwise, by reason of being a Member or acting as the Manager of the Company.

SUF ¶ 18.

Section 2.8, "Failure to Observe Formalities," similarly provides that:

> A failure to observe any formalities or requirements of this Agreement, the Certification of Formation or the Act shall not be grounds for imposing personal liability on the Members or Managers for liabilities of the Company unless significant monetary damages result from such failure and a court of competent jurisdiction deems such failure grossly negligent, intentionally fraudulent or misleading to the Company and its Members.

SUF ¶ 19.

Section 4.2 of the Management Company Agreement expressly provides that:

> Limited Liability. Except as required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

SUF ¶ 20.

Section 5.5 further provides that a "Manager or officer of the Company shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or by any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, reckless or intentional misconduct, or a knowing violation of law by such Manager or officer of the Company." SUF ¶ 25. The same section continues that "Any Manager or officer of the Company who performs the duties of Manager or officer of the Company, as the case may be, in compliance with this Section 5.5 shall not have any liability by reason of being or having been a Manager or officer of the Company." SUF ¶ 26.

Mr. Omanoff's complete control over the operations of the Company was further confirmed by the VoIP Guardian LLC Operating Agreement. Section 4.6, "Members are not Agents," provides that "Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement …," that no Member is an "agent" of the Management company, and no member has "any power or authority to bind or act on behalf of the Company in any way …" SUF ¶ 27 (emphasis added). The "express" authorizations for Members to exert any power in the VoIP Operating Agreement were limited to issues such as votes on issuance of membership interests or creation of different classes of interests. SUF ¶ 29.

Even to the extent that Members had voting rights, their voting rights were determined by their membership interests. SUF ¶ 30. Thus, Mudmonth and Philipson voting together (if evidence showed that Mr. Omanoff had ever put anything to a vote) represented a minority interest. SUF ¶¶ 11-12.

Article 5 of the VoIP Guardian LLC Operating Agreement provides that all "business, property and affairs of the Company shall be managed and all powers of the Company shall be exercised by or under the direction of the Board of Managers." SUF ¶ 31. As noted above, Omanoff America was the sole member of the Board of Managers. SUF ¶ 23. Article 5.4, "Powers of Managers," further provides that the Board of Managers has "the right, power and authority to manage the day-to-day operations of the Company," including "[t]o borrow money in the name and on behalf of the Company, and to secure any such loans …," along with twenty-two additional specifically listed powers. SUF ¶ 24.

Pursuant to Section 5.5 of the VoIP Guardian LLC Operating Agreement, the only recognized fiduciary duty owed to the Company is "the fiduciary duties of a Manager to the Company and its Members [which] shall be those of a director to a corporation and its stockholders under the DGCL and not those of a partner to a partnership and its partners." SUF ¶ 28.

**3. The use of the Debtor as a vehicle for the business of VoIP Guardian LLC**

The Limited Liability Company Agreement of VoIP Guardian Partners I, LLC (the "LLC Agreement") was executed by Mr. Omanoff as of October 9, 2015, in his capacity as a "Director"

of VoIP Guardian LLC. SUF ¶ 32. The LLC Agreement confirms that VoIP Guardian LLC is the sole Member of the Debtor. SUF ¶ 33.

Section 16 of the LLC Agreement provides that VoIP Guardian LLC may "appoint officers of the Company (the "Officers") and assign in writing titles …," which is the same language that appears in the VoIP Operating Agreement. SUF ¶ 34.

There is no evidence that any person or entity was ever appointed by the Company to serve as an "officer" of the Debtor. Mr. Omanoff has confirmed in his deposition that no officers or directors were needed for the Debtor because "VoIP Guardian Partners I was a sole-purpose vehicle, a subsidiary, a whole-owned subsidiary of VoIP Guardian. And so it was – VoIP Guardian Partners I was operated at the VoIP Guardian level where the managers and members lived." SUF ¶ 41. *See also* SUF ¶¶ 37, 38, 42.

The LLC Agreement contained an exculpation clause that limits the liability of any "Member or Officer" to damages caused by acts that constitute "willful misconduct or gross negligence." SUF ¶ 35. The implication of Section 18 is that it demonstrates that the first step in the Trustee's Aiding and Abetting Claim is that he must prove that Mr. Omanoff breached his fiduciary duties by operating the Debtor's Managing Member in a manner that constituted "willful misconduct or gross negligence." *Id.* Mr. Omanoff has testified that he does not believe that any of his actions ever met this level for a breach of fiduciary duties. SUF ¶ 36.

**B. <u>DLI's Funding Arrangements</u>**

**1. <u>The Loan Agreement</u>**

DLI's factoring investments were funded under a Loan and Security Agreement (the "<u>Loan Agreement</u>"), dated October 1, 2015, between Direct Lending Income Fund, LP, by and through Millenium Trust Company, LLC FBO Direct Lending Income Fund, LP (collectively, and with other affiliates, "<u>DLI</u>") as "Lender," and the Debtor as "Borrower," with initial available credit of $20,000,000 (the "<u>Maximum Facility Amount</u>"). SUF ¶¶ 43-45. The Loan Agreement authorized the Debtor to use the DLI funds for <u>only</u> two purposes: (i) to engage in the VoIP factoring business by purchasing "Eligible Collateral Assets," or (ii) to repay DLI's note. SUF ¶ 46. The definition of "Eligible Collateral Assets" states that any such loans required DLI's approval, which means

that DLI loan proceeds could only be used by the Debtor to fund factoring deals approved by DLI, or to repay DLI. SUF ¶ 47. The Loan Agreement was amended on five occasions, primarily to increase the Maximum Facility Amount in various stages to $250,000,000, and to revise various terms related to DLI's collateral and security interest. SUF ¶¶ 50-58.

By the Loan Agreement, and again by the Third Amendment to the Loan Agreement, dated April 1, 2017, the parties confirmed that all DLI funds would be held in segregated accounts, subject to a Deposit Account Control Agreement, defined as "an agreement providing the Lender with control over the Segregated Account within the meaning of Section 104(a)(2) of the UCC, in a form acceptable to the Account Bank, as applicable." SUF ¶¶ 52-54.

