**BAKER & HOSTETLER LLP**
David J. Richardson (SBN168592)
(drichardson@bakerlaw.com)
Lauren Attard (SBN 320898)
(lattard@bakerlaw.com)
Jack Koehn (SBN 358542)
(jkoehn@bakerlaw.com)
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067-4301
Telephone: (310) 820-8800
Facsimile: (310) 820-8859

and

Jorian L. Rose (*pro hac vice*)
(jrose@bakerlaw.com)
45 Rockefeller Plaza
New York, NY 10111-0100
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC and Overseas Charters Inc.*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| VOIP GUARDIAN PARTNERS I, LLC,<br><br>Debtor. | Case No.: 2:19-bk-12607-BR<br><br>Chapter 7 |
| TIMOTHY YOO, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>VOIP GUARDIAN LLC, *et al.*,<br><br>Defendants. | Adv. No. 21-ap-01044-BR<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON TRUSTEE'S SECOND AMENDED COMPLAINT PURSUANT TO 11 U.S.C. § 550(a) AND RELATED LAW**<br><br>Hearing Date: TBD<br>Time: TBD<br>Courtroom: TBD |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, THE PLAINTIFF AND HIS COUNSEL, ALL NAMED DEFENDANTS AND THEIR COUNSEL, AND ALL PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Mark Proto, Youssef "Joseph" Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc. (collectively, the "Defendants"), all named as defendants in the *Second Amended Complaint for: 1. Breach of Fiduciary Duty; 2. Aiding and Abetting Breach of Fiduciary Duty; 3. Avoidance of 2-Year Fraudulent Transfers (Actual Intent); 4. Avoidance of 2-Year Fraudulent Transfers (Constructive Fraud); 5. Avoidance of 4-Year Fraudulent Transfers (Actual Intent); 6. Avoidance of 4-Year Fraudulent Transfers (Constructive Fraud); 7. Avoidance of Preferential Transfers; 8. Avoidance of Postpetition Transfers; 9. Recovery of Avoided Transfers; 10. Breach of Contract; 11. Unjust Enrichment; and 12. Claim Disallowance* (the "Complaint"), filed by the chapter 7 trustee Timothy Yoo (the "Trustee"), on August 17, 2021, hereby move by this motion (the "Motion") requesting that this Court enter judgment in favor of defendants pursuant to Fed. R. Civ. P. 56, or alternatively dismissing the Trustee's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (h), on the grounds that no recoveries of avoided transfers could be for the benefit of the estate under 11 U.S.C. § 550(a) and related California and federal law as the Trustee presently holds a multiple of the unencumbered cash required to pay any and all allowable unsecured claims in the full amount permitted under the Trustee's authority to proceed, and can no longer pursue recoveries "for the benefit of the estate" under applicable law when all future recoveries would benefit equity, a secured creditor, or the Trustee and his professionals.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Statement of Uncontroverted Facts, the Declaration of David J. Richardson filed herewith, and all documents in the record of the above-captioned adversary proceeding and chapter 7 bankruptcy case.

**PLEASE TAKE FURTHER NOTICE** that no hearing has been set for this Motion, nor for a companion motion for summary judgment filed herewith, pursuant to the Court's local procedures for dispositive motions.

Dated: November 26, 2025

**BAKER & HOSTETLER LLP**

By: *_/s/ David J. Richardson_*
David J. Richardson

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc..*

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ..... 1

II. FACTUAL BACKGROUND ..... 5

A. The Debtor's Business and Operating Agreements ..... 5

B. DLI's Funding Arrangements ..... 5

1. The Loan Agreement ..... 5

C. DLI Controlled All Disbursements of DLI's Loan Advances ..... 6

D. The DLI Stipulation ..... 7

E. The Trustee's Claim to Be Working for the Benefit of Unsecured Creditors ..... 8

1. The Settled or Withdrawn Claims ..... 8

2. The Secured DLI Proofs of Claim ..... 9

3. The Forefront Partners Proof of Claim ..... 9

4. The Only Potentially Allowable General Unsecured Claims ..... 10

5. The professional fees generated for the "benefit" of minimal unsecured creditors ..... 12

F. The Claims for Relief Pleaded in the Complaint ..... 13

III. LEGAL STANDARDS ..... 14

A. Jurisdictional Statement ..... 14

B. Standard for Summary Judgment ..... 14

IV. CONTINUATION OF THE TRUSTEE'S LITIGATION CANNOT PROVIDE GENERAL UNSECURED CREDITORS HOLDING ALLOWABLE CLAIMS WITH ANY "BENEFIT" ..... 15

A. Summary of Argument ..... 15

B. A Chapter 7 Trustee May Not Pursue Litigation that Only Provides "Benefit" under Section 550(a) to Parties Other than Allowed Unsecured Creditors ..... 16

C. A Chapter 7 Trustee Cannot Perpetuate Avoidance Claims for the Benefit of the Debtor or Its Equity Holders ..... 21

D. Avoided Transfers May Not Be Recovered Under Section 550(a)for the "Benefit" of a Secured Creditor ..... 24

E. A Chapter 7 Trustee's Duty to Investigate Includes a Duty to Refrain From Litigation that Does Not Meet a Cost-Benefit Analysis ..... 27

F. The Same Requirement of "Benefit" to General Unsecured Creditors Applies to the Trustee's Fiduciary Duty Claims ..... 29

G. The Forefront Claim Raises Serious Concerns of Propriety if it Could Be Relied upon to Justify Ongoing Litigation ..... 32

V. CONCLUSION ..... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*,
34 F.3d 800 (9th Cir. 1994) ........ 17, 18

*In re Allied Props., LLC*,
2007 WL 1849017, 2007 Bankr. LEXIS 2174 (Bankr. S.D. Tex. June 25, 2007) ........ 30

*American Broad. Sys. v. Nugent (In re Betacom of Phoenix, Inc.)*,
240 F.3d 823 (9th Cir. 2001) ........ 23

*In re C. Keffas & Son Florist, Inc.*,
240 B.R. 466 (Bankr. E.D.N.Y. 1999) ........ 28

*In re Carmona*,
362 B.R. 453 (Bankr. C.D. Cal. 2006) ........ 31

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 14

*Congress Credit Corp. v. AJC Int'l*,
186 B.R. 555 (D. P.R. 1995) ........ 16, 25, 26

*Congress Credit Corp. v. AJC Int'l*,
42 F.3d 686 (1st Cir. 1994) ........ 25

*Donell v. Mojtahedian*,
976 F. Supp. 2d 1183 (C.D. Cal. 2013) ........ 14

*In re Eugene Liggett*,
118 B.R. 219 (Bankr. S.D.N.Y. 1990) ........ 21

*In re Extended Stay, Inc.*,
2020 Bankr. LEXIS 2128, 2020 WL 10762310 (Bankr. S.D.N.Y. Aug. 8, 2020) ........ 21

*Ferrette & Slater v. U.S. Tr. (In re Garcia)*,
335 B.R. 717 (9th Cir. BAP 2005) ........ 31

*HSBC Bank USA, N.A. v. Blendheim (In re Blendheim)*,
803 F.3d 477 (9th Cir. 2015) ........ 9

*Houghton v. South*,
965 F.2d 1532 (9th Cir. 1992) ........ 14

*Ilardo v. Al's Diesel, Inc. (In re World Parts, LLC)*,
322 B.R. 37 (Bankr. W.D.N.Y. 2005) .......... 19, 26, 34

*Kingsley v. Wetzel (In re Kingsley)*,
518 F.3d 874 (11th Cir. 2008).......... 17

*Luzinski v. Peabody & Arnold LLP (In re Gosman)*, 382 B.R. 826 (S.D. Fla. 2007).......... 20

*Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC)*,
2020 WL 374357, 2020 Bankr. LEXIS 178 (Bankr. W.D. Okla. Jan. 17, 2020) .......... 19

*McCord v. Agard (In re Bean)*,
251 B.R. 196 (E.D.N.Y. 2000).......... 28, 29, 31

*Merrill Lynch Bus. Fin. Servs. v. Kupperman*,
2010 WL 2179181, 2010 U.S. Dist. LEXIS 52785 (D. N.J. May 27, 2010) .......... 26

*Moore v. Bay*,
284 U.S. 4 (1931) .......... 21

*Morris v. Kansas Drywall Supply Co. (In re Classic Drywall, Inc.)*,
127 B.R. 874 (D. Kan. 1991) .......... 19

*Nathan v. Brownstone Plastics, LLC*,
511 B.R. 863 (D. E.D. Mich. 2014) .......... 19

*Phillips v. Josmic 2 LLC (In re ONH AFC CS Invs., LLC)*,
671 B.R. 680 (Bankr. D. Del. 2025) .......... 21, 22

*Pritchard v. Brown (In re Brown)*,
118 B.R. 57 (Bankr. N.D. Tex. 1990) .......... 19

*In re Revco D.S., Inc.*,
1990 Bankr. LEXIS 2966 (Bankr. N.D. Ohio Dec. 17, 1990) .......... 21

*In re Riverside-Linden Inv. Co.*,
925 F.2d 320 (9th Cir. 1991).......... *passim*

*Rocco v. J.P. Morgan Chase Bank*,
No. 05–cv–00366, 2006 U.S. Dist. LEXIS 12850 (W.D. Pa. 2006), *aff'd In re Rocco*, 255 Fed. Appx. 638 (3d Cir. Nov. 28, 2007) .......... 17

*Rodriguez v. Tucker (In re Tucker)*,
2025 WL 926485, 2025 U.S. Dist. LEXIS 57707 (D. Col. March 27, 2025).......... 29

*Rombro v. Dufrayne (In re Med Diversified, Inc.)*,
461 F.3d 251 (2d Cir. 2006).......... 23

*Rushton v. Bank of Utah (In re C.W. Mining Co.)*,
477 B.R. 176 (10th Cir. BAP 2010), *aff'd* 749 F.3d 895 (10th Cir. 2014).......... 17, 27

*In re Scoggins*,
142 B.R. 940 (Bankr. D. Or. 1992) .......... 29

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Sec. Investor Prot. Corp.)*,
568 B.R. 481 (Bankr. S.D.N.Y. 2017) .......... 17

*Shay v. Hoffman (In re Metschan)*,
2025 WL 1355650, 2025 Bankr. LEXIS 1128 (9th Cir. BAP May 9, 2025) .......... 30, 31, 33

*Taggart v. Lorenzen*,
587 U.S. 554, 139 S. Ct. 1795, 204 L. Ed. 2d 129 (2019) .......... 22

*Tolz v. Miller (In re Todd)*,
391 B.R. 504 (Bankr. S.D. Fla. 2008) .......... 19

*Tzung v. State Farm Fire & Casualty Co.*,
873 F.2d 1338 (9th Cir. 1989) .......... 14

*In re Walnut Equipment Leasing Co.*,
1999 Bankr. LEXIS 1626, 1999 WL 1271762 (Bankr. E.D. Pa. 1999) .......... 23

*Wellman v. Wellman*,
933 F.2d 215 (4th Cir.), cert. denied, 116 L. Ed. 2d 279, 112 S. Ct. 339 (1991) .......... 17

**Statutes**

11 U.S.C. §510(b) .......... 23

11 U.S.C. § 544(b) .......... 13, 16

11 U.S.C. § 547 .......... 13, 16

11 U.S.C. § 548 .......... 13, 16

11 U.S.C. § 549 .......... 13, 16

11 U.S.C. § 550 .......... 16, 17, 22

11 U.S.C. § 550(a) .......... *passim*

11 U.S.C. § 554 (a) .......... 17

11 U.S.C. § 704 .......... 20

11 U.S.C. § 704(1) .......... 28

11 U.S.C. § 704(a)(1) .......... 20, 31

Cal. Civ. Code § 3439.01 .......... 16

Cal. Civ. Code § 3439.08 ........ 16, 20

Cal. Civ. Code § 3439.08(b) ........ 20, 21, 35

Cal. Civ. Code § 3439.08(b)(1) ........ 16

**Rules**

Fed. R. Civ. P. 56 ........ 1

Fed. R. Civ. P. 56(a) ........ 14

Fed. R. Bankr. P. 9019(a) ........ 30

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. PRELIMINARY STATEMENT

Defendants bring this Motion for summary judgment on the grounds that the Trustee has sufficient funds to pay all potentially allowable non-equity unsecured claims (if any), and that his ongoing litigation cannot provide "benefit" to the estate under 11 U.S.C. § 550(a) and related law.