The Loan Agreement provided that the Debtor would be the owner of the loan proceeds. SUF ¶ 49. This is merely a necessary term to provide the Debtor with a sufficient legal interest to grant DLI a security interest, rather than proceed under a bailment or trust relationship.

**C. <u>DLI Controlled All Disbursements of DLI's Loan Advances</u>**

The funds that DLI deposited into the Debtor's DACA-controlled and segregated "Operating Account" at First Republic Bank ("<u>FRB</u>") ending in 9399 (the "<u>Operating Account</u>"), could not be used by the Debtor for any purpose of its own. The Debtor could not transfer the funds to a factoring client, could not pay a creditor, could not transfer the funds between accounts, and could not withdraw any funds to purchase anything such as office supplies. SUF ¶¶ 46, 73-81.

Under a procedure established with FRB, funds could only be transferred from the Operating Account, or transferred between the Debtor's FRB accounts, if DLI's Controller, Mandy Isaac (the "<u>DLI Controller</u>"), logged onto the FRB website, approved proposed transfers, and physically clicked the correct buttons to release the transfer, in the case of U.S. dollar transfers. SUF ¶¶ 75, 77-79. In the case of Euro transfers, FRB did not have the website availability for wire transfers, and so any transfers of Euros were approved by a telephone call or email between an FRB representative and the DLI Controller. SUF ¶ 76.

The DLI Controller, the Debtor's own Controller, and Rodney Omanoff, the majority owner, and CEO/COO of VoIP Guardian, LLC, have confirmed in depositions in this case that the Debtor had no dominion over DLI's funds, as the Debtor could not use even one dollar of the DLI

funds to purchase office supplies, or any other item, unless the DLI Controller caused the withdrawal to happen. SUF ¶¶ 73-81.

**D. The DLI Stipulation**

Early in the Debtor's chapter 7 case, the Trustee confirmed by a sworn declaration that because DLI has a perfected security interest in all of the Debtor's assets, the estate had no interest in any recoveries of the DLI funds that could be shared with unsecured creditors, absent a deal with DLI to share recoveries with the estate:

> Prior to agreeing to the terms of the Stipulation, my counsel and I conducted an independent investigation on the validity of the DLI Fund's claim against the Estate. My counsel ran a search for any and all UCC filings related to the Debtor and in so doing, confirmed that DLI Fund is the only creditor with a security interest in the Debtor's assets. My counsel also confirmed that the UCC's requirements for the creation and attachment of DLI Fund's security interest had been satisfied and that **DLI Fund's security interest was properly perfected**. …
>
> Indeed, **without the agreement with DLI** Fund and based upon the available assets in this Estate, **there is no avenue for the Estate's unsecured creditors to receive any distribution whatsoever** – let alone the 30% provided for under the Stipulation. The Estate's assets are fully encumbered by DLI Fund's $203,459,871.69 secured claim.

SUF ¶¶ 65-69 (the "Yoo Declaration") (emphasis added). The Trustee's counsel, Andy S. Kong, also submitted a declaration testifying, among other things, that he and his associate had researched and confirmed that DLI's security interest was properly perfected. SUF ¶¶ 67 and 70.

DLI's perfected security interest covers "[a]ll assets of the Debtor," with specific reference to "accounts," "deposit accounts," "commercial tort claims," "cash proceeds," "accounts receivable," "rights to payment of any and every kind," and "other forms of obligations and receivables," among other categories. SUF ¶¶ 59-62.

**E. The Factoring Clients and their payments to Zoom Telecom**

In the words of Mr. Omanoff, the business of "VoIP Guardian LLC" was to provide "trade finance and factoring services to selected small and medium-sized Wholesale Telecom Carriers that have been granted Carrier Service Agreements to engage in the routing and termination of international calls and other communication services for major Tier 1 Telecom Carriers and other Originators of traffic." SUF ¶ 92.

In each factoring relationship, VoIP Guardian LLC caused the Debtor to enter into a Factoring Agreement with the "Wholesale Telecom Carrier" which laid out the terms for the financing and provided that factored client would pay a $500 monthly fee for monitoring of the factored traffic, and a $5,000 set-up fee to cover the costs of having Zoom Telecom interconnect with the factored company's switch and the Originator's switch. SUF ¶¶ 83-84.

Monthly reconciliations prepared to summarize each Factored Client's financial transactions show that the Zoom Telecom fees were deducted from a one-percent holdback of the factored entity's payment that was withheld, and then administered and reconciled by VoIP Guardian LLC, and that the payments due to Zoom Telecom for its services were paid to Zoom Telecom by VoIP Guardian LLC, by check, from the one-percent holdback, not by the Debtor. SUF ¶ 85.

### F. <u>The Trustee's Fiduciary Duty Claims</u>

The Trustee has also pleaded two fiduciary duty claims. He has sued Mr. Rahman and Mr. Proto for having allegedly "breached their fiduciary duties as both directors and officers of the Debtor," even though neither was a director nor officer of the Debtor. SUF ¶¶ 87 and 90 (the "<u>Fiduciary Duty Claim</u>"). And the Trustee asserts a claim against Mr. Rahman, Mr. Proto and Zoom Telecom for aiding and abetting Mr. Omanoff's alleged breach of fiduciary duties "[t]o the extent they did not owe direct duties of care and loyalty to the Debtor." SUF ¶ 88 (the "<u>Aiding and Abetting Claim</u>") (collectively, the "<u>Fiduciary Duty Claims</u>").

## III.

## <u>LEGAL STANDARDS</u>

### A. <u>Jurisdictional Statement</u>

This Motion addresses the Trustee's fiduciary duty claims arising under Delaware law. This Court has subject matter jurisdiction to make a dispositive ruling on the arguments raised herein pursuant 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O), and 1334.