It is well-settled that a chapter 7 trustee administers an estate for the benefit of unsecured creditors and may not pursue litigation solely for the benefit of equity claims or secured creditors as there is no "benefit" to the general unsecured creditors to whom chapter 7 trustees owe their primary duties. When a chapter 7 trustee has recovered sufficient funds to pay all allowable claims of non-equity unsecured creditors in full, such claims must be paid and further litigation must cease in furtherance of the trustee's primary duty to expeditiously close the estate. The case may not be continued for the "benefit" of the debtor or its equity holders, secured creditors, a trustee's fees, or their professionals' fees. But such is *this* case.

This Trustee has recovered more than $12 million for the estate, all of which is DLI's collateral, but only $3.3 million of which was recovered in this Adversary Proceeding. Under the DLI Stipulation (defined below) approved by this Court at the outset of the case, DLI's collateral may be used to pay the fees of the Trustee and his professionals, and to pay any allowed unsecured claims up to 30% of their allowed amount, after which all funds revert to DLI. Because the estate never had unencumbered assets of its own, unsecured creditors cannot recover more than 30% of their allowed claims no matter how long the Trustee continues to litigate.

The face value of claims of non-equity unsecured creditors that have not yet been disallowed total less than $200,000 if they were all allowed in full. Most of those claims, if not all, should be disallowed in part or in full, but that is not a necessary issue for purposes of this Motion. Rather, even if every remaining general unsecured creditor's claim was allowed in full, the amount due under the 30% cap would be less than $60,000, and the Trustee could pay such amount one hundred times over from cash in the bank. Yet he has already paid himself and his professionals more than $7.4 million in this case, and is now seeking approval of another $932,850.90, all for the "benefit" of purported unsecured creditors who – if they exist at all – are owed about $60,000.

The Trustee and his professionals should be declaring victory in this case (at least for their own benefit). They should be confirming the allowance or disallowance of unsecured creditors' claims, finalizing fees, and paying the remainder to DLI (if there is any remainder). But instead, they are continuing litigation against these Defendants even though the litigation can only benefit DLI's secured claim, equity holders, and professionals.

The Trustee will point to two other claims asserted against the estate: the claims of Forefront Partners, LLC ("Forefront") and VoIP Guardian LLC. But both are equity claims, by contract or judgment, to recover the profits of the Debtor's parent company. In other words, the remains of this chapter 7 case after the Trustee has timely and properly paid the claims of general unsecured claims (if any) is a fight between the actual or putative equity holders of non-debtor VoIP Guardian LLC, the Debtor's parent company, for their respective share of profits owed by that parent company. And after that, there is only the Trustee's collection of collateral for a secured creditor after the payment of professionals' fees. None of these qualify as a permissible purpose for an ongoing chapter 7 case.

The fight between equity holders has already been playing out in New York litigation since 2017 where it continues to this day. Forefront, a partner in VoIP Guardian LLC's predecessor, was pushed out of the business in 2015 when Mr. Omanoff formed VoIP Guardian LLC, and then sued Mr. Omanoff, Mr. Proto, Mr. Rahman, VoIP Guardian LLC, and others, to recover its share of the net profits of VoIP Guardian LLC.

Mr. Proto and Mr. Rahman settled any claims against them in 2018, but Mr. Omanoff and three of his entities took the case to trial. A New York jury rejected Mr. Omanoff's testimony claiming that the VoIP Guardian LLC business was an illegitimate business with no real profits to be shared with Forefront, and entered a judgment against the Omanoff defendants for more than $36 million in "net profit" made by VoIP Guardian LLC. That judgment was reversed in an intermediate appeal for retrial on the unclean hands defense, yet remains on appeal.

Forefront's judgment has not been entered against this Debtor. Yet Forefront filed a proof of claim asserting the Debtor's liability for the judgment even though the Debtor did not generate its own profits or receive the profits of VoIP Guardian LLC. Rather, the Debtor was a special

purpose entity that merely handled DLI's loan proceeds. Profits of VoIP Guardian LLC were paid to equity holders of VoIP Guardian LLC. Profits did not flow down to an SPE subsidiary, and therefore the Debtor could not have been an entity with any funds to pay the profits earned by its parent. Yet Forefront's judgment claim appears to be the justification for the Trustee's ongoing litigation on the pretense that it might be an allowable claim of an unsecured creditor rather than the judgment of a former equity holder for a share of VoIP Guardian LLC's profits.

This ongoing fight among equity to their respective shares of VoIP Guardian LLC's "net profit" is not a fight that belongs in a subsidiary SPE's bankruptcy case, but in the New York Supreme Court where it was filed in 2017. The Trustee of this Debtor does not have standing to pursue litigation that will only benefit equity holders, whether they are equity holders by contract or by judgment, as it does not provide "benefit" under 11 U.S.C. § 550(a) or related federal law to the estate's interest holders, the general unsecured creditors (if any exist).

The legal morass created by the Trustee's ongoing litigation is immense. Mr. Proto and Mr. Rahman already settled Forefront's claims against them. But if the Trustee recovers funds from either of them, they will have paid Forefront for its share of "net profit" twice: once in their own settlement, and as a further payment of Mr. Omanoff's liability through this Trustee's litigation.

Defendants have been questioning the ethical propriety of this case for years as the Trustee is suing these Defendants on the theory that they received "fake profits" from a business that was not real, yet that he should recover those "fake profits" to pay Forefront's judgment for the same funds as "net profit" of the same business. Similarly, VoIP Guardian LLC has a subordinated proof of claim for some of those profits that were not yet paid from DLI's loan proceeds before the bankruptcy case was filed. Those actual profits would also be paid with "fake" profits recovered from Mr. Proto. Yet Mr. Proto's minority 40% interest in VoIP Guardian LLC would then entitle him to a recovery of his own "fake profit" payments as actual "net profit" of the same company. The ethical quandaries of this litigation are mind-boggling.

In order to oppose this Motion, the Trustee will need to defend his ongoing litigation by presenting some form of argument to justify the Forefront proof of claim as a purportedly allowable general unsecured claim (even though he will move to disallow it once this litigation is over), and

claim that it is his duty to recover funds for VoIP Guardian LLC's subordinated claim for its own net profit. But the harder the Trustee fights for the right to continue litigation to pay a claim for the "net profit" of VoIP Guardian LLC, the greater the ethical quandary raised by his litigation claiming that these Defendants received "fake profits" from a "fake business."

In a proper chapter 7 case, this litigation would have been dismissed by now, disputes between equity holders of the parent company would have been left to a court that has jurisdiction over such matters (the New York Supreme Court already overseeing these disputes), allowable claims of general unsecured creditors (if any) would have been paid in full, the remaining millions of recovered DLI collateral would have been paid back to DLI, and this case would have been dismissed as a victorious case leading to the highest possible payment for all general unsecured creditors. Instead, it continues without any possibly legitimate cost benefit analysis to justify its ongoing existence.

The Trustee in a chapter 7 case is not the proper authority to resolve disputes among current or former partners of the non-debtor parent company for their respective shares of its "net profit," particularly by alleging contradictory claims that there were no such profits in order to pay another's judgment for actual profits. A continuation of this litigation cannot benefit non-equity unsecured creditors and, under applicable law, must be dismissed. Indeed, continued litigation under such circumstances violates a chapter 7 trustee's duty to "expeditiously" close the estate and justifies a denial of fees.

This is becoming a case that could be discussed in legal journals for years to come. This would be a proper time for resolution of these simple issues before the topics for future journal articles multiply further. The Trustee cannot pursue litigation that would only benefit equity or secured creditors, particularly if it proceeds with inherently contradictory claims. And he cannot continue litigation that, in the clear light of day, is only benefiting professionals. Judgment should be entered against the Trustee on all claims against these Defendants – not merely because the litigation is a morass of conflicting position – but because the litigation no longer provides "benefit" to an estate of putative unsecured creditors whose payment has been sitting in the bank for years (in case *any* of their claims are ever allowed).

## II. FACTUAL BACKGROUND

### A. The Debtor's Business and Operating Agreements

On September 25, 2015, Rodney Omanoff caused the incorporation of the Parent Company, VoIP Guardian, LLC. SUF ¶ 1.[1] On October 9, 2015, Mr. Omanoff caused the incorporation of the Debtor as a subsidiary limited liability company, and special purpose vehicle. SUF ¶ 2. The Debtor served as the vehicle to "house" DLI's collateral in segregated accounts controlled by DLI for factoring investments made by DLI and VoiP Guardian LLC. SUF ¶¶ 28, 33, 54.

Through two of his entities, Mr. Omanoff owned a controlling voting interest in VoIP Guardian LLC: (i) Omanoff America Telecom LLC, which owned a 40% interest in VoIP Guardian LLC, and (ii) Omanoff America, LLC ("Omanoff America") which owned a 10.01% interest in VoIP Guardian LLC. SUF ¶¶ 8, 10-11. The Trustee also alleges that Mr. Omanoff controlled Contacts & Contracts, Inc., which owned a 4.99% interest in VoIP Guardian LLC, which Mr. Omanoff demonstrated by signing VoIP Guardian LLC's Operating Agreement on behalf of Contacts & Contracts. SUF ¶¶ 7 and 15.

VoIP Guardian LLC was the Sole Member of the Debtor. SUF ¶ 3. In turn, VoIP Guardian LLC's Board of Managers' sole manager was Omanoff America, while Rodney Omanoff is the sole manager of Omanoff America's own board of managers. SUF ¶¶ 4-5. The ownership structure of VoIP Guardian LLC provided Mr. Omanoff with complete control over VoIP Guardian LLC and the Debtor.