**B. Standard for Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To meet their burden for summary judgment, Defendants need to demonstrate that there is an absence of evidence to support a necessary element of the Trustee's claims, which shifts the burden to the Trustee to show that there is a "genuine issue for trial," or alternatively, movants may demonstrate that the Trustee's claims are not based on valid interpretations of applicable law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339-40 (9th Cir. 1989) (confirming whether district court "applied the relevant substantive law" to summary judgment motion). The burden then shifts to the non-moving party to demonstrate that there is a genuine issue for trial, which requires "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**IV.**

**THE TRUSTEE'S FIDUCIARY DUTY CLAIMS FAILS AS A MATTER OF LAW**

**A. The Trustee's Fiduciary Duty Claims Hinge on a Showing of Insolvency from the Debtor's Inception**

The Trustee's standing to pursue his fiduciary duty claims as plaintiff, in the shoes of the Debtor, hinges on his allegations in his Complaint claiming that the Debtor was insolvent from its inception. Under Delaware law, when a wholly owned subsidiary is solvent, fiduciaries only owe a duty to the parent company – in this case, VoIP Guardian LLC. *Trenwick America Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 200 (Del. Ch. 2006) ("[I]n a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholder.") quoting *Andarko Petroleum Corp.*

*v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988). The *Trenwick* Court explained that Delaware law requires a subsidiary's directors to manage the subsidiary with loyalty to the parent, even if their actions harm the subsidiary. *Trenwick*, 906 A.2d at 201.

If the Debtor was insolvent at the time of any alleged breaches of fiduciary duty, then the claims that would arise from such breaches belong to creditors, and the Trustee might *appear* to have standing to pursue such claims. See *Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Entm't, LLC)*, 520 B.R. 455, 472 (Bankr. D. Del. 2014) (dismissing trustee's breach of fiduciary duty claims for lack of standing where complaint failed to clearly allege insolvency at the time of alleged breaches).

Defendants have filed a companion motion for summary judgment [Dkt No. 447] which addresses financial and damages issues, challenging the Trustee's claim that the Debtor was insolvent from its inception, and showing that the conduit Debtor could not have experienced any damages when DLI's collateral was not returned for repayment to DLI (the "Amended MSJ"). If the Court grants Defendants' Amended MSJ, the instant Motion may be mooted, depending on the nature and the scope of the Court's relief. To the extent that the Court finds that the Trustee cannot prevail on a showing of insolvency at the time of alleged breaches of fiduciary duties, whether by a lack of evidence or by his failed efforts to obtain a Ponzi presumption, dismissal of the fiduciary duty claims for a lack of standing may be necessary. *Id*.

To whatever extent the Trustee's Fiduciary Duty Claim and Aiding and Abetting Claim remain pending, the following arguments provide that the Trustee cannot meet at least one of the elements of his claims, or they are subject to affirmative defenses.

## B. <u>The Trustee's Fiduciary Duty Claims Hinge on Actual or De Facto Officer Status</u>

### 1. <u>Mr. Proto and Mr. Rahman Were Not "Officers" of the Debtor</u>

The fundamental first element of a breach of fiduciary duty claim under Delaware law is that the defendant owed a fiduciary duty to the plaintiff. The Trustee claims that Mr. Rahman and Mr. Proto owed such a duty by serving as "officers" or "directors." And when these two labels are shown to be incorrect, he will allege that they were both "de facto" officers of the Debtor, hoping that he can create an alternative fiduciary duty. But the Trustee fails on both steps of his argument.

The Trustee alleges in his Complaint that:

> Omanoff, Proto, Rahman, and Phillipson served as directors and officers of the Debtor as well as to the Management Company (the Debtor's sole member) or otherwise owed fiduciary duties thereto.

SUF ¶ 89. In the allegations specific to the Trustee's Fiduciary Duty Claim, he alleges that "Omanoff, Proto, Rahman, and Philipson and each of them, breached their fiduciary duties as both directors and officers of the Debtor." SUF ¶ 90.

The Debtor had no officers or directors. SUF ¶ 37-38, 41-42. There are no provisions under the LLC Agreement for "Directors" of any kind. SUF ¶ 39. Mr. Omanoff has testified that the Debtor did not need Officers because "[t]he management company, VoIP Guardian, which has managers and members as a whole, was running VoIP Guardian Partners I." SUF ¶ 38.

Mr. Omanoff further testified at his deposition that:

> I don't recall there being officers specifically assigned to VoIP Guardian Partners I, the debtor; that the management and officers would have been at the management company level being that VoIP Guardian Partners I was just a sole-purpose vehicle to house Direct Lending's money. [SUF ¶ 42].

The Trustee's case has been based all along on a series of marketing letters prepared by Mr. Omanoff where he handed out titles to a long list of individuals, including Mr. Rahman and Mr. Proto. It has always been a misleading argument, particularly as the marketing letters are not about the Debtor, but are describing the business of VoIP Guardian, LLC, defined in each letter as the "Company." SUF ¶¶ 92-93. Moreover, Mr. Omanoff's decision to hand someone a title in a marketing letter is not equivalent to a corporate resolution establishing an officer role. *Goldman v. Shahmoon*, 42 Del. Ch. 227, 229, 208 A.2d 492, 493-94 (1965) ("One distinction between officers and agents or employees of a corporation lies in the manner of their creation. An office is created usually by the charter or bylaws of the corporation, while an agency or employment is created usually by the officers.") (quoting Vol. 13, American Jurisprudence, Officers, § 866). Fiduciary duties arise when a formal process for creating the officer role has been satisfied under Delaware's "bright line" rule. *In re Walt Disney Co. Derivative Litig.*, 2004 WL 2050138 at *4, 2004 Del. Ch. LEXIS 132 (Del. Ch. Dec. 10. 2004) (adopting a "bright-line rule whereby officers and directors become fiduciaries only when they are officially installed, and receive the formal investiture of

authority that accompanies such office or directorship"). A marketing letter is not even an *informal* investiture of authority.[3]

Mr. Rahman and Mr. Proto were not officers of the Debtor or of VoIP Guardian LLC, and they did not owe the Debtor any fiduciary duty by reason of an "officer" or "director" status that did not exist.