### B. DLI's Funding Arrangements

#### 1. The Loan Agreement

DLI's factoring investments were funded under a Loan and Security Agreement (the "Loan Agreement"), dated October 1, 2015, between Direct Lending Income Fund, LP, by and through Millenium Trust Company, LLC FBO Direct Lending Income Fund, LP (collectively, and with other affiliates, "DLI") as "Lender," and the Debtor as "Borrower," with initial available credit of $20,000,000 (the "Maximum Facility Amount"). SUF ¶¶ 24-25. The Loan Agreement authorized

[1] "SUF" citations to evidence are citations to the Omnibus Statement of Uncontroverted Facts filed herewith.

the Debtor to use the DLI funds for two purposes: (i) to engage in the VoIP factoring business by purchasing "Eligible Collateral Assets," or (ii) to repay DLI's note. SUF ¶ 26. The Loan Agreement was amended on five occasions, primarily to increase the Maximum Facility Amount in various stages to $250,000,000, and to revise various terms related to DLI's collateral and security interest. SUF ¶¶ 30-38.

By the Loan Agreement, and again in more detail by the Third Amendment to the Loan Agreement, dated April 1, 2017, the parties confirmed that all DLI funds would be held in segregated accounts, and would each be subject to a Deposit Account Control Agreement, defined as "an agreement providing the Lender with control over the Segregated Account within the meaning of Section 104(a)(2) of the UCC, in a form acceptable to the Account Bank, as applicable." SUF ¶¶ 28 and 34.

**C. <u>DLI Controlled All Disbursements of DLI's Loan Advances</u>**

The funds that DLI deposited into the Debtor's DACA-controlled and segregated "Operations Account," ending in 9399 (the "<u>Operations Account</u>"), could not be used by the Debtor for any purpose of its own. The Debtor could not transfer the funds to a factoring client, could not transfer the funds between accounts, and could not withdraw any funds to purchase paper clips or pay an unsecured creditor. SUF ¶¶ 58-64.

Under a procedure established with First Republic Bank ("<u>FRB</u>"), funds could only be transferred from the Operations Account, or transferred between FRB accounts, if DLI's Controller, Mandy Isaac (the "<u>DLI Controller</u>"), logged onto the FRB website, approved proposed transfers, and physically clicked the correct buttons to release the transfer, in the case of U.S. dollar transfers. SUF ¶¶ 58, 60-61. In the case of Euro transfers, FRB did not have the website availability for wire transfers, and so any transfers of Euros were approved by a telephone call or email between an FRB representative and the DLI Controller. SUF ¶ 59.

The DLI Controller, VoIP Guardian LLC's own Controller, and Rodney Omanoff, have all confirmed in depositions in this case that the Debtor had no dominion or control over DLI's funds. SUF ¶¶ 57-63. Mr. Omanoff confirmed that he could never have withdrawn one dollar of DLI's loan proceeds to use for any discretionary purpose. SUF ¶ 64. Without the DLI Controller's

physical release of the funds, no transfers or withdrawals of DLI's funds from any of the Debtor's FRB accounts could take place. SUF ¶¶ 58-64.

**D. The DLI Stipulation**

As of the Petition Date, every dollar that the Trustee could possibly recover in this chapter 7 case would have been the property of DLI, leaving nothing for unsecured creditors. This isn't argument. It is the Trustee's sworn testimony provided in support of the DLI Stipulation:

> Prior to agreeing to the terms of the Stipulation, my counsel and I conducted an independent investigation on the validity of the DLI Fund's claim against the Estate. My counsel ran a search for any and all UCC filings related to the Debtor and in so doing, confirmed that DLI Fund is the only creditor with a security interest in the Debtor's assets. My counsel also confirmed that the UCC's requirements for the creation and attachment of DLI Fund's security interest had been satisfied and that **DLI Fund's security interest was properly perfected**. …
>
> Indeed, **without the agreement with DLI** Fund and based upon the available assets in this Estate, **there is no avenue for the Estate's unsecured creditors to receive any distribution whatsoever** – let alone the 30% provided for under the Stipulation. **The Estate's assets are fully encumbered by DLI Fund's $203,459,871.69 secured claim**.

SUF ¶¶ 48-49 (the "Yoo Declaration") (emphasis added). The Trustee's counsel, Andy S. Kong, also submitted a declaration in support of the DLI Stipulation, testifying among other things that he and his associate had researched and confirmed that DLI's security interest was properly perfected. SUF ¶ 50.

DLI's far-reaching security interest covers "[a]ll assets of the Debtor," including "accounts," "deposit accounts," "commercial tort claims," "cash proceeds," "accounts receivable," "rights to payment of any and every kind," and "other forms of obligations and receivables," among other categories. SUF ¶¶ 39-42. DLI filed its UCC-1 to perfect its security interest on or about January 11, 2016. SUF ¶ 42. And every alleged "transfer" the Trustee is attempting to avoid occurred after DLI's lien was perfected. *See* Exhibit BB, MSJ 1438–1444, and MSJ 1447–1453.

The Bankruptcy Court's approval of the DLI Stipulation, and its agreed allowance of DLI's secured claim, served to allow DLI's secured claim in its full claimed amount of $203,459,871.69 plus interest. SUF ¶ 52.

**E. <u>The Trustee's Claim to Be Working for the Benefit of Unsecured Creditors</u>**

The phrase "for the benefit of unsecured creditors" is utilized in bankruptcy cases as a natural justification for any recovery effort a trustee might pursue, and this case has been no exception. For that reason, it is worthwhile to note the nature of the "unsecured creditors" the Trustee claims to be working for, and has held up as his reason to enter into the DLI Stipulation.

Nine proofs of claim were filed in this case, but three have been withdrawn or settled, one has been disallowed, two are duplicate fully secured claims, and two are claims on behalf of equity. The only remaining potential general unsecured claims are a claim of the Franchise Tax Board that should have been addressed in VoIP Guardian LLC's tax returns, and three scheduled claims of law firms that appear to have been paid by VoIP Guardian LLC post-petition. In other words, there does not appear to be a single general unsecured claim that could be allowed in this case for the benefit of general unsecured creditors holding allowable claims. And, at most, they show a face value of less than $200,000 *before* application of the DLI Stipulation's 30% cap.

**1. <u>The Settled or Withdrawn Claims</u>**

Proof of Claim No. 9-1 was withdrawn shortly after it was filed. SUF ¶ 66.

Proof of Claim No. 5-1, filed by the Debtor's D&O insurer, Those Certain Underwriters at Lloyd's, London ("<u>Lloyds</u>"), was erased in a settlement with Lloyds to address the Debtor's claims under its D&O insurance policy, resulting in a recovery for the Trustee's fiduciary duty claims that is less than 0.15% of the amount sought by the Trustee in this litigation (the settlement also encompasses other lawsuits for the combined $300,000 recovery). SUF ¶¶ 78, 98-99 and 101.

Proof of Claim 2-2 was, at one point, the only potentially allowable claim of a general unsecured creditor in this case. It was filed by HILF Telecom asserting an unsecured claim of $461,873.28 (the "<u>HILF Claim</u>"), based on an email from Mr. Omanoff stating that such amount would be owed on the condition that the entire amount withheld by BT Nederland would be recovered. SUF ¶ 75. The Trustee's settlement with BT Nederland and Dutch Authorities

recovered about half of the amount withheld, or $9.75 million, so that should have demonstrated as far back as July 2024 that the HILF Claim would be subject to disallowance. SUF ¶ 103. Since then, the Trustee obtained entry of default judgment in his adversary proceeding against HILF which included a request for disallowance of the HILF Claim. SUF ¶¶ 76-77. Thus, the HILF Claim is no longer relevant to any discussion about "benefit" to unsecured creditors, if it ever was.

Proof of Claim No. 1-1, was filed by equity holder VoIP Guardian LLC asserting a general unsecured claim in the amount of $9,401,725.06, for $8,771,070.21 in unpaid management fees, which are VoIP Guardian LLC's profit recoveries, and $630,654.84 in reimbursement of legal expenses (the "VoIP Guardian LLC Claim"). SUF ¶ 73. The VoIP Guardian LLC Proof of Claim was subordinated to all other claims upon the Court's approval of the Trustee's Settlement in this litigation with Rodney Omanoff, VoIP Guardian LLC, and certain Omanoff entities. SUF ¶ 74. The VoIP Guardian LLC Claim is a claim of the Debtor's sole equity holder, and is not a general unsecured claim for purposes of a chapter 7 "benefit to the estate" inquiry, as addressed below.

**2. The Secured DLI Proofs of Claim**

Proofs of Claim 3-1 and 4-1 are identical proofs of claim filed by DLI for recovery of its secured claim, which has been allowed by the Court in the Court's order approving the DLI Stipulation, in the full amount of $203,459,871.69 plus interest. SUF ¶¶ 52 and 67.

**3. The Forefront Partners Proof of Claim**

Proof of Claim 6-1 was filed by Forefront Partners, LLC ("Forefront") asserting an unsecured claim for $25,000,000 arising from litigation commenced by Forefront in the New York Supreme Court in 2017 against Mr. Omanoff, VoIP Guardian LLC, Mr. Proto, Mr. Rahman, and other defendants, Index No. 650973/2017 (the "Forefront Litigation"). SUF ¶ 79. Forefront was a co-owner of Talking Capital, which was the predecessor business that invested DLI's funds in VoIP telecom factoring, and Forefront's principal alleged that he had introduced DLI's business to Talking Capital. SUF ¶¶ 80-81. Forefront claimed, among other claims, that it had been denied partnership in VoIP Guardian LLC, and sued to recover the net profits of VoIP Guardian LLC on the grounds that they had been improperly diverted. SUF ¶ 82.

Mr. Proto and Mr. Rahman settled Forefront's claims against them in 2019. SUF ¶ 83. The Debtor was also named in Forefront's complaint, but Forefront did not take its claims against the Debtor to trial. Instead, the case went to trial against Mr. Omanoff and three of his entities before a jury in the New York Supreme Court, at which Mr. Omanoff attempted to testify that he has now realized that VoIP Guardian LLC was a fraudulent business that never had profits, releasing him from any liability to pay actual profits to Forefront. SUF ¶ 84. The jury awarded Forefront a judgment in the amount of $36,732,540.87, of which over $36 million was awarded as the "net profit" of VoIP Guardian LLC plus interest (the "Forefront Judgment"). SUF ¶ 86. The remainder of the Forefront Judgment is for $60,000 in compensation that was paid to Mr. Omanoff. *Id.*

On July 15, 2024, Forefront amended Proof of Claim 6-1 by filing Proof of Claim 6-2 asserting a general unsecured claim in the amount of $36,732,540.87 based on the Forefront Judgment. SUF ¶ 87 (the "Forefront Claim").

The Forefront Judgment was reversed on appeal in an intermediate appeal and remanded for a retrial on the defense of unclean hands by the First Department, New York Appellate Division, but the ruling was further appealed by Forefront to the New York Court of Appeals where it remains pending as of the date of this Motion. SUF ¶ 88. Thus, and as addressed below, the Forefront Claim represents the claim of a putative equity holder of VoIP Guardian LLC, the Debtor's parent company, for the "net profit" earned by VoIP Guardian LLC. It is not the claim of a general unsecured creditor that could be allowed against this Debtor.