**2. Delaware Law Will Not Support a Finding that Either Defendant Owed a Fiduciary Duty to the Debtor Under Any Alternative Theory of Liability**

The VoIP Guardian LLC Operating Agreement only recognizes a fiduciary duty that the Manager owed to the Company and Members because, under Delaware law, shareholders or non-managing members do not owe fiduciary duties to the company. *US Airways Group v. British Airways PLC*, 989 F. Supp. 482, 494 (S.D.N.Y. 1997) ("It is well-settled under Delaware law that a shareholder does not owe a fiduciary duty to the corporation unless it owns a majority interest in or exercises control over the business affairs of the corporation."); citing *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) ("Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation."). *See also NHB Assignments LLC v. Gen. Atl. LLC (In re PMTS Liquidating Corp.)*, 526 B.R. 536, 544 n.5 (D. Del. 2014) (under Delaware law, holding a "position of trust and confidence … is not a valid basis to establish fiduciary duty between a shareholder and the company in which it invests."

Mr. Proto was a member of Mudmonth, which held a minority interest in VoIP Guardian LLC of no more than 40%, and had no established management authority or voting rights. SUF ¶¶ 11 and 27. Under Delaware law, he owed no fiduciary duty to VoIP Guardian LLC, let alone its wholly owned SPV, the Debtor. *Id.* Mr. Rahman was even more remote from the Debtor's corporate structure, as he was not an officer, "director," member, or shareholder of any entity in the Debtor's corporate structure. Instead, he ran Zoom Telecom, which provided a service required

[3] The Trustee's arguments of the past four years appear to reflect confusion between the "apparent authority" by which a non-officer can bind a corporation when third parties are led to believe that they carry authority, with the "actual control" and domination of the board that is required to establish a *de facto* officer that owes fiduciary duties. *See* below.

for each investment in exchange for a fee deducted from the factored clients' funds, paid directly to Zoom Telecom by VoIP Guardian LLC, not by the Debtor. SUF ¶¶ 82-83.

The Trustee will argue that Mr. Rahman and Mr. Proto became "de facto" officers of the Debtor under Delaware law and therefore owed the Debtor a fiduciary duty. But the standard under Delaware law for *de facto* officer status is exceedingly high, and uncontroverted facts demonstrate that the Trustee cannot demonstrate such a case.

In *Anderson Dig., LLC v. ANConnect, LLC (In re Our Alchemy, LLC)*, 2019 WL 4447519, 2019 Bankr. LEXIS 2907 (Bankr. D. Del. Sept. 16, 2019), the court summarized the facts of several cases where a non-officer was found to be a *de facto* fiduciary, demonstrating circumstances far in excess of anything that could be alleged in this case:

> In [*Triple H Family Limited Partnership v. Neal*, 2018 WL 3650242, at *14 (Del. Ch. July 31, 2018)], the Court of Chancery found that an individual acted as a *de facto* manager where he signed the LLC's certificate of formation, had his personal attorney draft the operating agreement, directed the CFO of a different entity he controlled to handle the LLC's accounts, loaned working capital to the firm, approved hiring decisions and employee compensation, and staffed the LLC with his own associates. *Triple H*, 2018 WL 3650242, at *14. In the corporate context, [*Kahn v. Lynch Comm. Sys., Inc.*, 638 A.2d 1110, 1114-15 (Del. 1994)] dealt with a 43.3% shareholder who exerted actual control over the board's decision-making process to approve a strategic acquisition where the directors deferred to the demands of its controlling shareholder rather than follow their own business judgment. *Id*. at 1114-115. In *Kahn v. Lynch*, the controller was so brazen as to tell the board "you must listen to us" and threatened to take full control of the company if the board did not meet their demands. *Id*. at 1114.

*In re Our Alchemy, LLC*, 2019 WL 4447519 at *6.

In the context of a minority shareholder, such as Mudmonth, owned by Mr. Proto, the Delaware Supreme Court has held that "a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) (emphasis added). The same court has further explained that such control to establish a *de facto* duty must arise to a "dominating" level to qualify. *Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 70 (Del. 1989) ("A shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status. For a

dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder though actual control of corporation conduct.").

"Domination" is not giving advice, persuading others to follow a path, or even providing a service that is relied upon. Domination by a minority equityholder sufficient to create a fiduciary duty requires that the individual control the board "such that the directors of [the company] could not freely exercise their judgment." *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 993 (Del. Ch. 2014). The "actual control" test "is not easy to satisfy," and can only be met where "stockholders who, although lacking a clear majority, have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control." *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006). The "minority blockholder's power must be 'so potent that independent directors . . . cannot freely exercise their judgment, fearing retribution' from the controlling minority blockholder." *In re Morton's Restaurant Group, Inc. Shareholders Litigation*, 74 A.3d 656, 664-65 (Del. Ch. 2013).

The Trustee cannot establish that either Mr. Proto or Mr. Rahman owed the Debtor a fiduciary duty merely because of "influence" over Mr. Omanoff, or Mr. Omanoff's reliance on their experience, as that is not the standard. Where the defendant was an employee, concepts such as influence or use of confidential information can be enough to establish that employee as a fiduciary.

But that is not a standard that applies to a minority shareholder or a contracting party. In *Witmer v. Armistice Cap., LLC*, 2025 WL 2350799 at *8-16, 2025 Del. Ch. LEXIS 207 (Del. Ch. Aug. 14, 2025), the court explained in a lengthy discussion the distinction between the standard that applies to an employee, and the far stricter standard that applies to a minority shareholder, holding that a 41% owner of a company did not owe a fiduciary duty, despite receipt and use of confidential information, where they were not a "controller" of the company.

Controlling the board – or in this case, the Managing Member, Mr. Omanoff – is "the <u>operative question</u> under Delaware law," and is more critical to the establishment of a fiduciary duty than any operational roles. *In re KKR Fin.*, 101 A.3d at 993 (emphasis added). In *KKR Fin.*, the Delaware Chancery Court explained that even though the defendant "managed the day-to-day operations of" the company, this was insufficient to establish fiduciary status because there was no

showing that the defendant "controlled" the board. *Id.* No amount of advice, information, or telephone conversation between Mr. Omanoff and either defendant would be sufficient to establish a fiduciary duty without evidence demonstrating that either defendant so controlled and dominated Mr. Omanoff's role as Managing Member that he was left unable to "freely exercise [his] judgment, fearing retribution' from" Mr. Proto or Mr. Rahman. *In re Morton's Restaurant Group,* 74 A.3d at 664-65. There is no evidence that comes close to this standard.