**4. The Only Potentially Allowable General Unsecured Claims**

Proof of Claim 7-2 was filed by the Franchise Tax Board to claim a priority unsecured claim in the amount of $32,089.64, the basis for which is the claim that the Debtor did not file tax returns in the State of California. SUF ¶ 71. Proof of Claim 7-2 asserts two components of the claim: (i) an unsecured priority tax claim for $26,575.31; and (ii) a general unsecured claim for $5,514.33, claiming "no tax return filed" as the basis for the claim. *Id.* But the Debtor *never* filed its own tax returns. It was treated as a disregarded entity on the tax returns of VoIP Guardian LLC, which has continued to file tax returns post-petition. SUF ¶ 72.

Proof of Claim 8-4 was also filed by the Franchise Tax Board asserting a post-petition administrative expense claim for an $800 annual LLC fee not paid to the State of California in 2019. SUF ¶ 70.

**In other words, the only potentially allowable general unsecured claim filed in this case is the Franchise Tax Board's general unsecured claim for $5,514.33 if, and only if, this was somehow not addressed in VoIP Guardian LLC's own tax returns.**

There are also three scheduled claims listed in the Debtor's chapter 7 petition that the Debtor stated in an amount in excess of $0.00, which are the claims of three law firms in a total amount of $157,745.94. SUF ¶ 89. The three scheduled claims are: (i) $36,181.53 in favor of Kennedy Van Der Laan; (ii) $114,448.67 in favor of McCarter & English LLP; and (iii) $7,115.74 in favor of Van Doorne NV (the "Scheduled Law Firm Claims"). *Id*.

Restrictions in the DLI Loan Agreement barred the Debtor from using any of the DLI Loan Funds to make payments to any creditor other than DLI, which would include payments to any law firms. SUF ¶ 26. This explains why VoIP Guardian LLC was the entity that paid the fees of these law firms, both before and after the Debtor's Petition Date.[2]

On March 26, 2019, just one week after the filing of the Debtor's Schedule E/F, VoIP Guardian LLC made the first of its post-petition payments to Kennedy Van Der Laan, in the amount of $35,703.36. SUF ¶ 90.

On March 26, 2019, just one week after the filing of the Debtor's Schedule E/F, VoIP Guardian LLC made the first of its post-petition payments to Van Doorne NV in the amount of $7,021.70. SUF ¶ 91.

McCarter & English invoices attached to the VoIP Guardian Proof of Claim are addressed to VoIP Guardian LLC, not the Debtor. SUF ¶ 92.

[2] Rather than burden the Court with yet another motion for leave to file the same bank records under seal, Defendants' Omnibus Statement of Uncontroverted Facts cites to Exhibit E-3 to the Declaration of David J. Richardson [Doc No. 449] filed under seal on October 8, 2025, as evidence for SUF ¶¶ 90-91 and 97, as this existing exhibit shows the first post-petition payments made to two of these law firms by VoIP Guardian LLC in March 2019. To whatever extent, if any, the Court deems such a procedure to be improper, these facts are only context for the motion and are not material facts. Whether the Scheduled Law Firm Claims are allowable at the scheduled amount of $157,745.94 or should be disallowed or reduced, the point remains the same: the Trustee has had enough cash for two years to pay these claims in the full amount of their 30% cap, or even their entire scheduled amount, many times over.

Even if the Debtor could have used DLI's Loan Funds to make discretionary payments to creditors such as these law firms despite the Loan Agreement's prohibition, and even if these Scheduled Law Firm Claims have not been satisfied by VoIP Guardian LLC in whole or in part, then they would represent the only potentially allowable general unsecured claims in this case other than the Franchise Tax Board's claim for $5,514.33 (the "FTB Unsecured Claim"). If each of those claims were deemed allowed in their case or scheduled amounts, then the estate's total potential liability for the Scheduled Law Firm Claims and the FTB Unsecured Claim combined is less than $200,000. The 30% maximum payment that can be made under the DLI Stipulation means that the most these putative general unsecured creditors could be paid in this case is about $60,000. The reality is that all of these claims should be disallowed, as this case has been proceeding for five years without any legitimately allowable general unsecured claims. But for purposes of this Motion, the face amount of these claims is plain in the evidence. Whether VoIP Guardian LLC has paid these claims is not a necessary fact for this Motion, as the argument remains the same whether the 30% cap that can be paid on allowed claims of general unsecured creditors results in a payment of $60,000, or a payment of zero. No further litigation can possibly provide further benefit to general unsecured creditors.

The Trustee may attempt to argue that Forefront's Proof of Claim for the "net profit" of the Debtor's parent company, VoIP Guardian LLC, is an allowable general unsecured claim against the Debtor. As addressed below, such an argument would be incorrect and would raise various concerns about the purpose and motivation behind this litigation.

**5. The professional fees generated for the "benefit" of minimal unsecured creditors**

Of the roughly $12 million that the Trustee has recovered for the estate, he had approximately $6,843,529.59 in the bank as of October 15, 2025. SUF ¶ 114. At the maximum 30% recovery that is permitted for unsecured creditors in this case, this means that the Trustee presently has possession of more than 100 times the amount necessary to pay all general unsecured claims if they were all allowed in their face or scheduled amounts.

In the first and second rounds of fee applications, this Court approved professional fees and

expenses totaling more than $7.4 million – for a case where it is questionable whether the estate has a single allowable unsecured creditor's claim to pay. According to the Trustee's motion, the first and second rounds of fee applications approved by this Court broke down as follows:

| **Professional** | **Allowed Fees** | **Allowed Expenses** |
|---|---|---|
| Chapter 7 Trustee | $331,243.53 | $0.00 |
| NautaDutilh NV (first application) | $149,132.07 | $12,611.20 |
| NautaDutilh NV (second application) | $320,901.69 | $859.45 |
| BG Law (first application) | $1,320,000.00 | $106,535.98 |
| BG Law (second application) | $3,278,394.22 | $88,026.67 |
| Arent Fox | $1,221,091.00 | $55,563.88 |
| Force 10 | $546,071.00 | $27,805.47 |
| **TOTAL:** | **$7,166,833.51** | **$291,402.65** |

SUF ¶ 115.

All of these funds were funds that were collateral of DLI and should have been recovered by DLI for its own benefit in litigation pursued by DLI, not by a chapter 7 trustee for hire.

The Trustee has set a hearing for December 16, 2025, to consider a third round of fee applications. SUF ¶ 116. Applications that have been filed as of the date of this Motion seeking allowance of fees totaling a further $932,850.90. SUF ¶ 117.

**F. The Claims for Relief Pleaded in the Complaint**

The Trustee filed his operative Complaint on August 17, 2021. SUF ¶ 104 (as corrected). The claims for relief stated in the Complaint that name one or more of these Defendants fall into two primary categories.

The Trustee has sued certain Defendants for a variety of avoidance claims under 11 U.S.C. §§ 544(b), 547, 548, and 549 (the "Avoidance Claims") (SUF ¶¶ 107-112), theorizing that funds going in and out of a third party's escrow account that serviced dozens of telecom companies from the same commingled account must have been the "Debtor's" funds at all times, even though all deposits from the Debtor's account were DLI's collateral, controlled and transferred by DLI.

The Trustee has also pleaded two fiduciary duty claims. He has sued Mr. Rahman and Mr. Proto for having allegedly "breached their fiduciary duties as both directors and officers of the Debtor," even though neither was a director nor officer of the Debtor. SUF ¶ 105 (the "Direct Fiduciary Duty Claim"). And the Trustee asserts a claim against Mr. Rahman, Mr. Proto and Zoom-Tel for aiding and abetting Mr. Omanoff's alleged breach of fiduciary duties "[t]o the extent they did not owe direct duties of care and loyalty to the Debtor." SUF ¶ 106 (the "Aiding and Abetting Claim") (collectively, the "Fiduciary Duty Claims").

## III. LEGAL STANDARDS

### A. Jurisdictional Statement

This Court has subject matter jurisdiction to rule on this Motion pursuant to Fed. R. Civ. P. 56, and 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O), and 1334.

### B. Standard for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To meet their burden for summary judgment, Defendants need to demonstrate that there is an absence of evidence to support a necessary element of the Trustee's claims, which shifts the burden to the Trustee to show that there is a "genuine issue for trial," or alternatively, movants may demonstrate that the Trustee's claims are not based on valid interpretations of applicable law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339-40 (9th Cir. 1989) (confirming whether district court "applied the relevant substantive law" to summary judgment motion); *Donell v. Mojtahedian*, 976 F. Supp. 2d 1183 (C.D. Cal. 2013) ("because Plaintiff bears the burden of proving a Ponzi scheme to be entitled to summary judgment he 'must come forward with evidence which would entitle [him] to a directed verdict if the evidence went uncontroverted at trial.'") (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

## IV. CONTINUATION OF THE TRUSTEE'S LITIGATION CANNOT PROVIDE GENERAL UNSECURED CREDITORS HOLDING ALLOWABLE CLAIMS WITH ANY "BENEFIT"

### A. Summary of Argument

There are several steps to the argument presented in this Motion.

The first step is an analysis of case law that distinguishes the concept of "benefit to the estate" in chapter 7 cases and chapter 11 cases. For example, litigation that benefits equity holders can provide "benefit" to unsecured creditors in a chapter 11 case where unsecured creditors received equity under a plan of reorganization as payment on their claims. Case law discussing "benefit" in a chapter 11 context is irrelevant and misleading to any analysis of this case. Chapter 7 liquidations are far simpler, and "benefit" is measured solely by the extent to which litigation will increase the amount that non-equity unsecured creditors will receive on their allowed claims.

The second step is an analysis of case law that – in a chapter 7 setting – bars a chapter 7 trustee from pursuing avoidance litigation for the benefit of a debtor or its equity holders because such litigation does not provide "benefit" to unsecured creditors under Section 550(a).

The third step is an analysis of case law that – in a chapter 7 setting – bars a chapter 7 trustee from pursuing avoidance litigation for the sole benefit of a secured creditor because such litigation does not provide "benefit" to unsecured creditors under Section 550(a). This is not a case where satisfying a secured claim will release funds for unsecured creditors or increase the value of shares in a reorganized debtor. The DLI Stipulation was intentionally drafted in the opposite manner as a "reverse waterfall." Exhibit E at MSJ 0131. Unsecured claims are satisfied first up to their limit of a 30% recovery, and all remaining litigation is for the sole benefit of DLI once the impermissible claims of equity holders have been removed from the equation because the Trustee already has the funds he needs for any potentially legitimate unsecured claims.

The fourth step is case law holding that – in a chapter 7 case – the same principle that requires "benefit" to unsecured creditors applies to any litigation beyond avoidance claims, barring a chapter 7 trustee from continuing other bankruptcy litigation or common law claims that would only provide "benefit" to the debtor/equity holders, to a secured creditor, or to the litigating

professionals. All such continued litigation violates a chapter 7 trustee's duty to expeditiously close the estate once there is available cash for allowed unsecured claims.

The final step is a demonstration of the trial that will unfold if the Trustee successfully argues that Forefront's or VoIP Guardian LLC's claims are not really equity claims but are somehow allowable general unsecured claims for VoIP Guardian LLC's "net profit." Should the Trustee attempt to rescue his case by adopting such a position, the ethical quandaries of the Trustee's case claiming a "fake" business that earned no profits in order to pay the real "net profit" claim of another putative creditor will raise issues that reach beyond the scope of this Motion.