Mr. Proto did not own a majority interest in VoIP Guardian LLC or, by extension, the Debtor. There is no evidence in the record that could justify a finding that Mr. Proto "dominated" the VoIP Guardian LLC business in the manner required by Delaware law, let alone any suggestion that he "dominated" the Debtor's sole function to serve as a conduit for DLI's loan proceeds. In order to create a material issue for trial, the Trustee would need to come forward with legitimate evidence demonstrating that Mr. Proto dominated VoIP Guardian LLC, despite Mr. Omanoff's ownership control, despite Mr. Omanoff's role as the sole Manager on the Board of Managers for the sole Member and Manager of the Debtor. Evidence that Mr. Omanoff relied on someone's advice or fulfillment of certain tasks is not evidence of domination over the business in a manner that could qualify for the "insider" exception under Delaware law. But there is no evidence that Mr. Proto played *any* sort of day-to-day role in the operations of either VoIP Guardian LLC or the conduit Debtor, and certainly nothing that could rise to the level of a "dominating" role.

In the case of Mr. Rahman and Zoom Telecom, similar "domination" over Mr. Omanoff and his operation of the business is required. For a contractual relationship to create a *de facto* fiduciary relationship, it requires "confidence reposed by one side and domination and influence exercised by the other." *BAE Sys. N. Am., Inc. v. Lockheed Martin Corp.*, 2004 Del. Ch. LEXIS 119, 2004 WL 1739522, at *8, n.62 (Del. Ch. Aug. 3, 2004) (following *Gross v. Univ. of Chi.*, 14 Ill. App. 3d 326, 302 N.E.2d 444, 453-54 (Ill. App. Ct. 1973) for its application of the Restatement (Second) for Torts). The Chancery Court in *BAE* went on to explain that any effort to establish a fiduciary duty "would also have to meet the standard for a fiduciary relationship spelled out in *Gross*" given that it is one of the few cases to address the Restatement (*id.*). *Gross* explains that the evidence required to establish a fiduciary relationship is proof of "domination and influence"

by the defendant beyond the contractual relationship itself, and went on to dismiss claims where the evidence had not been shown. *Gross*, 14 Ill. App. 3d at 339.

The Trustee will claim that Mr. Omanoff reposed confidence in Mr. Rahman, and will argue that Mr. Rahman exerted influence by reason of his experience and technological knowledge. But far more is required when the relationship is a contractual relationship. In *Nieves v. Insight Bldg. Co., LLC*, 2020 WL 4463425, 2020 Del. Ch. LEXIS 256 (Del. Ch. Aug. 4, 2020), the Chancery Court expanded on the "confidence" and "domination" requirements to find that no fiduciary duty existed where the parties were engaged in a profit-driven commercial relationship. The court explained that:

> The fact that a relationship involves "trust in the specialized knowledge or skill of one party," however, does not turn it into a fiduciary relationship. Rather, a fiduciary relationship "requires confidence reposed by one side *and* domination and influence exercised by the other."

*Nieves*, 2020 WL 4463425 at *6 (emphasis in original) (quoting *Prestancia Mgmt. Group, Inc. v. Va. Heritage Found., II LLC*, 2005 Del. Ch. LEXIS 80 *23-24, 2005 WL 1364616, at *6 (Del. Ch. May 27, 2005)). The court in *Nieves* explained that, because the concept of fiduciary duties arose from the law of truats, the "hallmark of a fiduciary relationship" is illustrated by a trustee/beneficiary relationship, where "both parties" have the "good of the beneficiary" as their goal, and the defendant "must pursue this end <u>to the exclusion of any other interests</u>." *Id*. (emphasis added). But in a commercial relationship, the court went on to explain, "a legal regime imposing broadly such relationships, by definition, would hamstring parties' ability to self-order, with perverse effects on efficiency and the right to contract." *Id.* For that reason, the court held that "[b]roadly imposing such relationships would be inimical to commercial affairs, and fiduciary duties are thus narrowly implied, arising only in the conditions described above. *Id*.

The parties in *Nieves* were engaged in a for-profit business relationship, and because the court found that "the ends sought by the parties were not identical" in the manner that a trustee must subvert its interests to the common "good of the beneficiary," it concluded that no fiduciary relationship had been created. *Id*., at *7. See also *Bird's Constr. v. Milton Equestrian Ctr*., 2001 Del. Ch. LEXIS 140, at *13-*14 (Del. Ch. Nov. 16, 2001) (downplaying reliance as a sufficient

factor in a business relationship, stating "[o]ne may place trust in a workman of any sort and does place trust in one's physician, but it would hardly be contended that such trust would warrant chancery's assuming jurisdiction over a claim that a workman or physician caused injury by want of due care.").

In other words, mere confidence and influence, and even a common shared interest to make a profit, do not come close to establishing a fiduciary duty to the Debtor where Mr. Rahman provided a service through Zoom Telecom in exchange for a fee paid by VoIP Guardian LLC using funds held back from each factoring client. No funds of the "Debtor" were ever involved in payment to Zoom Telecom, as the Debtor was a mere conduit with no ability to use DLI's loan proceeds for any purpose of its choosing. The Trustee will need to prove with evidence that Mr. Rahman did not merely influence Mr. Omanoff's operation of the Debtor, but dominated his operation of the Debtor and acted in the manner of a trustee, subverting his own commercial interests for the shared good of the Debtor. There is no evidence that could meet this standard.