**B. A Chapter 7 Trustee May Not Pursue Litigation that Only Provides "Benefit" under Section 550(a) to Parties Other than Allowed Unsecured Creditors**

The Trustee's Avoidance Claims brought under 11 U.S.C. §§ 544(b), 547, 548 and 549 are claims to *avoid* a transfer, but are not claims to *recover* a transfer. Recovery of transfers is governed by 11 U.S.C. § 550(a), which provides "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, **for the benefit of the estate**, the property transferred …" 11 U.S.C.A. § 550(a) (emphasis added). Similarly, transfers avoided under Cal. Civ. Code § 3439.01 et seq. may be recoverable under Section 3439.08 to the extent necessary to satisfy creditors' claim. Cal. Civ. Code § 3439.08(b)(1). The Trustee's Ninth Claim for Relief seek recovery of any avoided transfers under both statutory provisions.

The term "benefit to the estate" in Section 550(a) carries slightly different meanings in chapter 7 than it does in chapter 11. In *Congress Credit Corp. v. AJC Int'l*, 186 B.R. 555 (D. P.R. 1995) the court synthesized case law on the issue into three "determinative factors: (1) whether the trustee is a Chapter 11 trustee or a Chapter 7 trustee; (2) whether the secured creditors have a claim to the assets recovered by the trustee; and (3) whether the unsecured creditors will benefit" from the litigation. *Congress*, 186 B.R. at 559. The court explained that the first factor – whether the trustee is a chapter 7 or chapter 11 trustee, is a "crucial" factor to be considered in any Section 550 analysis, because "unlike a Chapter 11 trustee – a Chapter 7 trustee represents the interests of the unsecured creditors and *not* the secured creditors." *Id*. (emphasis in original). *See also Rocco v. J.P. Morgan Chase Bank*, No. 05–cv–00366, 2006 U.S. Dist. LEXIS 12850 *21 (W.D. Pa. 2006)

(“A Chapter 7 trustee administers the estate and more specifically liquidates property for the benefit of unsecured creditors … The Chapter 7 trustee is specifically instructed by the United States Trustee to sell only those secured assets that will generate funds for the benefit of unsecured creditors.”), *aff'd In re Rocco*, 255 Fed. Appx. 638 (3d Cir. Nov. 28, 2007); *Barber v. McCord Auto Supply (In re Pearson Indus., Inc.)*, 178 Bankr. 753, 761 (Bankr. C.D.Ill. 1995) (“It is a fundamental concept in bankruptcy that a trustee's primary duty is to the unsecured creditors rather than to the secured creditors. … If there is no equity in the collateral for the bankruptcy estate … the trustee generally abandons the property pursuant to 11 U.S.C. § 554 (a) …. A Chapter 7 trustee should not act as a mere conduit for the benefit of secured creditors only.”) (citations omitted).

“The proper focus of recovery under Section 550(a) is not on what the transferee gained but rather on what the bankruptcy estate lost as a result of the transfer.” *Rushton v. Bank of Utah (In re C.W. Mining Co.)*, 477 B.R. 176, 185 (10th Cir. BAP 2010), *aff'd* 749 F.3d 895 (10th Cir. 2014)). The Ninth Circuit adopted this principle in the context of chapter 11 in *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800 (9th Cir. 1994), in which the Ninth Circuit explained the distinction between avoidance of a transfer under Sections 544(b) and potential recovery of that transfer under Section 550(a):

> Our conclusion that Acequia has a right under section 544(b) to avoid transfers in excess of the amount of unsecured claims does not lead inexorably to the conclusion that Acequia may actually recover every transfer avoidable under that provision. Rather, the extent of Acequia's recovery is governed by section 550(a), which enables the corporation to pursue section 544(b) actions where recovery will accrue “for the benefit of the estate.” 11 U.S.C. § 550(a). See, *e.g., Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir.) (“[A] debtor-in-possession of a bankruptcy estate cannot maintain an avoidance action . . . unless the estate would be benefitted by the recovery of the transferred property.”), cert. denied, 116 L. Ed. 2d 279, 112 S. Ct. 339 (1991); [4 *Collier on Bankruptcy* Par. 548.02[5]], pages 10015-16, Par. 550.02 at 550-6 to 550-7 n.3 (“The preamble to section 550(a) limits the trustee by permitting recovery only for the benefit of the estate. Thus, in general, the trustee or debtor in possession may not recover the property transferred or its value when the result is to benefit only the debtor rather than the estate.”).

*Acequia*, 34 F.3d at 811.

The Ninth Circuit explained that there were “several cases, for example, [where] courts have refused to dismiss avoidance actions even though the unsecured creditors had received full distributions under a plan of reorganization,” and gave as an example a case where “creditors had

received an equity stake in the reorganized debtor and any recovery would increase the corporation's value." *Id.*, 34 F.3d at 811 (citing *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 Bankr. 964, 973 (Bankr. D. Del. 1994). Therefore, the Ninth Circuit concluded that because, in the chapter 11 case before it, any "recovery would secure performance of Acequia's postconfirmation obligations under the plan of reorganization, including continued payments to Prudential pursuant to a long-term note," the litigation provided "benefit" to the chapter 11 estate, and the lower court's capping order was reversed. *Id*., 34 F.3d at 812.

If this were a chapter 11 case addressing enforcement of a plan of reorganization where unsecured creditors received equity in payment of their claims, *Acequia* would be controlling and would permit a reorganized debtor or chapter 11 trustee to pursue avoidance actions that would benefit equity solely because it would also benefit former unsecured creditors who had received equity interests. But the holding of *Acequia* does not impact a chapter 7 case where the Debtor is liquidated, where unsecured creditors (if any) are only entitled to a fixed amount, and where all further recoveries cannot impact their payment (except by imperiling that recovery by mounting professional fees).

If there is a holding from *Acequia* that is controlling in this case, it is the Ninth Circuit's adoption of the underlying principle that the reorganized debtor in that case could recover the entire transfer at issue because it would "make the bankruptcy estate whole." *Acequia*, 34 F.3d at 812. And in stating this holding, the Ninth Circuit cited to earlier case law for other wording of the same principle: "*Morris v. Kansas Drywall Supply Co. (In re Classic Drywall, Inc.)*, 127 B.R. 874, 876 (D. Kan. 1991) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."); *Pritchard v. Brown (In re Brown)*, 118 B.R. 57, 60 (Bankr. N.D. Tex. 1990) (same)." *Id.* Other courts have echoed the same holding. *Kingsley v. Wetzel (In re Kingsley)*, 518 F.3d 874, 877 (11th Cir. 2008) (same) (citing cases); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Sec. Investor Prot. Corp.)*, 568 B.R. 481 (Bankr. S.D.N.Y. 2017) (same).

Courts often describe the principle by stating that, if the debtor did not lose property of its own – such as where the debtor was a conduit for a secured creditor's collateral – there is nothing

for the debtor to recover under Section 550(a) because any recovery would not recover for the estate anything of value that had been lost. See, *e.g.*, See, *e.g., Ilardo v. Al's Diesel, Inc. (In re World Parts, LLC)*, 322 B.R. 37, 43 (Bankr. W.D.N.Y. 2005) (dismissing chapter 7 trustee's avoidance claims where it was stipulated that the transferred property was the property of a single secured creditor and subject to a security interest, even though the secured creditor had stipulated to share recoveries with the estate, as "[t]he debtor could make no fraudulent conveyance, for the simple reason that it had no property to convey"); *Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC)*, 2020 WL 374357 *13, 2020 Bankr. LEXIS 178 (Bankr. W.D. Okla. Jan. 17, 2020) (dismissing avoidance claim per Section 550(a) where trustee had not shown that any of the transferred funds were unencumbered, and held that this barred recovery because "where property transferred has a security interest over and above the value of the property, the weight of authority dictates that a trustee may not recover because the estate would not benefit.") (quoting *Nathan v. Brownstone Plastics, LLC*, 511 B.R. 863, 869 (D. E.D. Mich. 2014)), *aff'd*, 2020 Bankr. LEXIS 2441, 2020 WL 5512500 (B.A.P. 10th Cir. Sept. 14, 2020).

Section 3439.08 of the Cal. Civ. Code is derived from Section 550(a) and is part of a statutory scheme that "declares rights and provides remedies for unsecured creditors against transfers that impede them in the collection of their claims. *Renda v. Nevarez*, 223 Cal.App.4th 1231, 1235 (2014). Like Section 550(a), its purpose is to "protect unsecured creditors against transfers and obligations injurious to their rights." *Id.*

It is law of the case by the Trustee's sworn testimony, the DLI Stipulation, and this Court order approving the DLI Stipulation and allowing DLI's secured claim in full, that all DLI loan proceeds transferred from the Debtor's Operating Account were fully encumbered by DLI's perfected lien. SUF ¶¶ 48-52. The Debtor lost nothing of its own, and nothing of value that it could have used to pay any unsecured creditors, when DLI's loan proceeds were transferred from its Operating Account. Any recovery that this Trustee could use to pay his own and his professionals' fees before paying the remainder to DLI would not be restoration of the Debtor's position but would

be a recovery that is dependent upon a fictional premise claiming that DLI's fully perfected collateral, fully controlled by DLI, was actually the Debtor's property to do with as it pleased.[3]

Even if the Debtor could have recovered one dollar of its own to use in any manner it might choose, contrary to all testimony and evidence, the Trustee would still be pursuing litigation that provides no "benefit" to non-equity unsecured creditors, because he has far more cash in the bank than would be necessary to satisfy their claims in the full amount possible in this case. As addressed below, courts have confirmed that the continuation of litigation under such circumstances is not merely a breach of a trustee's duties, it should be the basis for denial of claimed professional fees.

The issue of "benefit" under Section 550(a), and the purpose behind Cal. Civ. Code § 3439.08(b), are both consistent with the nature of a chapter 7 trustee's duties under 11 U.S.C. § 704, as a trustee is obligated to close an estate "expeditiously" once there are sufficient funds to pay the claims of allowed general unsecured creditors. 11 U.S.C. § 704(a)(1). Expeditiously closing the estate is a chapter 7 trustee's "main" duty, which is "a general proposition that seems beyond reproach." *In re Riverside-Linden Inv. Co.*, 925 F.2d 320, 322 (9th Cir. 1991).

Because the Trustee has recovered more than enough funds to pay all potentially allowable claims of non-equity unsecured creditors (if any) to their complete entitlement in this case, all further recoveries in ongoing litigation would be for the "benefit" of the Debtor's owner and equityholders, its sole secured creditor, or the Trustee and his professionals. And so far, it is turning out to be solely the latter. But, as addressed below, none of these qualify as permissible recoveries for the "benefit" of the estate under Section 550(a) or Section 3439.08(b) in a chapter 7 case.