The Trustee will likely quote testimony from Mr. Omanoff claiming that he knew nothing about the telecom monitoring carried out by Zoom Telecom, and will argue that Mr. Omanoff's reliance on Mr. Rahman establishes a special relationship sufficient to create a fiduciary duty. But there is no evidence that Mr. Rahman acted in the manner of a trustee, with a shared singular goal to which he subverted all other interests, and "dominated" the business operations of either VoIP Guardian LLC or its conduit SPV, the Debtor. Rather, the evidence is that Mr. Rahman provided a service through Zoom Telecom in exchange for a fee that was paid by VoIP Guardian LLC, <u>not</u> by the Debtor. SUF ¶ 85. Neither Mr. Rahman nor Zoom Telecom received any profit distributions from VoIP Guardian LLC or the Debtor, nor any other form of compensation that could suggest a joint venture or other shared business relationship. The mere fact that VoIP Guardian LLC's business depended on the services provided by Zoom Telecom is not sufficient to create a fiduciary duty absent evidence that Mr. Rahman dominated Mr. Omanoff's decisions and functions. VoIP Guardian LLC's business also depended on the services of First Republic Bank, and its investor, DLI, among others. Indeed, if there is any party in this litigation that could be shown by evidence to have elevated a position of reliance into one of dominance over the Debtor, it is DLI.

Neither Mr. Proto nor Mr. Rahman owed the Debtor a fiduciary duty, either as "officers," "directors," or "de facto" managers/officers. The Trustee's Fiduciary Duty Claims must fail.

## C. The Trustee's Aiding and Abetting Claims Are Barred by the Doctrine of *In Pari Delicto*

### 1. The *In Pari Delicto* Defense Applies in Bankruptcy to a Trustee's Pursuit of a Debtor's Claims

The Trustee's Aiding and Abetting Claim is a fallback claim that the Trustee has pleaded against Mr. Rahman, Mr. Proto and Zoom Telecom because he is well aware that he cannot present credible evidence showing that Mr. Rahman or Mr. Proto owed the Debtor a fiduciary duty, and therefore he needs leverage to assert a claim against them as non-fiduciaries. But it is also a claim that fails under the *in pari delicto* defense.

"A claim for aiding and abetting a breach of fiduciary duty requires … (1) the existence of a fiduciary relationship; (2) a breach of that duty; (3) knowing participation by the non-fiduciary; and (4) damages." *Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.)*, 361 B.R. 747 (Bankr. D. Del. 2007) (citation omitted).

When a trustee in bankruptcy pursues a debtor's purported claim for breach of fiduciary duties, "the trustee steps into the shoes of the debtor, taking such rights of action subject to any defenses a defendant would have had against the debtor, including *in pari delicto*." *Seror v. Farias (In re L.D.T Invs., Inc.)*, No.: 1:11-bk-22664-MT, 2017 Bankr. LEXIS 1029 *18-19 (C.D. Cal. April 13, 2017) (granting summary judgment against trustee on pre-petition usury claims on grounds of *in pari delicto*).

In *Rund v. Lee (In re Amergence Technology, Inc.)*, 2016 Bankr. LEXIS 2723 *5, 2016 WL 4069550, at *2 (Bankr. C.D. Cal. July 27, 2016), the court observed: "[a]lthough the Ninth Circuit has not directly addressed the issue, every circuit to have considered the question has held that a defendant sued by a trustee in bankruptcy may assert the defense of *in pari delicto*, if the jurisdiction whose law creates the claim permits such a defense outside of bankruptcy."

When the doctrine arises in bankruptcy, it asks whether the debtor could have asserted the same claim prepetition or would have been barred by unclean hands. In other words, it requires asking in this proceeding whether the Debtor, controlled by Mr. Omanoff through his entity

Omanoff America, could have filed a prepetition lawsuit against Mr. Proto and/or Mr. Rahman asserting that they aided his alleged breach of fiduciary duties. Because Mr. Omanoff was in full control of both VoIP Guardian LLC and the Debtor as the majority owner and sole legal authority, and was the sole actor with respect to any breach of fiduciary duties, this is a classic case where *in pari delicto* bars the claims by the Debtor.

### 2. The *In Pari Delicto* Defense Is Governed by Delaware Law

It is blackletter law that claims arising under the internal affairs of a Delaware corporation or LLC are determined by Delaware law under the internal affairs doctrine, which is not merely recognized by federal courts, but is also codified in California as Corporations Code section 2116. *See Friese v. Superior Court*, 134 Cal.App.4th 693, 706 (2005) ("As applied to directors' liability, section 2116 is a codification of the 'internal affairs doctrine'"); *Mattel, Inc. v. MGA Entm't, Inc.*, 705 F.3d 1108, 1110 (9th Cir. 2013) ("[c]laims involving 'internal affairs' of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation.").

### 3. The Breached Fiduciary Duty Alleged by the Trustee is a Breach by the Sole Actor in Control of the Debtor

The Aiding and Abetting Claim alleges that Mr. Rahman, Mr. Proto and Zoom Telecom aided and abetted Rodney Omanoff's breach of fiduciary duties:

> 192. Omanoff is sued under this claim in his capacity as the sole member and managing member of Omanoff America LLC. Omanoff America LLC is the manager of the Debtor's parent company, VoIP Guardian LLC.
>
> 193. To the extent they did not owe direct duties of care and loyalty to the Debtor, Proto, Rahman, Zoom Telecom, Philipson, and each of them, provided material assistance and aided Omanoff in breaching his fiduciary duties by, among other things …

Complaint at ¶ 192-193.

The Trustee has phrased the claim in this manner because Rodney Omanoff is the only individual who can be shown to owe the Debtor a fiduciary duty, by reason of his status as the controlling shareholder of VoIP Guardian, LLC, and the sole Manager of the Debtor's Managing Member, among other positions of control that he asserted over the Debtor and its operations. SUF ¶¶ 3-4, 7, 14.

But, if Mr. Omanoff breached any fiduciary duties that he owed to the Debtor, it would have arisen in the course of his employment as the individual who managed and controlled the Debtor's Managing Member, and therefore under Delaware law his conduct is imputed to the Debtor and the Trustee. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358 (3rd Cir. 2001) (If an officer's conduct is carried out in the course of his employment, for the benefit of the corporation, then the conduct is imputed to the corporation). While the Third Circuit in *Lafferty* analyzed the *in pari delicto* defense under Pennsylvania law as it applied to a committee of unsecured creditors, including analyzing cases applying the concept to bankruptcy trustees, the same concepts have been applied to Delaware law, discussed below.