---

[3] The Trustee has frequently argued in this case that, despite the Yoo Declaration and the allowed DLI secured claim, there are assets of the estate that are *not* encumbered by DLI's lien. There are two serious problems with this position, in addition to it being legally and factually incorrect with respect to the Debtor's prepetition property interests. The first is that the Trustee is judicially estopped from changing his testimony after obtaining entry of the order approving the DLI Stipulation based on his testimony. *Luzinski v. Peabody & Arnold LLP (In re Gosman)*, 382 B.R. 826, 842-43 (S.D. Fla. 2007) (chapter 7 trustee judicially estopped from taking position in litigation that was inconsistent with prior positions in avoidance action). Moreover, it is a position that suggests that the Trustee breached his duties to unsecured creditors (or relied on poor legal advice) when he agreed in the DLI Stipulation to give DLI 70% of recoveries that the Trustee now claims are unencumbered property of the estate, taking that cash out of the pockets of unsecured creditors and handing it to the secured creditor. The Trustee's original position, sworn under penalty of perjury, is the correct one.

### C. A Chapter 7 Trustee Cannot Perpetuate Avoidance Claims for the Benefit of the Debtor or Its Equity Holders

Ever since *Moore v. Bay*, 284 U.S. 4, 5 (1931), courts have uniformly held that a chapter 7 trustee's efforts must provide "benefit" to the estate's creditors, and that a chapter 7 trustee may not recover avoided transfers under Section 550(a) for the benefit of equity holders:

> The weight of authority indicates that shareholders may not benefit from the avoidance of a fraudulent conveyance. In *Moore v. Bay*, 284 U.S. 4, 5 (1931), the United States Supreme Court held that any recovery from a transferee of a fraudulent conveyance must be divided equally among 'allowed claims.' Although the Supreme Court did not address the rights of the debtor's equity holders to benefit from an avoided fraudulent transfer, courts have interpreted *Moore v. Bay* as indicating that they may not so benefit.

*In re Revco D.S., Inc.*, 1990 Bankr. LEXIS 2966 at *71-72 (Bankr. N.D. Ohio Dec. 17, 1990) (citing cases). *See also In re Eugene Liggett*, 118 B.R. 219, 222 (Bankr. S.D.N.Y. 1990) ("avoiding powers may be exercised by a debtor in possession only for the benefit of creditors, and not for the benefit of the debtor itself"); *In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128, 2020 WL 10762310, *69 (Bankr. S.D.N.Y. Aug. 8, 2020) (the principle that "[a]n estate representative cannot use the avoidance powers in actions in which estate creditors will not benefit from the action" is applied "to bar actions under the Bankruptcy Code to avoid fraudulent transfers where the debtor on whose behalf the action is brought has no unpaid unsecured creditors of its own.").

A recovery for the "debtor" means and includes any recovery that benefits its equity holders. *See Phillips v. Josmic 2 LLC (In re ONH AFC CS Invs., LLC)*, 671 B.R. 680, 693 (Bankr. D. Del. 2025) (explaining that fraudulent transfer claims in chapter 7 are not to benefit "the debtor itself or its owners"); *In re Revco D.S., Inc.*, 1990 Bankr. LEXIS 2966 at *71-72 (following *Moore v. Bay* and subsequent cases).

When the case is proceeding in chapter 7, this is not merely a matter of priorities, but of a trustee's inability to continue litigation that would benefit the debtor or its equity holders after funds for unsecured claims have already been recovered. One Delaware bankruptcy court recently addressed this issue, explaining that the Supreme Court has repeatedly pointed to a "longstanding interpretive principle" under which, when a statutory provision is "obviously transplanted from another legal source," it "brings the old soil with it." *Phillips v. Josmic 2 LLC (In re ONH AFC CS*

*Invs., LLC)*, 671 B.R. 680, 689 (Bankr. D. Del. 2025) (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 560-561, 139 S. Ct. 1795, 204 L. Ed. 2d 129 (2019)). And for that reason, it is instructive that "the common law remedy of fraudulent conveyance was available to benefit creditors, not the debtor itself or its owners." *Id*. at 690. The court continued, stating that "the 'old soil' of the creditor's remedy of fraudulent conveyance would strongly suggest that, at the very least, when a trustee seeks to recover under § 550 on a claim for fraudulent conveyance, the term 'for the benefit of the estate' should be understood to mean for the benefit of creditors." *Id*.

The court in *Josmic* went on to conclude that "[i]t makes good sense that creditors should be able to recover in bankruptcy whatever would have been available to them outside of bankruptcy," but "to allow the remedy to be used to benefit equity holders would unmoor it from its historical foundations." *Id*., 671 B.R. 693. It bears repeating that unsecured creditors could never have recovered one dollar from this Debtor outside of bankruptcy because every dollar that ever came into its position did so as DLI's collateral under DLI's complete control. This entire case is built on the fiction that the Debtor had the ability to use DLI's collateral to make discretionary payments to unsecured creditors, when all testimony and evidence confirms that the Debtor never had one dollar for its own uses. Or, as the Trustee testified, there was "no avenue" for unsecured creditors to receive any recovery in this chapter 7 case because all assets were subject to DLI's perfected security interest. SUF ¶ 49. Yet, here we are, five years later, with more than $8.3 million plus unpaid contingency fees going to professionals for a case that *may not even have a single allowed unsecured non-equity creditor's claim*.

Forefront's judgment awards Forefront more than $36 million in VoIP Guardian LLC's "net profit" plus interest to be paid by Mr. Omanoff and three of his entities (Omanoff America LLC, Omanoff America Telecom LLC, and Contacts & Contracts, Inc.). SUF ¶ 85. The Ninth Circuit Court of Appeals has addressed the nature of a claim similar to Forefront's judgment claim in the context of 11 U.S.C. §510(b) and applied the language of the Bankruptcy Code broadly to conclude that such a claim is a claim on account of an equity interest. In *American Broad. Sys. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir. 2001), the creditors' claims arose from a merger agreement that would have provided them with stock, but did not close, and the Ninth

Circuit found that the claimants' resulting claims for damages were subject to subordination as equity claims. *Betacom*, 240 F.3d at 829.

The Ninth Circuit rejected the claimants' arguments to distinguish their claims, including that they had never received the stock and that the merger agreement was not a "sale" or "purchase" of a security. The court explained that "[n]othing in § 510(b)'s text requires a subordinated claimant to be a shareholder," and cited to case law stating that Section 510(b) "does not limit its application to any particular type of claimant but, rather, focuses on the type of claim possessed." 240 F.3d at 829 (quoting *In re Walnut Equipment Leasing Co.*, 1999 Bankr. LEXIS 1626, 1999 WL 1271762, *6 (Bankr. E.D. Pa. 1999)). The Ninth Circuit further explained that:

> Even if an investor never receives her promised shares, she entered into the investment with greater financial expectations than the creditor. The creditor can only recoup her investment; the investor expects to participate in firm profits.

*Betacom*, 240 F.3d at 830. The Ninth Circuit found the claims subject to subordination. *Id*. at 831.

Forefront's expectation was also "that [it] would be able to share in its profits as an owner; the debtor's alleged breach may have burdened [claimant's] efforts to realize that expectation, but it did not alter its fundamental character." *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251 (2d Cir. 2006) (following *Betacom*). Forefront's claim arises from a breach of its agreement with other equity holders of Talking Capital, and its exclusion from participation as a member of Talking Capital's successor, VoIP Guardian LLC. It is a claim on account of an equity interest, whether or not that equity interest was acknowledged by Mr. Omanoff or forced upon him by a jury. And as a creditor holding a claim that would be properly subordinated, Forefront is not "treated as a general unsecured creditor." *Id*., 461 F.3d at 256. If the Trustee's litigation could continue for the benefit of subordinated equity claims, it would be, at its core, litigation to resolve a dispute between equity holders for their respective shares of a non-debtor parent company's profits. It is not litigation for the benefit of the estate under Section 550(a), and any fees that arise from the pursuit of such litigation would be properly disallowed. *In re Riverside-Linden*, 925 F.2d at 323 (affirming disallowance of trustee's counsel's fees for filing challenge to purported "unsecured claim" of one of the debtor's partners, where counsel claimed a duty to investigate claim on behalf of debtor's other partners).

If the Trustee attempts to argue around the foregoing case law and insist that he can pursue his litigation for the "benefit" of Forefront's $36 million proof of claim, it elevates a host of already existing ethical issues discussed below. It also turns this chapter 7 Adversary Proceeding into a California subset of Forefront's litigation in the New York Supreme Court between the existing or putative equity holders of VoIP Guardian LLC. Mr. Proto and Mr. Rahman have already settled any liability they could have to Forefront for its unpaid share of VoIP Guardian LLC's "net profit," and Mr. Omanoff faces a judgment that will either be confirmed on further appeal or addressed in a retrial. Either way, Forefront's right to recover VoIP Guardian LLC's "net profit" is before the New York Supreme Court. The Trustee's avoidance claims against these Defendants seek to recover funds they received from the profitable VoIP Guardian LLC, but under a theory that it was actually a "fake" business with "fake profits." And the Trustee claims the right to recover these "fake profits" so that he can provide "benefit" to Forefront by using those same funds to pay its claim to the same "net profit" of VoIP Guardian LLC.

Even if such litigation did not create concerns of legal ethics, this subsidiary SPE Debtor does not owe the "net profit" of its parent company VoIP Guardian LLC to any equity holder of VoIP Guardian LLC, by contract or by judgment. And any effort to continue avoidance claims for Forefront's or VoIP Guardian LLC's benefit in this chapter 7 case would be impermissible under Section 550(a) because it would pursue avoidance recoveries for the benefit of a putative equity holder of non-debtor VoIP Guardian LLC.

**D. <u>Avoided Transfers May Not Be Recovered Under Section 550(a)for the "Benefit" of a Secured Creditor</u>**

While the Trustee may attempt to rely on equity claims to justify his ongoing litigation, the litigation has always been about recovering DLI's collateral through the borrower's chapter 7 case. The DLI Stipulation is merely the employment agreement that attempts to establish the Trustee of an SPE Debtor as a proper plaintiff to recover the secured creditor's collateral, even though the Debtor itself could never have used a single dollar in a discretionary manner. Unfortunately for the DLI Receivership, it appears that all recoveries in this case will end up serving the fee applications of professionals, and DLI's investment in this chapter 7 case will have been for naught.

Even if the DLI Stipulation could have been a proper means at the outset of this case to elevate the Trustee of a no-asset SPE to the status of a plaintiff recovering a secured creditor's collateral, the charade can no longer continue once the Trustee has sufficient funds to pay the maximum allowable amount of general unsecured creditors' claims. In *Congress Credit Corp., supra,* the court explained that the secured creditor in that chapter 7 case claimed "a legal right to the proceeds acquired by the Trustee in the adversary proceedings," but explained that this did not "help" the argument that "the adversary proceedings should continue." Rather, because the secured creditor had the primary right to the proceeds, it raised "the question whether the unsecured creditors will benefit at all by these proceedings." *Congress*, 186 B.R. at 559. The court answered that question in the negative when it moved on to the "third factor" in its Section 550(a) test; whether unsecured creditors will receive part of the recoveries. *Id*.

The chapter 7 trustee in *Congress Credit Corp.* testified to the court – in language that is remarkably similar to the Trustee's Declaration filed early in this case – stating that:

> After a study of the matter, Trustee agrees with the Court that the preferential payments being reclaimed are the only assets of the estate, and that, since they are pledged to Congress Credit, their recovery will not be for the benefit of the unsecured creditors of the estate. There are no other realizable assets in the estate.