The Third Circuit explained in *Lafferty* that the "adverse interest" exception applies where the breaching party's conduct did not benefit the corporation, but that the "adverse interest" exception is subject to its own exception known as the "sole actor" exception. *Id.*, at 359.

> The general principle of the "sole actor" exception provides that, if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests. The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability.

*Lafferty*, 267 F.3d at 359 (internal citations omitted). Delaware courts have followed *Lafferty* and applied the same "sole actor" exception under Delaware law. *Stewart v. Wilmington Trust SP Servs.*, 112 A.3d 271, 310 (Del. Ch. 2015) (following *Lafferty* and applying "sole actor" exception); *Claybrook v. Broad & Cassel, P.A. (In re Scott Acquisition Corp.)*, 364 B.R. 562 (Bankr. D. Del. 2007) (same).

Even if the Court were to apply California law to the Trustee's claims, California law is consistent. For example, in *Uecker v. Wells Fargo Capital Fin., LLC (In re Mortg. Fund '08 LLC)*, 2014 WL 543685 *4-5, 2014 Bankr. LEXIS 562 (Bankr. N.D. Cal. Feb. 11, 2014), the court followed *Lafferty* and dismissed a trustee's fiduciary duty claims against a bank, without leave to amend, on the grounds that the "sole actor" exception applied where the debtor's "only owner, only member, and only manager … was, in turn, owned and controlled by" two individuals. The court expressly laid out this ownership and control arrangement as the basis for the defense:

> The Complaint alleges that Walter and Kelly Ng, the sole relevant decision makers, were also the sole owners of the Mortgage Fund which was the sole owner and sole member of MF08. Accordingly, the allegations of the Complaint show that the sole actor exception applies here as it did in Lafferty and Peregrine Funding.

*Uecker*, 2014 WL 543685 at *5. See also *Sugarman v. Taylor (In re Yellow Cab Coop., Inc.)*, 602 B.R. 357, 362 (Bankr. N.D. Cal. 2019) (dismissing trustee's breach of fiduciary duty claims against alleged corporate agents after applying *in pari delicto defense* and "sole actor" exception). In the same manner as *Uecker*, this Debtor had a single owner, single member, and single manager, all controlled by Rodney Omanoff, the "sole actor."

There should be no need to reach the "sole actor" exception, as the Debtor was a shell SPV whose sole "assets" were DLI's perfected collateral. There were no assets belonging to the Debtor to be looted or lost, and therefore the Debtor lost nothing when two Originator entities did not pay factored invoices in January 2019. The loss was DLI's alone. Because the Debtor had no assets to lose, and lost nothing of its own, the "adverse interest" exception cannot apply. But even if the Court were to find that Mr. Omanoff did breach fiduciary duties owed to the Debtor, and that his conduct was adverse to the Debtor's interests, Mr. Omanoff was the Debtor's sole actor.

The holding and facts of *Uecker* demonstrate why the Trustee's Aiding and Abetting Claim cannot succeed. Mr. Omanoff was the sole manager of Omanoff America, LLC, which in turn was the sole manager of the Board of Managers of VoIP Guardian, LLC, which in turn was the sole Member of the Debtor, owning 100% of the Debtor's membership interests. SUF ¶¶ 3-4. All decision-making powers rested with Mr. Omanoff under the VoIP Guardian LLC Operating Agreement and the LLC Agreement. He could take advice from Mr. Rahman or Mr. Proto, but neither of them had the power to bind either VoIP Guardian LLC or the Debtor to a contract, or to overrule Mr. Omanoff on any corporate decision. SUF ¶¶ 11, 21-24, 27. Relying on either of them for advice or experience or ideas or technological services does not establish that they exercised "control" in any manner that could diminish Mr. Omanoff's sole corporate authority to make all corporate decisions under the LLC Agreement and the VoIP Guardian LLC Operating Agreement.

Mr. Omanoff was the sole actor for purposes of *in pari delicto*, and any breach of fiduciary duties by Mr. Omanoff that could qualify as a breach under the corporate documents (*i.e.*, be

"willful misconduct or gross negligence), and that could have been aided and abetted by anyone, is conduct that is imputed to the Debtor – and the Trustee in the Debtor's shoes – by the *in pari delicto* doctrine.

**4. The Defendants Are Not "Insiders" Under Delaware Law for Purposes of the *In Pari Delicto* Defense**

The Trustee is certain to argue that *in pari delicto* does not apply where a debtor/trustee is suing the debtor's own insiders. But the concept of an "insider" for purposes of Delaware's *in pari delicto* doctrine is not the same as the broad definition of an "insider" under the Bankruptcy Code.

Delaware law recognizes an "insider exception" to *in pari delicto* that permits a debtor/trustee to sue an insider, but limits the definition of "insider" to someone that controls the debtor. The insider exception does not hinge on the broad definition of "insider" provided by Section 101(31)(B) of the Bankruptcy Code. Rather, the "insider exception" to the *in pari delicto* defense hinges on a defendant's demonstrable "control" over the corporation, which thereby renders the defendant an "insider."

In *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 389 B.R. 357, 367 (D. Del. 2008), the District Court addressed the insider exception under New York law, although as will be seen, the decision has been applied to Delaware law. The court addressed the "insider exception" and stated that it "makes little sense without some showing of control or domination by the alleged insider over the debtor. The justification for the insider exception is that *in pari delicto* should not apply '[w]here the parties do not stand on equal terms and one party controls the other'." *Oakwood Homes*, 389 B.R. at 367 (quoting *In re KDI Holdings, Inc.*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999)) (emphasis added).