*Congress*, 186 B.R. at 560. The trustee in *Congress* had tried to make a deal similar to the DLI Stipulation in this case, but it was rejected by the court. *See Congress Credit Corp. v. AJC Int'l*, 42 F.3d 686, 688 (1st Cir. 1994) (noting that bankruptcy court in *Congress* had "rejected a proposed agreement for Congress Credit to finance the trustee's preference actions and has ordered the trustee to show cause why the preference actions should not be dismissed, as none of the proceeds would benefit the estate" because of the Congress lien).[4] Even though the secured creditor in *Congress* had agreed that its recoveries would "fund the litigation" brought by the trustee, the court rejected the idea that this provided "benefit" to the estate, finding instead that it was not an "appropriate rationale" for the continuation of the adversary proceeding. *Congress*, 186 B.R. at 560. Therefore, the court dismissed the adversary proceeding with prejudice. *Id*. *See also In re World Parts, LLC*,

---

[4] The bankruptcy court opinion in *Congress*, cited above, arose following remand from the First Circuit to determine whether the preference action should proceed in light of the benefit flowing to the secured creditor.

322 B.R. at 43 (dismissing avoidance claims despite trustee's deal with secured creditor to share recoveries of collateral).

Once it is clear that continuation of an avoidance action will only benefit secured creditors, the proper action for a trustee to take is to dismiss the litigation. *Merrill Lynch Bus. Fin. Servs. v. Kupperman*, 2010 WL 2179181 *18, 2010 U.S. Dist. LEXIS 52785 *53 (D. N.J. May 27, 2010) (explaining that chapter 7 trustee dismissed avoidance action where transfers and proceeds were collateral of secured creditors, and that such "action was in accordance with its role as trustee."). As addressed below, continuation of litigation after such funds have been secured is a violation of a trustee's duties.

Even if there were a reason for the Trustee's DLI Stipulation to be distinguished from the fee-sharing agreements that were rejected in *Congress* and *World Parts*, the DLI Stipulation would not rescue the Trustee from this problem of his own making, as DLI agreed in the DLI Stipulation to share recoveries of its collateral with unsecured creditors *until* unsecured claims are paid 30% of their allowed amounts, only *after* which DLI will begin to receive its collateral. That intentional "reverse waterfall," as the Trustee described it when seeking court approval for the DLI Stipulation, demonstrates that litigation in this case can only provide any "benefit" for unsecured creditors until the stage where the Trustee has enough cash to pay 30% of the potential allowable amounts (if any allowable claims exist). After that, only DLI, the Trustee, and his professionals, will benefit from a continuation of litigation. The DLI Stipulation was not just poorly conceived, it was poorly drafted, and it cannot establish "benefit" for ongoing litigation under Section 550(a).

By the Trustee's own admission, he presently has $6,843,529.59 in his account that is available to pay the claims of professionals, and has asked for relief to pay another nearly $1 million more to professionals, leaving at least $5.8 million in the bank, which is enough funds to pay any allowed claims of non-equity unsecured creditors nearly a hundred times over. SUF ¶¶ 114, 117. Until recovering such funds, it might have been possible for the Trustee to evade a Section 550(a) argument by arguing that both DLI and unsecured creditors would benefit from litigation until the Trustee had sufficient funds to pay allowed unsecured claims. But even if that argument might have worked *then*, the bar to further litigation exists *now*, as the Trustee has far more cash sitting

in his account than would be necessary to pay any allowed unsecured claims. Because any future recoveries cannot benefit equity holders, as addressed above, they would be for the sole benefit of DLI, and such "benefit" is not "benefit to the estate" under Section 550(a) in a chapter 7 case. *In re C.W. Mining Co.*, 477 B.R. at 189 (chapter 7 trustee's avoidance claim dismissed where "it is relatively easy to conclude that there would be no benefit to the estate since the recovery of the avoided Transfer would inure to Bank as the secured creditor," and concluding further that the only "benefit" would be to the trustee's fees).

The Trustee cannot continue to pursue his Avoidance Claims for the "benefit" of DLI, his own fees, or his professionals' fees, and his ongoing litigation must be brought to a conclusion by entry of judgment in favor of Defendants.

**E. <u>A Chapter 7 Trustee's Duty to Investigate Includes a Duty to Refrain From Litigation that Does Not Meet a Cost-Benefit Analysis</u>**

The Trustee is likely to argue that, if he can just continue litigating his claims, perhaps he will recover more than the $203 million plus interest that would be required to pay DLI's secured claim (plus all professional fees to obtain that result), because then any further recoveries would allow him to pay the remaining 70% of general unsecured claims (if there even are any allowed unsecured claims). But such a pie-in-the-sky excuse to perpetuate litigation on the impossible likelihood of recovering more than $200 million in order to pay a few thousand dollars to creditors whose claims are not likely to be allowable is a violation of a trustee's duties.

In *In re Riverside-Linden*, the Ninth Circuit justified its affirmance of the BAP's denial of counsel fees by quoting the BAP's and bankruptcy court's statement that "when a cost benefit analysis indicates that the only parties who will *likely* benefit from an investigation of a claim are the trustee and his professionals, investigation is unwarranted." 925 F.2d at 322 (emphasis added). That same "cost benefit analysis" that applies to any investigation of a claim also applies to the litigation that may follow. Despite a trustee's broad discretion to decide whether to pursue litigation, "it would be an abuse of discretion to bring an action to set aside a post-petition transfer if it would not financially benefit the estate. In order to make this assessment, a trustee must conduct a cost-benefit analysis." *McCord v. Agard (In re Bean)*, 251 B.R. 196, 204 (E.D.N.Y. 2000). As

the court in *In re C. Keffas & Son Florist, Inc.*, 240 B.R. 466 (Bankr. E.D.N.Y. 1999) explained:

> if the trustee fails to make this necessary cost-benefit analysis, then the trustee will necessarily breach the statutory mandate under 11 U.S.C. § 704(1) … If a trustee incurs transaction costs for the estate when no purpose would be served by [such conduct], then that constitutes a per se breach of that duty.

*Keffas*, 240 B.R. at 474.

The Trustee's sworn testimony at the outset of this case was that there is "no avenue" for unsecured creditors to receive any distributions in this case unless it comes from DLI collateral shared by DLI, because every asset of the Debtor was encumbered by DLI's perfected lien. SUF ¶ 49. And because the Debtor never had any assets beyond its bare legal title to receive and hold DLI's funds, there can be no recoveries beyond the amount of that cash, which corresponds to the amount of DLI's secured claim. If the Trustee could somehow disavow that sworn testimony upon which all of this litigation has been permitted, he would still face a massive uphill battle to justify ongoing litigation.

The history of this Adversary Proceeding demonstrates that no legitimate cost benefit analysis could justify its ongoing existence. The Trustee alleges damages that equal DLI's lost collateral, of about $200 million. He has recovered $3 million combined from the individual and his entities who were the Debtor's majority shareholder, the CEO, the Managing Member, and the person fully in control of the Debtor's finances and daily business. SUF ¶ 100. He dismissed DealDefenders for no recovery. SUF ¶ 119. Go2Tel.com was dismissed. SUF ¶ 120. The Debtor's D&O insurer paid out $300,000 (0.15% of damages) on the Trustee's breach of fiduciary duty claims. SUF ¶ 101. And the Trustee is settling with Mr. Philipson for what is likely to be very minor or non-existent recovery given that it is a settlement based on his "ability to pay a potential judgment." SUF ¶ 121.

That leaves these Defendants. In a case that has produced nothing but nuisance-value and zero-dollar settlements, the Trustee needs to justify this ongoing litigation with a cost benefit analysis showing that he can recover well over $200 million from <u>these</u> Defendants (plus punitive damages, interest and further professional fees) before he would have any funds to pay the remaining alleged unsecured claims (all of which should be disallowed). Absent such a cost benefit

analysis, this ongoing exercise in fee generation is a breach of the Trustee's and his professionals' duties to this Court. Allegations will not suffice. Evidence must justify such a decision. The Trustee and his counsel must "consider whether or not the probable cost of legal services or litigation would be disproportionately large in relation to the maximum probable (not possible) recovery." *In re Scoggins*, 142 B.R. 940, 945 (Bankr. D. Or. 1992); *see also McCord*, 251 B.R. at 206 ("it was a gross abuse of the trustee's discretion to pursue an avoidance action which could not possibly financially benefit the estate.").

The $160 million that two U.K. telecom entities failed to pay in January 2019 has now been missing and unrecovered for six years. The Trustee has not located it. DLI has not located it. And litigation against these Defendants will neither locate it nor recover it.

### F. <u>The Same Requirement of "Benefit" to General Unsecured Creditors Applies to the Trustee's Fiduciary Duty Claims</u>

In a prior motion to dismiss filed in 2023, Defendants raised the Trustee's lack of standing to pursue fiduciary duty claims because a conduit shell company that merely held possession of a lender's collateral, and which funds remained under the control of the lender, did not experience its own independent "injury-in-fact." This Court denied that motion, and it will be appealed once the order is final, or will be addressed once this case is withdrawn to the District Court.

In a companion motion for summary judgment, Defendants have raised the argument that the Trustee's Avoidance Claims lack the necessary element of "transfers" of an "interest of the debtor in property" because transfers of fully encumbered collateral are not avoidable, and that the Trustee's Fiduciary Duty Claims lack the necessary element of damages based on the same underlying facts. A plaintiff cannot recover that which it did not lose.

In this motion, the same fact pattern raises a third issue of law supporting judgment in favor of the Defendants: the Trustee's ongoing litigation is not for the "benefit" of allowable claims of non-equity unsecured creditors. It is an argument that applies not only to the Trustee's Avoidance Claims, as argued above, but also to his Fiduciary Duty Claims brought under Delaware law.

The concept that a chapter 7 trustee's actions must provide "benefit" to unsecured creditors of the estate is universal across all aspects of a trustee's duties, not just for Section 550(a)

recoveries. It bars a chapter 7 trustee from selling fully encumbered property for the sole benefit of the secured creditor. *See Rodriguez v. Tucker (In re Tucker)*, 2025 WL 926485, 2025 U.S. Dist. LEXIS 57707 *16-17 (D. Col. March 27, 2025) (affirming bankruptcy court's ruling "that it would be 'improper' (as it would be where a chapter 7 trustee seeks to liquidate fully-encumbered property for the benefit of a single secured creditor) to permit the Trustee to liquidate" property where a secured creditor would receive all proceeds, and "the sole benefit to the estate would be the recoupment of administrative costs.").

The same principle bars a chapter 7 trustee from settling estate claims that solely benefit a secured creditor. *See In re Allied Props., LLC*, 2007 WL 1849017, 2007 Bankr. LEXIS 2174 *26-27 (Bankr. S.D. Tex. June 25, 2007) (rejecting settlement under Rule 9019(a) where sole benefit would be to settling secured creditor that already had lien on proceeds from subject litigation, as the settlement "gives the estate no benefits").