The Third Circuit affirmed on appeal, rejecting use of the Bankruptcy Code definition of "insider" for purposes of *in pari delicto defense* as "misplaced," and dismissing claims where evidence showed the debtor remained in "control" of its corporate decisions. *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 356 Fed. Appx. 622, 628 (3d Cir. Dec. 16, 2009). The decision has since been extended to Delaware law. *See, e.g.*, *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 514 (D. Del. 2012) ("only those who actually control the

corporation are considered 'insiders' for" purposes of the *in pari delicto* defense) (Delaware law, following *Oakwood Homes*); *In re Extended Stay, Inc.*, No. 09-13764-JLG, 2020 Bankr. LEXIS 2128 *182, 2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) (for defenses to Delaware state law claims, finding that *in pari delicto* defense requires looking to whether "the Defendants have dominated or controlled" the debtor).

The Trustee's case is based on his claims that Mr. Rahman and Mr. Proto were copied on emails from Mr. Omanoff that they presumably read and did not object to. That is not the standard of control and domination that applies.

The Trustee's case is based on his claims that Mr. Rahman and Mr. Proto did not force Mr. Omanoff to conduct deeper due diligence than what was required by DLI. But that is not the standard of control and domination that applies.

The Trustee's case is based on Mr. Omanoff's belief that Mr. Rahman and Mr. Proto were secretly behind potential clients who reached out to Mr. Omanoff to discuss potential business. But that is not the standard of control and domination that applies.

The Trustee's case is based on statements in marketing and underwriting letters that Mr. Omanoff sent to both DLI and several potential new clients, and that he cc'd to Mr. Rahman and Mr. Proto, to which Mr. Rahman and Mr. Proto did not object. But that is not the standard of control and domination that applies.

None of the Trustee's arguments have demonstrated that he has any evidence to suggest that Mr. Rahman or Mr. Proto exerted such control and domination over Mr. Omanoff's functioning as the majority shareholder of VoIP Guardian LLC and sole Managing Member of the Debtor that they could qualify for the insider exception under Delaware law.

Every contract and every material corporate communication of VoIP Guardian LLC on behalf of the Debtor was carried out by Mr. Omanoff, consistent with his role as the sole Managing Member. Neither Defendant had any voting power to replace Mr. Omanoff or Omanoff America under either the VoIP Guardian LLC Operating Agreement or the LLC Agreement. SUF ¶¶ 11, 21-24, 27. Mr. Omanoff at all times retained the corporate power to reject their advice or services and proceed with the business in any manner he might choose – subject to DLI's approval and

willingness to release DLI's loan proceeds for such a purpose. Neither Mr. Proto nor Mr. Rahman ever obtained corporate authority that would have allowed them to overrule Mr. Omanoff or dominate *his* control of the business in any manner.

Throughout this litigation, the Trustee's case has been about the <u>opposite</u> of domination and control. It has been about silent consent, or a "failure" to object, such as Mr. Rahman's and Mr. Proto's apparent failure to object to titles that Mr. Omanoff gave to each of them in marketing letters. Such silent consent must – according to the Trustee – serve as consent to be bound by a fiduciary standard. But acquiescence is not the standard that applies. Even willing acceptance of a title that has the word "officer" in the title is not the standard that applies. The standard lies at the opposite end of the spectrum – control and domination over the majority shareholder and sole Managing Member's operation of a shell company. Silent acceptance of decisions made by a controlling shareholder and sole corporate authority is evidence of control and domination **<u>by</u>** the controlling shareholder and sole corporate authority, not control and domination <u>over</u> that individual.

Neither Mr. Proto nor Mr. Rahman nor Zoom Telecom qualify as an "insider" of the Debtor for purposes of the insider exception to the *in pari delicto* defense. The Trustee cannot prevail on his Aiding and Abetting Claim, and it must be dismissed.

## V.

## <u>CONCLUSION</u>

Neither Mr. Proto nor Mr. Rahman were "officers" or "directors" of the Debtor. Neither owed the Debtor or VoIP Guardian LLC a fiduciary duty, and neither can be liable for a breach of a duty that they did not owe.

Nor can the Trustee fall back on his Aiding and Abetting Claim, as Mr. Omanoff was the sole actor in control of the Debtor, his conduct is imputed to the Debtor and the Trustee, and it bars the Trustee's claim by *in pari delicto*.

WHEREFORE, for the reasons and applicable law briefed herein, Defendants respectfully request that this Court dismiss or overrule the Trustee's Fiduciary Duty Claim and Aiding and Abetting Claim.

Dated: November 4, 2025

BAKER & HOSTETLER LLP

By: *_/s/ David J. Richardson_*
David J. Richardson
*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, and Zoom Telecom, Inc.*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
1900 Avenue of the Stars, Suite 2700, Los Angeles, CA 90067

A true and correct copy of the foregoing document(s) entitled (*specify*):

- **NOTICE OF MOTION AND MOTION OF MARK PROTO, YOUSSEF RAHMAN AND ZOOM TELECOM, INC. FOR PARTIAL SUMMARY JUDGMENT ON SECOND AMENDED COMPLAINT**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) November 4, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Jonathan Feldman – feldman@katiephang.com
Jessica Bagdanov – jbagdanov@bg.law
Jason Komorsky – jkomorsky@bg.law
Jessica Wellington – jwellington@bg.law
Corey Weber – cweber@bg.law
Michael Chekian – mike@cheklaw.com
Cynthia Cohen – ccohen@brownwhitelaw.com
Aaron E. De Leest – adeleest@marschackhays.com
Michael Gottfried – mgottfried@elkinskalt.com
Steven Gubner – sbugner@gl.aw
Steven Kurtz – skurtz@lakklawyers.com
Olaf Muller – olaf@olafmullerlaw.com
Scott Siegel – ssiegel@laklawyers.com
United States Trustee – ustrpregion16.la.ecf@usdoj.gov
Timothy Yoo – thytrustee@lnbyg.com
Roye Zur – rzur@elkinskalt.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) ________________, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) November 4, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA PERSONAL DELIVERY
Honorable Barry Russell
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

John Philipson - john@philipsonintl.com (by email)

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| November 4, 2025 | David J. Richardson | */s/ David J. Richardson* |
| *Date* | *Printed Name* | *Signature* |