And the same principle bars a chapter 7 trustee from keeping a case open and continuing litigation when there are enough funds in the estate to pay the allowed claims of unsecured creditors. For example, in *Shay v. Hoffman (In re Metschan)*, 2025 WL 1355650, 2025 Bankr. LEXIS 1128 (9th Cir. BAP May 9, 2025), the chapter 7 trustee – just like this Chapter 7 Trustee – "had enough money to pay in full all administrative expenses, [an] allowed priority claim, and all timely filed unsecured claims, with" funds left over for the debtor or his spouse. 2025 WL 1355650 at *3. But rather than close the case, the Trustee's counsel continued to litigate a claim objection for two more years, including an appeal to the Ninth Circuit Court of Appeals, before settling the claim and seeking allowance of counsel's fees. *Id*. Although the bankruptcy court approved the attorneys' fee application, the BAP reversed, finding that the bankruptcy court abused its discretion approving the attorneys' fee application for two reasons. One reason was concern that the attorneys performed administrative functions of the trustee. But the primary reason was that the trustee and his attorneys "continued litigation that virtually depleted the estate even when it was clear there was no reasonable likelihood of benefit to unsecured creditors." *Id*., at *8-10. The BAP explained that:

> from the record before the Panel, no unsecured creditors had any possibility of benefitting from the continued claim objection litigation, the 'burden of the probable cost of legal services [was] disproportionately large in relation to the . . .

> maximum probable recovery,' the estate would not 'suffer' with the discontinuation of the claim objection, and given the hostility between the parties, there was little likelihood that continued claim objection litigation would resolve the issue successfully.

*In re Metschan*, 2025 WL 1355650 at *10 (quoting *Ferrette & Slater v. U.S. Tr. (In re Garcia)*, 335 B.R. 717, 725 (9th Cir. BAP 2005)). *See also In re Carmona*, 362 B.R. 453, 457-58 (Bankr. C.D. Cal. 2006) (dismissing case and denying trustee's and counsel's fee applications for efforts to sell house when debtor had arranged for payment of all unsecured claims).

As addressed above, the Ninth Circuit affirmed the disallowance of a chapter 7 trustee's fees in *In re Riverside-Linden Inv. Co*. where the trustee was able to pay the claims of all general unsecured creditors, but counsel continued litigation against partnership interests that did not benefit "anyone aside from the trustee's lawyers and accountants." 925 F.2d at 324. The basis for disallowance of such fees in *Riverside-Linden* was not "benefit," but the similar concept of whether such continued administration of the estate was in the "best interests" of the estate under Section 704(a)(1). If the Franchise Tax Board actually holds an allowable $5,000 unsecured claim that has not already been addressed by VoIP Guardian LLC's tax return, the Franchise Tax Board will not "benefit" from ongoing litigation, and such litigation is not in the "best interests" of the estate or the Franchise Tax Board, because the Trustee already has all the funds needed to pay their alleged unsecured claim. Indeed, the Trustee has had such funds in his possession since this Court approved his settlement with BT Nederland and Dutch authorities in July of 2024, yet this litigation has continued and incurred further seven-figure professional-fee obligations for the estate.

Continued litigation is not proper – is not compensable – and should be dismissed because it cannot provide benefit to general unsecured creditors and cannot be in the "best interests" of the estate. An action is "purposeless litigation" when a cost benefit analysis indicates that the only parties who will likely benefit from an investigation of a claim are the trustee and his professionals. *McCord v. Agard (In re Bean)*, 251 B.R. 196, 205 (E.D.N.Y. 2000).

Even if the Trustee could demonstrate that any of the Defendants owed and breached fiduciary duties to the Debtor, the Debtor never had funds of its own and could not have been injured by such alleged breaches. Zero minus any amount is still zero. And now that the Trustee

has recovered DLI funds that had been withheld by BT Nederland (and were recovered as DLI's collateral), there are more than enough funds in the estate to pay the permitted 30% recovery for unsecured creditors even if all of their claims were allowable.

If it were possible for an SPE with no assets of its own to have been "damaged" by a purported breach of fiduciary duties, it would be damage that is recovered for equity holders and/or the secured creditor, DLI, each of whom are expected to pursue their rights in other courts, not in a chapter 7 case. DLI could have sought a recovery of its damages by pursuing a myriad of claims based on the same allegations made by the Trustee. And equity holders could have pursued their respective rights against one another, as Forefront is doing in the New York Supreme Court. None of their alleged claims or losses permit this Trustee to pursue litigation in this Court for their benefit once he has recovered sufficient funds for any allowed unsecured claims.

The Trustee cannot perpetuate a fiduciary duty claim based on an alleged duty owed to the Debtor if the only injured party was DLI when its collateral was not recovered on account of some factored invoices. Nor can the Trustee continue a fiduciary duty claim based on an alleged duty owed to the Debtor if the injured parties were the Debtor's equity holder, VoIP Guardian LLC, or its respective equity holders. With every claim and every argument advanced by the Trustee, the obvious retort is "who was injured"? If every allegation raised by the Trustee were correct, the injured party would be DLI, every time, when its collateral was not recovered on account of factored invoices. But a chapter 7 trustee cannot continue litigation for a secured creditor's benefit.

**G. <u>The Forefront Claim Raises Serious Concerns of Propriety if it Could Be Relied upon to Justify Ongoing Litigation</u>**

If the Trustee could convince this Court that VoIP Guardian LLC's claim or the $36 million Forefront Claim for VoIP Guardian LLC's "net profit" are proper claims of general unsecured creditors – contrary to the Ninth Circuit case law discussed above – it would place any future trial on the Trustee's claims into context. But it is a context of legal absurdity and concerning propriety.

The "benefit" of such continued litigation would be the Trustee's potential ability to pay Forefront up to 30% of its judgment claim for the "net profit" of a non-debtor parent company that must have run a profitable and legitimate VoIP telecom factoring business in order to generate such

"net profit." The jury in the New York Supreme Court could not have awarded Forefront a recovery of "net profit" if it had accepted Mr. Omanoff's argument that VoIP Guardian LLC's factoring business was not a real business, and therefore he could not owe "net profit" to anyone. Yet the claims the Trustee would continue litigating in this case in order to recover funds to pay that "net profit" rest on proving that VoIP Guardian LLC was not a legitimate and profitable company, and that prior profits paid to equity holders of VoIP Guardian LLC were "fake" profits. And he would make that completely contradictory argument in order to recover those "fake" profits so that he can pay the same cash to Forefront, but now characterized as real "net profit" of the same company. Every brief filed in pursuit of that theory should be deemed a violation of F.R.B.P. 9011.

Furthermore, even though Mr. Proto and Mr. Rahman already settled any liability they could have had in this shareholder dispute in 2019, the Trustee would be going to trial on behalf of Forefront to recover more funds from Mr. Proto and Mr. Rahman in order to pay Mr. Omanoff's liability to Forefront on a claim that Mr. Proto and Mr. Rahman have already paid to address.

Perhaps the greatest concern from a perspective of legal ethics is that the Forefront Proof of Claim would serve as the purported justification for a continuation of this litigation only to face a claim objection once the litigation is complete. Why would the Trustee pay funds to Forefront on a claim that is patently disallowable when a claim objection would allow him to instead pay such funds to DLI – after collecting fees for the claim objection. This has become a case where professional fees have already exceeded $8.3 million, and a three-week jury trial lies ahead in 2026. Yet payments to allowed and legitimate unsecured creditors will hover somewhere between zero and about $60,000. How many *more* millions of dollars in fees will this case generate before it is finally demonstrated at the close of the case that <u>all</u> of this effort was solely to pay professionals, and perhaps some leftovers for the secured creditor?

These are ethical quandaries of the sort that the BAP found easy to resolve in hindsight in *In re Metschan* by refusing to permit recoveries of fees for an improper continuation of litigation. But they are also quandaries that are properly resolved at *this* stage by entry of judgment against the Trustee on all of his claims on the grounds that his continuing litigation cannot provide "benefit"

for the allowable claims of general unsecured creditors, and cannot be continued in a chapter 7 case for the benefit of equity holders, secured creditors, or the Trustee and his counsel.

This is not a case where there is any justifiable argument to explain why the estate has ended up in this position. There *never was* a legitimate argument that Forefront's claim for the "net profit" of the Debtor's parent company is a general unsecured claim and that Forefront is a general unsecured creditor for whose "benefit" this case could be run.

There *never was* a legitimate argument to claim that the defaulted HILF Claim could have been allowed.

There *never was* a legitimate argument to allow a Franchise Tax Board claim when the Debtor was a disregarded entity whose tax liabilities were always covered by VoIP Guardian LLC's tax returns.

There *never was* a legitimate argument to allow the Scheduled Law Firm Claims since VoIP Guardian LLC continued to pay such liabilities post-petition, and the Debtor never could have used one dollar of DLI's secured loan proceeds to pay such alleged creditors.

And there *never was* any legitimate evidence to support the Trustee's case against these Defendants.

This case has always been based on the idea that it would be run for the "benefit" of DLI to extract nuisance-value settlements out of the U.S. residents who could be reached with a summons issued by this Court. Perhaps most troubling is that, instead of being run for the benefit of DLI, it has turned out to be run entirely for the benefit of professionals. By the time this case is over, there are not likely to be any legitimately allowed claims of general unsecured creditors. And yet it is equally unlikely that there will be any significant amount of DLI's collateral that remains to be returned to DLI once professional fee applications have been resolved.

Twelve million dollars recovered. More than $8.3 million dollars in professional fees *so far*. And at most there will be about $60,000 to be paid to any legitimate general unsecured creditors, though the real number is closer to zero.

Even if any of DLI's collateral remains for repayment to DLI, it is not "benefit" that can justify a five-year exercise that has had so many legal and factual fatalities from the start. Secured

creditors are expected to pursue their collateral on their own, not by hiring a chapter 7 trustee with a fee agreement. *In re World Parts, LLC*, 322 B.R. at 43. For the same reasons, shareholders are expected to resolve their competing differences among themselves outside of a subsidiary company's bankruptcy case – such as the Forefront litigation in the New York Supreme Court. And professionals are not permitted to continue litigation for their own benefit.

It is time for the Trustee's "success" on behalf of any legitimate allowed unsecured creditors (if any) to be acknowledged, for this litigation to be dismissed, and for this case to be closed.

## V. CONCLUSION

The Trustee's ongoing pursuit of litigation against these Defendants cannot provide "benefit" to any allowable claims of general unsecured creditors, as the Trustee has more than enough cash sitting in an account waiting for the day when he makes payment. That day is now, and judgment must be entered in favor of Defendants pursuant to 11 U.S.C. § 550(a), Cal. Civ. Code § 3439.08(b), and related federal and Delaware law, on the grounds that continued litigation will not result in avoidable recoveries or recoverable damages that "benefit" allowable non-equity unsecured claims.

WHEREFORE, for the reasons and applicable law briefed herein, Defendants respectfully request that this Court enter judgment dismissing the Trustee's Complaint with prejudice.

Dated: November 26, 2025

**BAKER & HOSTETLER LLP**

By: */s/ David J. Richardson*
David J. Richardson

*Counsel for Mark Proto, Youssef Rahman aka Joe Rahman, Tarek Katit, Mudmonth, LLC, Zoom Telecom, Inc., Tee Telecommunications Inc., 2365 Azure LLC, and Overseas Charters, Inc..*