STEVEN T. GUBNER - Bar No. 156593
JASON B. KOMORSKY - Bar No. 155677
COREY R. WEBER – Bar No. 205912
JESSICA L. BAGDANOV - Bar No. 281020
JESSICA S. WELLINGTON - Bar No. 324477
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email: jkomorsky@bg.law
cweber@bg.law
jbagdanov@bg.law
jwellington@bg.law

Special Litigation Counsel for Plaintiff,
Timothy Yoo, Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>VOIP GUARDIAN PARTNERS I, LLC,<br><br>Debtor.<br><br>TIMOTHY YOO, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>VOIP GUARDIAN LLC, a Delaware limited liability company; et al.,<br><br>Defendants. | Case No. 2:19-bk-12607-BR<br><br>Chapter 7<br><br>Adv. No. 2:21-ap-01044-BR<br><br>**TRUSTEE'S NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION ON TRUSTEE'S CLAIMS FOR ACTUAL INTENT FRAUDULENT TRANSFERS AND CONTRUCTIVELY FRAUDULENT TRANSFERS AND RECOVERY OF AVOIDED TRANSFERS AGAINST DEFENDANTS MUDMONTH LLC AND MARK PROTO AS A SUBSEQUENT OR PASS-THROUGH TRANSFEREE OF MUDMONTH LLC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[Separate Statement of Undisputed Material Facts, Declarations and Request for Judicial Notice are filed concurrently herewith]**<br><br>Date: To be set by the Court<br>Time: To be set by the Court<br>Place: Courtroom 1668<br>United States Bankruptcy Court<br>255 E. Temple Street<br>Los Angeles, CA 90012 |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, DEFENDANTS MUDMONTH LLC, AND MARK PROTO AS SUBSEQUENT OR PASS-THROUGH TRANSFEREE OF MUDMONTH LLC, AND THEIR COUNSEL, AND ALL INTERESTED PARTIES:**

**PLEASE TAKE NOTICE** that **on a date and at a time to be set by the Court,** in Courtroom 1668 of the above-entitled Court, Plaintiff Timothy Yoo, the duly appointed and acting Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of debtor VoIP Guardian Partners I, LLC (the "Debtor"), will and hereby does move (the "Motion") the Court pursuant to Fed. R. Bankr. P. 7056, incorporating Fed. R. Civ. P. 56, for an order granting summary adjudication as to the Trustee's Third Claim for Relief for Avoidance of 2-Year Fraudulent Transfers (Actual Intent), the Fourth Claim for Relief for Avoidance of 2-Year Fraudulent Transfers (Constructive Fraud), the Fifth Claim for Relief for Avoidance of 4-Year Fraudulent Transfers (Actual Intent), the Sixth Claim for Relief for Avoidance of 4-Year Fraudulent Transfers (Constructive Fraud) and the Ninth Claim for Relief for Recovery of Avoided Transfers, as against defendants: (1) Mudmonth LLC ("Mudmonth"), a revoked[1] Nevada limited liability company and statutory insider of the Debtor that indirectly owns 40% of the membership interests of the Debtor; (2) Mark Proto ("Proto") as the subsequent transferee or pass-through transferee of Mudmonth and the sole member and owner of the revoked entity, Mudmonth, and statutory insider of the Debtor. Mudmonth and Proto are collectively referred to herein as the "Defendants."

The Motion is based on the grounds that the Debtor, which claimed to be in the business of factoring voice over internet protocol ("VoIP") invoices and accounts receivable, was engaged in fraud rather than a legitimate business. The manager of the Board of Managers of the Debtor, Rodney Omanoff ("Omanoff"), admitted that the Debtor was engaged in "the theft of the investor capital," that "[i]t's just fraud," and that the Debtor "never generated a profit because essentially it

---

[1] The Nevada Supreme Court has stated that "[w]ith the possible exception of an LLC whose "business" is litigation—say, a law firm or a collection agency—NRS 86.274(5) and NRS 86.505 thus seem to permit a domestic LLC to sue and be sued despite a revoked charter." *AA Primo Builders, LLC v. Washington*, 126 Nev. 578, 587 (2010).

was just a Ponzi scheme." The Debtor's actual intent to hinder, delay or defraud creditors is established by Omanoff's admissions.

Separately, the United States District Court appointed a federal equity receiver for the Debtor's lender, and the receiver reported to the District Court that the Debtor was engaged in money laundering, fraud or a Ponzi scheme. The receiver also reported to the District Court that the lender was a feeder fund to the Debtor (with the feeder fund itself comprised of sub-feeder funds containing hundreds of investors) and that the lender was a Ponzi scheme. The lender's founder, sole owner and CEO subsequently pleaded guilty in August 2022 to wire fraud for falsifying financial records and was recently sentenced to 40 months in federal prison.

While the Defendants have asserted that the Debtor's business was legitimate, that the Debtor was not engaged in fraud and that the Debtor's lender was a "respectable investment company" that monitored the use of funds, the Defendants wholeheartedly deny that they served in any official capacity for the Debtor or its parent company other than Mudmonth being an indirect owner of the Debtor (Mudmonth owned 40% of the parent company of the Debtor, which parent company operated the Debtor).

Defendants therefore have disavowed being in a position to rebut Omanoff's admissions that the Debtor was engaged in fraud. The Trustee's prima facie case to prove the actual intent fraudulent transfer claims, the Debtor's actual intent to hinder, delay or defraud creditors, is established by Omanoff's admissions, or, in the alternative, based on badges of fraud. The Trustee's prima face case to prove the constructively fraudulent transfers is established by the lack of reasonably equivalent value in exchange for the transfers to Mudmonth, which consisted solely of distributions of purported profits, and the insolvency of the Debtor.

The transfers to the Defendants for which the Trustee seeks summary adjudication in the Motion, are solely comprised of profit distributions from the Debtor's parent company based on the Debtor's operations while the Debtor was insolvent and engaged in fraud. All of the monies that Mudmonth received from profit distributions were then transferred to Proto and Mudmonth's company status was then revoked by the State of Nevada. The transfers are as follows:

| Date | Amount Transferred | | Check No. |
|---|---|---|---|
| 2/18/2016 | $ | 84,000.00 | 1006 |
| 6/7/2016 | $ | 120,000.00 | 1014 |
| 10/25/2016 | $ | 60,000.00 | 1050 |
| 1/9/2017 | $ | 120,000.00 | 1083 |
| 1/9/2017 | $ | 160,000.00 | 1089 |
| 1/9/2017 | $ | 110,000.00 | 1101 |
| 1/30/2017 | $ | 360,000.00 | 1107 |
| 2/24/2017 | $ | 400,000.00 | 1116 |
| 5/11/2017 | $ | 240,000.00 | 1130 |
| 6/12/2017 | $ | 320,000.00 | 1144 |
| 7/5/2017 | $ | 360,000.00 | 1159 |
| 8/10/2017 | $ | 400,000.00 | 1167 |
| 8/23/2017 | $ | 400,000.00 | 1179 |
| 9/27/2017 | $ | 480,000.00 | 1193 |
| 11/16/2017 | $ | 440,000.00 | 1207 |
| 1/3/2018 | $ | 480,000.00 | 1219 |
| 1/3/2018 | $ | 520,000.00 | 1238 |
| 2/7/2018 | $ | 560,000.00 | 1251 |
| 3/21/2018 | $ | 640,000.00 | 1268 |
| 4/25/2018 | $ | 600,000.00 | 1285 |
| 5/31/2018 | $ | 640,000.00 | 1297 |
| 7/6/2018 | $ | 760,000.00 | 1314 |
| 8/10/2018 | $ | 720,000.00 | 1332 |
| 10/10/2018 | $ | 509,296.32 | 1366 |
| 10/15/2018 | $ | 800,000.00 | 1348 |
| 10/26/2018 | $ | 446,666.68 | 1379 |
| 10/26/2018 | $ | 446,666.68 | 1394 |
| 10/26/2018 | $ | 35,000.00 | 1404 |
| | **$** | **11,211,629.68** | |

Proto admitted that Mudmonth “didn’t do anything apart from have the shares and get the distributions from VoIP”, and that it did not perform any business functions and did not have any officers or directors or employees other than Proto. Proto admitted that the representations made to DLI regarding Mudmonth and Proto were false insofar as Mudmonth provided no services and Proto was not the “director of business development.” Mudmonth did not pay anything in exchange for its 40% ownership of the Debtor’s parent company, which operated the Debtor, and the ownership interests were instead gifted to Mudmonth. Not only did Mudmonth not make a capital contribution, it also did not provide any other value to the Debtor or the Debtor’s parent company. When Proto was asked whether Mudmonth received 40% of the Debtor for doing nothing and bringing nothing to the table, Proto responded, “I didn’t bring anything to VoIP Guardian.” Proto testified that Mr. Omanoff “offered Mudmonth 40 percent of the company...” while asking for nothing in return. As Mudmonth’s sole owner, Proto, testified that “[t]here was nothing—there was no responsibilities, there was no ties, there was no agreement for anything I had to do for that a 40 percent—or that Mudmonth had to do for that 40 percent.”

The tax returns of the Debtor’s parent company reflect that the parent company and the Debtor were insolvent between 2016 and 2019, during the period when the transfers of purported profits were paid to Mudmonth. Thereafter, the Debtor’s statements and schedules filed on March

11, 2019 listed $71,284,210.07 in assets and $194,197,354.29 in liabilities, for negative net equity of ($122,913,144.22).

This Motion seeks summary adjudication on the Trustee's actual intent fraudulent transfer and constructive fraudulent transfer claims under the Bankruptcy Code and California Civil Code for transfers totaling over $11.2 million to Mudmonth and to Proto as the subsequent or pass-through transferee of Mudmonth. The Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities in support of the Motion, the Separate Statement of Undisputed Material Facts, the declarations of Timothy Yoo, Bradley Sharp, and Jason Komorsky, the Request for Judicial Notice, all pleadings, records, and files in this action, all matters of which the Court may take judicial notice, and any oral or written evidence or argument that the Court may consider at the hearing on this Motion.

**PLEASE TAKE FURTHER NOTICE** that, subject to the Court setting a hearing on the Motion, and subject to any different timeframe set by the Court, pursuant to Local Bankruptcy Rule 7056-1(c), any party who opposes the Motion shall, not later than twenty-one (21) calendar days prior to the hearing on the Motion, serve its response, if any, on the Trustee and his counsel of record, and file such response with the Clerk of Court.

DATED: September 4, 2026

BG LAW LLP

By: /s/ Jason B. Komorsky
Steven T. Gubner
Jason B. Komorsky
Corey R. Weber
Jessica L. Bagdanov
Jessica S. Wellington
Attorneys for Plaintiff, Timothy Yoo, Chapter 7 Trustee

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. BACKGROUND AND PROCEDURAL HISTORY ........ 4

A. The Debtor and Its Parent Company, VoIP Management ........ 4

B. The Debtor's Purported Business ........ 5

C. Investigations, Potential Claims and Litigation Regarding the Debtor and Defendants Beginning in Early 2017 ........ 6

D. The Debtor's Bankruptcy Filing ........ 6

E. The SEC's Complaint and Judgment Against the Debtor's Lender, DLI, the District Court's Appointment of a Receiver for DLI, and the Receiver's Report Finding That the Debtor Was Engaged in Fraud and That DLI Was a Ponzi Scheme and Feeder Fund ........ 6

F. The Adversary Proceeding Against Defendants ........ 7

1. The Complaint, Amended Complaints and Motions to Dismiss ........ 7

2. Defendants' Interlocutory Appeal ........ 8

3. Defendants' Multiple Motions for Summary Judgment ........ 8

4. Pre-Trial Stipulation, Transfer of the Case to the District Court, and the District Court's Return of the Case to the Bankruptcy Court for Pre-Trial Matters ........ 8

III. SUMMARY JUDGMENT ON THE CLAIMS FOR ACTUAL INTENT FRAUDULENT TRANSFERS IS WARRANTED ........ 9

A. Summary Judgment Legal Standard ........ 9

B. Elements for Actual Intent Fraudulent Transfer Claims ........ 9

1. The Debtor Made Transfers to or for the Benefit of Defendants ........ 10

2. The Debtor's Actual Intent To Hinder, Delay or Defraud Creditors May Be Established Through Omanoff's Admissions in Sworn Testimony That the Debtor Was Engaged in Fraud ........ 12

3. In Addition to Omanoff's Admissions, the Debtor's Actual Intent May Be Established Through Badges of Fraud and As When Otherwise Supported by the Evidence ........ 13

*a.* The Defendants Were Insiders of the Debtor ........ 15

*b.* The Debtor Had Been Sued or Threatened with Suit ........ 16

*c.* The Value of the Consideration Received by the Debtor Was Not Reasonably Equivalent to the Value of Assets Transferred ........ 18

4. The Debtor Was Insolvent or Became Insolvent Shortly After the Transfers Were Made ........ 20

5. Other Factors—The Statutory Badges of Fraud Are Non-Exclusive And, As Stated In The Statute, May Be Considered "Among Other Factors" ....23

*a.* The Debtor Did Not Follow Its Stated Business Model and Instead Included Facts in Its Materials to Lenders and Investors That Were, According To Proto, Simply Not True ....23

*b.* Two Purported Tier 1 Entities Which Owed Approximately 83% of the Debtor's Accounts Receivable Simultaneously Defaulted on Amounts Due, Then Sent Identical Messages to the Debtor and Initiated Insolvency Proceedings That Did Not List Any Amounts Due to the Debtor or To the Entities That Factored Invoices With the Debtor ....25

*c.* Notwithstanding That Indigo11 Stopped Operating and Was in an Insolvency Proceeding, Zoom Continued to Generate Invoices for Minutes Purportedly Generated by Indigo11, and the Debtor Then Factored Those Invoices ....28

*d.* The Principal of Another Tier 3 Entity Factored by the Debtor Pleaded Guilty to Generating Fake Invoices for VoIP Minutes ....29

*e.* Another Entity That the Debtor Factored Accounts Receivable for Was Owned and Controlled by Proto and Was Just A Small Middleman Entity That Went Out of Business, Transferred Assets and Did Not Maintain Its Books and Records ....30

6. Given Omanoff's Admissions and the Badges of Fraud, Expert Testimony Is Not Required ....32

C. Elements for Constructive Fraudulent Transfer Claims ....32

1. Lack of Reasonably Equivalent Value in Exchange for the Transfers ....33

2. The Debtor Meets the Insolvency Tests ....34

IV. PROTO QUALIFIES AS THE IMMEDIATE OR MEDIATE TRANSFEREE OF MUDMONTH, OR THE PASS-THROUGH TRANSFEREE OF MUDMONTH ....34

V. CONCLUSION ....35

## TABLE OF AUTHORITIES

Page

**Cases**

*AA Primo Builders, LLC v. Washington*,
126 Nev. 578 (2010) ..... 3

*Adams v. Anderson (In re Superior Stamp & Coin Co., Inc.*),
223 F.3d 1004 (9th Cir. 2020) ..... 11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (S.Ct. 1986) ..... 9

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ..... 10

*In re Acequia, Inc.*,
34 F.3d 800 (9th Cir. 1994) ..... 14, 15

*In re Adbox*,
488 F.3d 836 (9th Cir. 2007) ..... 11

*In re Bellingham Ins. Agency, Inc.*,
702 F.3d 553 (9th Cir. 2012),
aff'd sub nom., *Executive Benefits Ins. Agency v. Arkison*,
573 U.S. 25 (2014) ..... 32

*In re Beverly*,
374 B.R. 221 (B.A.P. 9th Cir. 2007) ..... 32

*In re Classic Coach Interiors, Inc.*,
290 B.R. 631 (Bankr. C.D. Ill. 2002) ..... 12

*In re DAK Industries, Inc.*,
170 F.3d 1197 (9th Cir. 1999) ..... 20

*In re Fitness Holdings Intern., Inc.*,
714 F.3d 1141 (9th Cir. 2013) ..... 33

*In re Fox Bean Co., Inc.*,
287 B.R. 270 (Bankr. D. Idaho 2002),
*subsequently aff'd sub nom. In re Fox Bean Co.*,
144 Fed. Appx. 697 (9th Cir. 2005) ..... 22

*In re Fox Ortega Enterprises, Inc.*,
631 B.R. 425 (Bankr. N.D. Cal. 2021) ..... 14, 23, 32

*In re Healthcentral.com*,
504 F.3d 775 (9th Cir. 2007) ..... 9

*In re Kemp Pacific Fisheries, Inc.*,
16 F.3d 313 (9th Cir. 1994) ..... 11

*In re Lull*,
386 B.R. 261 (Bankr. D. Hawaii 2008) ........ 14, 15

*In re Marshall*,
550 F.3d 1251 (10th Cir. 2023) ........ 11

*In re Palmdale Hills Property, Inc.*,
2017 WL 4573691 (Bankr. C.D. Cal., Oct. 12, 2017, No. 1:16-AP-01120-GM) ........ 15

*In re Pitcock*,
208 B.R. 862 (Bankr. N.D. Tex. 1997) ........ 12

*In re Prototype Engineering & Manufacturing, Inc.*,
2019 WL 9243004 (Bankr. C.D. Cal., Dec. 12, 2019, No. 2:17-BK-21018-RK) ........ 20

*In re Rexford Properties, LLC*,
557 B.R. 788 (Bankr. C.D. Cal. 2016) ........ 15, 16

*In re The Vill. at Lakeridge, LLC*,
814 F.3d 993 (9th Cir. 2016) ........ 15, 16

*Misty Mgmt. Corp. v. Lockwood*,
539 F.2d 1205 (9th Cir.1976) ........ 22

*Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*,
96 B.R. 275 (9th Cir. BAP 1989) ........ 20

*Thrifty Oil Co. v. Bank of America Nat. Trust & Sav.*,
322 F.3d 1039 (9th Cir. 2003) ........ 9

**Statutes**

11 U.S.C.,
Section 544 ........ 3, 9

11 U.S.C.,
Section 101(2)(A) ........ 15

11 U.S.C.,
Section 101(31) ........ 15

11 U.S.C.,
Section 101(31)(B) ........ 15

11 U.S.C.,
Section 101(31)(E) ........ 15

11 U.S.C.,
Section 101(31)(F) ........ 15

11 U.S.C.,
Section 101(32) ........ 20

11 U.S.C.,
Section 101(54)(D) ........ 10

11 U.S.C.,
Section 548 .......... 3, 10

11 U.S.C.,
Section 548(a)(1) .......... 10, 34

11 U.S.C.,
Section 548(a)(1)(B) .......... 33

11 U.S.C.,
Section 550 .......... 3

11 U.S.C.,
Section 550(a) .......... 34

11 U.S.C.,
Section 550(a)(1) .......... 35

11 U.S.C.,
Section 550(a)(2) .......... 35

11 U.S.C.,
Section 550(b) .......... 35

California Civil Code,
Section 3439 .......... 3

California Civil Code,
Section 3439.01(m) .......... 10

California Civil Code,
Section 3439.02(a) .......... 20, 33

California Civil Code,
Section 3439.04(a) .......... 10, 34

California Civil Code,
Section 3439.04(b) .......... 14, 23

California Civil Code,
Section 3439.05 .......... 33, 34

Nevad Revised Stature,
Section 86.505 .......... 3

Nevada Revised Statutes
86.274(5) .......... 3

## I. INTRODUCTION

The Debtor claimed to be in the business of factoring invoices and accounts receivable for telecommunications companies engaged in providing services for voice over internet protocol ("VoIP") telecommunications traffic. **UMF[2] Nos. 11-14.** However, the manager of the Board of Managers of the Debtor, Rodney Omanoff ("Omanoff"), admitted in sworn testimony that the Debtor was engaged in fraud by "the theft of the investor capital" and operated as "a money laundering business". **UMF Nos. 51.** Omanoff further admitted that the VoIP voice traffic reflected in the invoices factored by the Debtor was part of the Debtor's scheme, that "[n]one of the traffic is legitimate. There's no traffic. It's a Ponzi scheme." **UMF Nos. 51-53.** Whatever description is used to describe the Debtor's business, Omanoff admitted that "[i]t's just fraud." **UMF No. 51.**[3]

The Trustee's prima facie case to prove the actual intent fraudulent transfer claims, the Debtor's actual intent to hinder, delay or defraud creditors, is established by Omanoff's admissions and, in the alternative, based on badges of fraud.

While the Defendants contest that the Debtor was engaged in fraud, they provide no evidence of the legitimacy of the business while simultaneously (and falsely) denying that they served in any official capacity in the management of the Debtor or its parent company, which operated the Debtor. **UMF Nos. 57.** Therefore, Defendants disclaim that they have any personal knowledge to rebut Omanoff's or Philipson's admissions that the Debtor was engaged in fraud. These admissions and conclusions that the Debtor was operating a fraudulent business are also not isolated. To the contrary, the receiver for the Debtor's lender, Direct Lending Investments, LLC ("DLI"), appointed by the United States District Court for the Central District of California, similarly reported to the District Court that the "evidence suggests VoIP Guardian was either a Ponzi scheme or a money-laundering or other criminal enterprise," and that DLI was a feeder fund into the Debtor comprised of two sub-feeder funds had a total of 952 lenders and investors and was itself a Ponzi scheme. **UMF Nos. 27-31.** DLI's founder, sole owner and CEO pleaded guilty in August 2022 to wire fraud

---

[2] Undisputed Material Facts in the Trustee's Separate Statement are referred to herein as "**UMF**."

[3] Omanoff's admissions were echoed by John Philipson ("Philipson") who worked for the Debtor and Omanoff. **UMF No. 141.**

for falsifying financial records and was recently sentenced to 40 months in federal prison. **UMF No. 32.** In addition, the principal of one of the entities factored by the Debtor, Interstach GMBH (a German entity), was recently convicted and sentenced in Europe to fifty-four months in prison, with the court finding that Interstach was involved in a scheme including the issuance of fictitious invoices for VoIP phone minutes. **UMF Nos. 95-96.** The Court need not determine whether the Debtor was a Ponzi scheme in order to determine that the Debtor was engaged in fraud, and this Motion does not seek a Ponzi scheme determination.[4]

The Debtor's stated business model was to factor (purchase at a discount) accounts receivable from "Tier 3" telecom entities (entities that terminated international VoIP calls initiated by large telecom carriers such as AT&T). **UMF Nos. 61.** However, the Debtor factored hundreds of millions of dollars in accounts receivable due from purported Tier 1 carriers that did not originate or terminate any calls, and instead were just small middleman entities with minimal assets and no telecom infrastructure, and which entities simultaneously defaulted on amounts due to the Debtor under factoring agreements, abruptly ceased operations, entered into insolvency proceedings or simply disappeared overnight. **UMF Nos. 67-84.** Notwithstanding the tens of millions of dollars paid by the Debtor to factor supposedly legitimate accounts receivable, the schedules of assets and liabilities filed in the insolvency proceeding of one of the "Tier 1" carriers did not reflect that *any* amounts were due to the Debtor or to the Tier 3 entities that factored their receivables with the Debtor. **UMF No. 83.** One of the Tier 3 middleman entities even generated invoices showing the connection of calls with millions of dollars of accounts receivable that were then factored by the Debtor ***after*** the Tier 3 entity had ceased operating and was in an insolvency proceeding. **UMF Nos. 85-86.** When the insolvent entity's liquidator was contacted, he advised in writing that he was unaware of any contractual relationship between the Debtor and the insolvent entity. **UMF No. 82.** The Debtor's actual business model was contrary to its stated business model and was based on fraud.

The Trustee seeks summary adjudication as to the actual intent and constructive fraudulent transfer claims against defendants Mudmonth LLC ("Mudmonth"), a revoked Nevada limited

---

[4] To the extent that the Court determines that there are triable issues of material fact, the Trustee reserves the right to present evidence at trial that the Debtor operated as a Ponzi scheme.

liability company[5] that indirectly owned 40% of the Debtor, and its subsequent or pass-through transferee Mark Proto ("Proto"), the sole member and owner of Mudmonth. Mudmonth, which indirectly owned 40% of the Debtor, received over $11.2 million in distributions of purported profits based on the Debtor's operations. **UMF Nos. 37, 43-44.** The distributions were made at times when the Debtor was insolvent and engaged in fraud. **UMF Nos. 51-54.**

Proto admitted under oath that Mudmonth did not do anything apart from receiving distributions based on ownership interests and that it had no officers, directors or employees other than Proto. **UMF Nos. 43-50.** Proto admitted that no consideration was provided for the ownership interests and that he did nothing for the Debtor and brought nothing to the table. **UMF Nos. 43-50.** Proto was unable to recount anything that he or Mudmonth did in exchange for Mudmonth receiving the profit distributions other than Mudmonth being offered a 40 percent ownership interest and Proto agreeing to take it. **UMF No. 47.** All of the monies that Mudmonth received were then transferred by Mudmonth to Proto or to third parties for Proto's benefit. **UMF Nos. 38.** Mudmonth's limited liability company status was then revoked by the State of Nevada. **UMF No. 42.**

The claims and issues set forth in this Motion are appropriate for summary adjudication because the Trustee has proven his prima facie case that the transfers to Defendants were made with the actual intent to hinder, delay or defraud creditors. The constructive fraudulent transfer claims are also appropriate for summary judgment because the Trustee has established that Defendants did not provide reasonably equivalent value in exchange for the transfers and based on the insolvency of the Debtor at the time of the transfers. The Motion seeks a judgment avoiding and recovering actual intent and constructively fraudulent transfers of over $11.2 million during the four years prior to the petition date. This Motion seeks summary adjudication on the Trustee's actual intent and constructive fraudulent transfer claims under §§ 544, 548, 550 and California Civil Code § 3439, *et seq.*, and the avoidance and recovery of the transfers.

Based on the grounds set forth herein, the Separate Statement of Undisputed Material Facts ("Separate Statement"), the declarations of Timothy Yoo, Bradley Sharp, and Jason Komorsky and

---

[5] "NRS 86.274(5) and NRS 86.505 … permit a domestic LLC to sue and be sued despite a revoked charter." *AA Primo Builders, LLC v. Washington*, 126 Nev. 578, 587 (2010).

exhibits cited therein, and the Request for Judicial Notice ("RJN"), the Trustee respectfully requests the Court enter an order:

1. Granting summary adjudication in favor of the Trustee and against the Defendants on the Trustee's third, fourth, fifth, sixth and ninth claims for relief for the avoidance and recovery of actual intent and constructively fraudulent transfers.

2. For such other and further relief as the Cout deems appropriate.

## II. BACKGROUND AND PROCEDURAL HISTORY

### A. The Debtor and Its Parent Company, VoIP Management

On September 25, 2015, the Debtor's parent company, VoIP Guardian LLC (the "VoIP Management") was formed as a Delaware limited liability company. **UMF No. 1.** On October 9, 2015, the debtor, VoIP Guardian Partners I, LLC (the "Debtor") was formed as a Delaware limited liability company. **UMF No. 2.** VoIP Management was the sole member of the Debtor, owning 100% of the Debtor. **UMF No. 3.** VoIP Management operated the Debtor. **UMF No. 4.** The Debtor and VoIP Management were viewed by Proto as one and the same. **UMF No. 4.**

Omanoff America, LLC was the manager of the Board of Managers of VoIP Management and Omanoff was the manager of Omanoff America, LLC. **UMF No. 5.** Omanoff was also an officer of VoIP Management. **UMF Nos. 6.** Omanoff signed the certificate authorizing the Debtor's bankruptcy filing. **UMF No. 7.** The certificate further stated that it was resolved that Omanoff "is authorized and directed to appear in all bankruptcy proceedings on behalf of the Company…" **UMF No. 7.** Omanoff testified that the Debtor was operated directly by VoIP Management: "VoIP Guardian Partners I was a sole-purpose vehicle, a subsidiary, a wholly-owned subsidiary of VoIP Guardian. And so it was—VoIP Guardian Partners I was operated at the VoIP Guardian level where the managers and members lived." **UMF No. 4.** Even though the Debtor was in the telecom industry, Omanoff had no experience in the telecom industry, did not know the technical side of the business and testified that "you need experience and telecom relationships. I have none. When I say I have none, I mean I have zero." **UMF Nos. 8-9.**

VoIP Management was indirectly owned by Omanoff, Proto and John Philipson ("Philipson") as follows: (1) 40% Omanoff America Telecom LLC, 10.01% Omanoff America LLC and 4.99%

Contacts and Contracts, Inc., which collectively owned 55% of VoIP Management, were owned and controlled by Omanoff; (2) 40% Mudmonth LLC, which was owned and controlled by Proto; and (3) 5% Philipson International LLC, which was owned and controlled by John Philipson. **UMF No. 10.** The Debtor routinely represented that Mudmonth was owned 50% by Proto and 50% by Rahman, but both Rahman and Proto denied this representation. **UMF Nos. 65, 134.**

**B. The Debtor's Purported Business**

The Debtor factored invoices for companies that the Debtor claimed were engaged in providing services in the VoIP telecommunications industry and specifically, entities that provided services in terminating international VoIP traffic (i.e., the transmission of switched telephone services, including voice and/or facsimile traffic) ("VoIP Traffic"). **UMF No. 11.** The Debtor entered factoring agreements with companies that claimed (through telecommunications services agreements) that they provided actual telecommunications services and the Debtor provided factoring of VoIP telecom invoices owed by the originator of each factored entity's respective VoIP Traffic. **UMF No. 12.** In turn, the factored company would assign its rights under its services agreements with the originator of its VoIP Traffic for the Debtor to collect on the account receivables from the originator. **UMF No. 13.** The Debtor purported to purchase accounts receivable from Tier 3 entities, factoring those entities. **UMF No. 14.** The factoring was based on invoices reflecting call detail records ("CDR") reports monitoring the switches carrying the VoIP calls. **UMF No. 14.**

The Debtor did not have switches or any specialized equipment or software and "had no technology at VoIP Guardian outside the same computer that each of you have. Microsoft products, QuickBooks, Skype, Excel, things like that. Regular business tools or software on a regular personal computer, weren't connected to any telecom service or telecom software, billing software, nothing like that." **UMF No. 15.** Instead, the Debtor relied on switches provided by defendant Youssef Rahman's company, Zoom Telecom, Inc. ("Zoom") (a company with one owner and only one employee, Rahman, and an independent contractor, Christopher Lara), to monitor the minutes and data associated with calls routed between the purported Tier 1 carriers and the Tier 3 carriers factored by the Debtor. **UMF Nos. 16-19.** Zoom provided all of the switching services, monitoring and tracking the calls that went through the Zoom switch, and software used by Zoom showed the

calls and receivables factored by the Debtor. **UMF No. 17.** Tier 3 carriers factored by the Debtor were required to use Zoom's switches. **UMF Nos. 20.**

**C. Investigations, Potential Claims and Litigation Regarding the Debtor and Defendants Beginning in Early 2017**

Investigations and notice of potential claims were pending against the Debtor and Defendants beginning at latest in early 2017, two years before the Debtor filed its bankruptcy petition on March 11, 2019. **UMF No. 21.** A letter dated March 15, 2017 was sent by British Telecom to the Debtor and to one of the entities factored by the Debtor, Hilf Telecom, in regard to fraudulent traffic patterns detected. **UMF No. 21.** Following on the British Telecom letter to the Debtor, in 2017, the Netherlands government initiated an investigation into money laundering, carousel or Value Added Tax ("VAT") fraud and fake minutes, which investigation included the Debtor, Proto, Zoom, Rahman, and other defendants in this adversary proceeding. **UMF No. 21.** In addition, on February 24, 2017, a suit titled *Talking Capital, LLC, et al. v. Omanoff, et al.*, Case No. 650973/2017, was filed in the Supreme Court of the State of New York, County of New York, with a verified complaint that included the Debtor, Omanoff, Proto, Mudmonth and Rahman, as defendants, and which sought damages not less than $25 million. **UMF No. 21.**

**D. The Debtor's Bankruptcy Filing**

On March 11, 2019, the Debtor filed a chapter 7 bankruptcy petition, Mr. Yoo was appointed as the chapter 7 trustee. **UMF No. 22.** The Debtor's statements and schedules list $71,284,210.07 in assets and $194,197,354.29 in liabilities, for negative net equity of ($122,913,144.22). **UMF No. 23.** The Debtor only had cash and cash equivalents of approximately $1.7 million and accounts receivable of approximately $2.1 million. **UMF Nos. 23.** Nearly all of the listed assets are comprised of notes receivable (only about $32 million of the Debtor's accounts receivable were not deemed doubtful/uncollectible) and causes of action against third parties. **UMF Nos. 23.**

**E. The SEC's Complaint and Judgment Against the Debtor's Lender, DLI, the District Court's Appointment of a Receiver for DLI, and the Receiver's Report Finding That the Debtor Was Engaged in Fraud and That DLI Was a Ponzi Scheme and Feeder Fund**

Less than two weeks after the Debtor's bankruptcy filing, on March 22, 2019, the United States Securities and Exchange Commission ("SEC") filed a complaint against the Debtor's lender,

DLI. **UMF No. 24.** On April 1, 2019, the District Court entered a Preliminary Injunction Order and Order Appointing Permanent Receiver (Docket No. 10 in Case No. 2:19-cv-02188-DSF-MBK) (the "Receivership Order"). **UMF Nos. 24-25.** The Receivership Order appointed Bradley Sharp of Development Specialists, Inc. as the receiver for the receivership estate of DLI and affiliated entities Direct Lending Income Fund, L.P., Direct Lending Income Feeder Fund, Ltd., DLI Capital, Inc., DLI Lending Agent, LLC, and DLI Assets Bravo, LLC, and their successors, subsidiaries and affiliated entities. **UMF Nos. 25.** On June 18, 2019, the District Court entered a judgment against DLI (Docket No. 80 in Case No. 2:19-cv-02188-DSF-MBK). **UMF No. 26.**

On November 20, 2020, the Receiver filed his Report Regarding the Investigation of the Receivership Entities' Business Conduct and Recommendations Regarding Distributions (Docket No. 320 in Case No. 2:19-cv-02188-DSF-MBK), which report concluded that the "evidence suggests VoIP Guardian was either a Ponzi scheme or a money-laundering or other criminal enterprise" (*id.*, p. 64 of 112) and that the Debtor's lender, DLI, was engaged in fraud and a Ponzi scheme. **UMF Nos. 27-28.** In addition, the report concluded that DLI had two sub-feeder funds and that "DLI obtained investors for its loan portfolios through two 'feeder' funds, one limited partnership soliciting investment from United States investors (DLIF) and one Cayman Islands-exempted company soliciting funds from outside the United States (DLIFF)." **UMF Nos. 29-30.** In addition, the report concluded that DLI had hundreds of investors with hundreds of millions of dollars in investments in its sub-feeder funds and that "[r]ecords of the Receivership Entities show 952 investor accounts with a total investor NAV of $757.5 million across the two Feeder Funds as of November 30, 2018." **UMF No. 31.**

DLI's founder, sole owner and CEO, Brendan Ross, pleaded guilty in August 2022 to wire fraud for falsifying financial records to fraudulently inflate the value of the funds managed, and, in June 2025, Ross was sentenced to 40 months in federal prison. **UMF No. 32.**

## F. The Adversary Proceeding Against Defendants

### 1. The Complaint, Amended Complaints and Motions to Dismiss

On March 10, 2021, the Trustee filed his adversary complaint against the Defendants, together with the other defendants in the adversary proceeding (Adv. Docket No. 1). On March 31,

2021, the Trustee filed his first amended complaint (*id.*, No. 11). On July 22, 2021, the Court entered orders denying motions to dismiss the first amended complaint, setting a deadline to file an amended complaint to the extent that the Trustee desired to file an amended complaint and setting a status conference (*id.*, Nos. 117-121). On August 17, 2021, the Trustee filed his second amended complaint (*id.*, No. 130). On October 4, 2021, the Court denied Defendants' motion to dismiss the second amended complaint (*id.*, No. 187) and, in other orders, separately denied the other motions to dismiss (*id.*, Nos. 178-180, 187), with the exception of the motion filed by Go2tel.com, Inc., which the Court granted (*id.*, No. 188). Defendants filed their answers to the second amended complaint on October 13, 2021 (*id.*, Nos. 194-195).

**2. Defendants' Interlocutory Appeal**

Defendants filed a motion for leave to appeal interlocutory order denying motion to dismiss and an interlocutory appeal (*id.*, 409-416), which was denied on June 17, 2025. (Docket No. 13 in Case No. 2:25-cv-00284-SSS).

**3. Defendants' Multiple Motions for Summary Judgment**

To date, Defendants have filed four motions for summary judgment (Adv. Docket Nos. 326-368, 443-449, 456-470).[6] The Court set the motions for hearing in December 2026.

**4. Pre-Trial Stipulation, Transfer of the Case to the District Court, and the District Court's Return of the Case to the Bankruptcy Court for Pre-Trial Matters**

On September 30, 2025, the Court entered a Scheduling Order setting a deadline to file a pre-trial stipulation by November 18, 2025, setting a pre-trial conference for December 2, 2025 (Adv. Docket No. 442). On November 18, 2025, the Court entered an order approving a stipulation to extend the time to file and lodge the joint pre-trial stipulation to November 25, 2025 (*id.*, No. 462). On November 25, 2025, the Trustee and Defendants filed their joint pre-trial stipulation (*id.*, No. 465). On December 2, 2025, the Court signed and approved the parties' joint pre-trial stipulation

[6] In the Parties' Joint Pretrial Stipulation entered by the Court, the Trustee reserved the right to file a motion for summary adjudication. While Defendants' four motions for summary judgment are pending before this Court (after the District Court denied Defendants' motion to withdraw the reference), the District Court's standing order states that "[n]o party may file more than one (1) motion pursuant to Federal Rule of Civil Procedure 56, regardless of whether such motion is denominated a motion for summary judgment or summary adjudication, without leave of the Court."

(*id.*, No. 473). On December 2, 2025, the Court entered an order granting the transfer of the Adversary Proceeding to the District Court based on Defendants' jury trial demand (*id.*, No. 474). On March 2, 2026, the District Court entered orders denying Defendants' motion to withdraw the reference without prejudice (Docket No. 16 in Case No. 2:25-cv-11598-SSS; Docket No. 18 in Case No. 2:25-cv-11607-SSS). The District Court's orders noted that there are four pending motions for summary judgment and "[w]ith this volume of pre-trial matters existing, the Court does not find withdrawal appropriate." The District Court held that "[d]enying this Motion further does not abridge the Seventh Amendment jury trial right," citing to *In re Healthcentral.com*, 504 F.3d 775, 787 (9th Cir. 2007). This Court set a status conference in the adversary proceeding to take place on June 30, 2026, which was continued to August 11, 2026 and now scheduled for September 8, 2026.

## III. SUMMARY JUDGMENT ON THE CLAIMS FOR ACTUAL INTENT FRAUDULENT TRANSFERS IS WARRANTED

### A. Summary Judgment Legal Standard

> Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (S.Ct. 1986).

> Where, as here, the case turns on a mixed question of fact and law and the only disputes relate to the legal significance of undisputed facts, the controversy collapses into a question of law suitable to disposition on summary judgment.

*Thrifty Oil Co. v. Bank of America Nat. Trust & Sav.*, 322 F.3d 1039, 1045-1046 (9th Cir. 2003).

### B. Elements for Actual Intent Fraudulent Transfer Claims

The prima facie elements of a claim for the avoidance of a fraudulent transfer based on actual intent under both the Bankruptcy Code and the California Civil Code (California law may be used to pursue the fraudulent transfer claims pursuant to 11 U.S.C. § 544) consist of a transfer of the debtor's property made with the actual intent by a debtor to hinder, delay or defraud creditors.

> California's fraudulent transfer act and the federal bankruptcy code's fraudulent transfer provisions are almost identical in form and substance; therefore, we draw upon cases interpreting both. *In re AFI Holding, Inc.*, 525 F.3d 700, 703 (9th Cir.2008); *Agritech*, 916 F.2d at 534

*Donell v. Kowell*, 533 F.3d 762, 769-770 (9th Cir. 2008). Pursuant to 11 U.S.C. § 548:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted…

11 U.S.C. § 548(a)(1). Similarly, pursuant to the California Civil Code:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

California Civil Code § 3439.04(a).

**1. The Debtor Made Transfers to or for the Benefit of Defendants**

The Bankruptcy Code and the California Civil Code both include broad definitions of the term "transfer." Under the Bankruptcy Code, transfers include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with--(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). Under the California Civil Code, transfers similarly include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license, and creation of a lien or other encumbrance." Civil Code § 3439.01(m).

VoIP Management's only source of income was from the Debtor's purported factoring business activities. **UMF No. 35.** Based on the bank records for VoIP Management, VoIP Management made transfers to revoked entity Mudmonth in the total amount of $12,711,629.68[7]

[7] For the purposes of this Motion, the Trustee is only seeking the avoidance and recovery of $11,211,629.68 through checks from the Management Company to Mudmonth, plus interest. To the extent that the Court determines that there are triable issues of fact, the Trustee reserves the right to present evidence of additional transfers at trial.

($11,211,629.68 through checks from VoIP Management to Mudmonth, with the remainder paid through DealDefenders, during the four years prior to the petition date and $9,797,629.68 during the two years prior to the petition date). **UMF No. 37.** All of the monies that Mudmonth received were then transferred to Proto or to third parties for Proto's benefit. **UMF No. 38.** The parties have agreed that the bank statements, checks and wire transfer records produced in this litigation by banks or financial institutions, or maintained in the Debtor's and Defendants' files, accurately reflect deposits, withdrawals, checks, and transfers of funds. **UMF Nos. 39-41.** The transfers made via check to Mudmonth are as follows:

| Date | Amount Transferred | Check No. |
|---|---|---|
| 2/18/2016 | $ 84,000.00 | 1006 |
| 6/7/2016 | $ 120,000.00 | 1014 |
| 10/25/2016 | $ 60,000.00 | 1050 |
| 1/9/2017 | $ 120,000.00 | 1083 |
| 1/9/2017 | $ 160,000.00 | 1089 |
| 1/9/2017 | $ 110,000.00 | 1101 |
| 1/30/2017 | $ 360,000.00 | 1107 |
| 2/24/2017 | $ 400,000.00 | 1116 |
| 5/11/2017 | $ 240,000.00 | 1130 |
| 6/12/2017 | $ 320,000.00 | 1144 |
| 7/5/2017 | $ 360,000.00 | 1159 |
| 8/10/2017 | $ 400,000.00 | 1167 |
| 8/23/2017 | $ 400,000.00 | 1179 |
| 9/27/2017 | $ 480,000.00 | 1193 |
| 11/16/2017 | $ 440,000.00 | 1207 |
| 1/3/2018 | $ 480,000.00 | 1219 |
| 1/3/2018 | $ 520,000.00 | 1238 |
| 2/7/2018 | $ 560,000.00 | 1251 |
| 3/21/2018 | $ 640,000.00 | 1268 |
| 4/25/2018 | $ 600,000.00 | 1285 |
| 5/31/2018 | $ 640,000.00 | 1297 |
| 7/6/2018 | $ 760,000.00 | 1314 |
| 8/10/2018 | $ 720,000.00 | 1332 |
| 10/10/2018 | $ 509,296.32 | 1366 |
| 10/15/2018 | $ 800,000.00 | 1348 |
| 10/26/2018 | $ 446,666.68 | 1379 |
| 10/26/2018 | $ 446,666.68 | 1394 |
| 10/26/2018 | $ 35,000.00 | 1404 |
| | **$ 11,211,629.68** | |

**UMF No. 37.**

To the extent that Mudmonth argues that the funds in VoIP Management's account were not the Debtor's funds because the Debtor's assets were encumbered by DLI's lien, this argument fails. The general rule is that "*transfers by a debtor of borrowed funds constitute transfers of the debtor's property*." *In re Kemp Pacific Fisheries, Inc.*, 16 F.3d 313, 316 (9th Cir. 1994)[8] (identifying the earmarking doctrine, a doctrine that applies "when a third party lends money to a debtor for the specific purpose of paying a selected creditor" as lone exception to the general rule) (emphasis added); *see also Adams v. Anderson (In re Superior Stamp & Coin Co., Inc.*), 223 F.3d 1004, 1007 (9th Cir. 2020) ("*Superior Stamp*") (citing general rule).

---

[8] *See also In re Marshall*, 550 F.3d 1251, 1258 fn. 6 (10th Cir. 2023) (the moment bank "honored Debtor's draw on their line of credit those proceeds (the newly loaned funds) became an asset of Debtors' estate"); *In re Adbox*, 488 F.3d 836, 843 (9th Cir. 2007) (earmarking argument failed because there was no evidence that lender and debtor agreed that loan would be used to pay specific antecedent debt).

It is true that DLI may have had a security interest in the cash on hand and in the accounts receivable ("AR"), but there is no question that it did not have a security interest in the loaned monies once those monies were dissipated by the Debtor, including those monies paid as alleged profits to Debtor's owners such as Mudmonth. *See In re Classic Coach Interiors, Inc.*, 290 B.R. 631, 636-637 (Bankr. C.D. Ill. 2002) ("the corporation no more retains a property interest in the funds used to pay dividends than it does in funds used to pay its trade creditors or any other liability. Although the BANK contends that the dividends were paid unlawfully, and that it, as a creditor, has a claim to recover those payments, the BANK does not contend that the corporation has any continuing property interest in the cash used to pay the dividends."); *see also In re Pitcock*, 208 B.R. 862, 866 (Bankr. N.D. Tex. 1997) (once encumbered funds were spent, "the Bank's secured interest decreased until [all the] money was spent. Once the collateral was completely spent, the Bank could no longer assert a secured claim to the pasture rents.").

### 2. The Debtor's Actual Intent To Hinder, Delay or Defraud Creditors May Be Established Through Omanoff's Admissions in Sworn Testimony That the Debtor Was Engaged in Fraud

Omanoff, the manager of the Board of Managers of the Debtor, admitted during his deposition testimony that the Debtor's business involved "the theft of the investor capital," that "[t]his is a money laundering scheme," and "[i]t's just fraud." UMF Nos. 51. Omanoff admitted that all of the transactions that VoIP Management entered into for the Debtor were fraudulent. **UMF Nos. 52**. As to the VoIP traffic creating the accounts receivable purchased by the Debtor, Omanoff testified that "[n]one of the traffic is legitimate. There's no traffic. It's a Ponzi scheme." **UMF Nos. 53**. Omanoff also admitted that the VoIP Traffic factored by the Debtor was not genuine and was instead artificially-generated traffic. **UMF No. 54**. In explaining that the VoIP traffic was not legitimate, Omanoff testified that:

> The traffic was generated—what they call artificially-generated traffic. The telecom professionals associated with this business were generating the traffic. This wasn't—this wasn't genuine like retail traffic or wholesale traffic. It was actually being generated, and then it was being pushed through a chain of other—of other vendors to disguise the origin of this traffic, which ultimately pointed to Proto and Rahman in these transactions. And that was because it was part—it was part of a Ponzi scheme. The business that was going to be used to capture the investor's money was daily telecom traffic to be funded by the financier, but the traffic was fraudulently created on a daily basis to

> basically steal the investor's money drip by drip by drip day by day by day. And that's what the business really ultimately was.

**UMF No. 54**. Based on Omanoff's admissions, the Debtor's actual intent has been established. Philipson, in acknowledging that the minutes were fake identified Proto's company Arco, as the generator of these fake minutes. **UMF No. 135.** Omanoff further admitted that the Debtor generated no profits and was essentially just a Ponzi scheme, as it was simply recycling amounts from its lender, DLI, which were then being used in a circular manner to repay the loans and were being depleted by payouts to Defendants and others. **UMF Nos. 55-56**.

Defendants have argued that the Debtor was not engaged in fraud. However, Defendants cannot rebut Omanoff's admissions as the manager of the Board of Managers of the Debtor that the Debtor was perpetrating a fraud because Proto asserted under oath that he was not an officer, director, founder or otherwise involved in the management or day-to-day operations of the Debtor or VoIP Management and disavowed any knowledge as to the Debtor's operations. **UMF No. 57**. In addition to Proto's deposition testimony, Proto's responses to written discovery are emphatic that he had no position or responsibilities with the Debtor or VoIP Management. **UMF No. 58**. In Proto's response to Interrogatory No. 1, he states that "Defendant responds that he was not a director, officer, or manager of the DEBTOR at any time during the RELEVANT PERIOD…" **UMF No. 58**. In Proto's response to Interrogatory Nos. 2-3 in regard to any duties and responsibilities with VoIP Management or the Debtor, Proto states that "Defendant responds that no such duties and responsibilities were ascribed to him." **UMF No. 58**. Whether Proto's discovery responses and deposition testimony are accurate is beside the point; by claiming an absence of knowledge, he simply is not in a position to rebut Omanoff's admissions.

### 3. In Addition to Omanoff's Admissions, the Debtor's Actual Intent May Be Established Through Badges of Fraud and As When Otherwise Supported by the Evidence

In the alternative to solely considering Omanoff's admissions that the Debtor was engaged in fraud, the Ninth Circuit has held that actual intent to hinder, delay or defraud creditors may be established by badges of fraud:

> It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors. Therefore, as is the case under the common law of fraudulent conveyance, courts applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer, taking particular note of certain recognized indicia or badges of fraud.

*In re Acequia, Inc.*, 34 F.3d 800, 805–806 (9th Cir. 1994). In *Acequia*, the Ninth Circuit stated that "[t]he presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *See also, In re Lull*, 386 B.R. 261, 270 (Bankr. D. Hawaii 2008). The California Civil Code lists the statutory badges of fraud, which are non-exclusive and, as stated in the statute, may be considered "among other factors":

> In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, <u>among other factors</u>, to any or all of the following: (1) Whether the transfer or obligation was to an insider. (2) Whether the debtor retained possession or control of the property transferred after the transfer. (3) Whether the transfer or obligation was disclosed or concealed. (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit. (5) Whether the transfer was of substantially all the debtor's assets. (6) Whether the debtor absconded. (7) Whether the debtor removed or concealed assets. (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred. (11) Whether the debtor transferred the essential assets of the business to a transferred the assets to a lienor that transferred the assets to an insider of the debtor.

Civil Code § 3439.04(b) (emphasis added).

As recently stated by the United States Bankruptcy Court for the Northern District of California (Hon. William J. Lafferty, III):

> <u>There is no minimum number of factors that are required to demonstrate fraudulent intent</u>, and only one or two badges of fraud may suffice to find a transfer was made with actual fraudulent intent. *Ezra v. Seror (In re Ezra)*, 537 B.R. 924, 931 (B.A.P. 9th Cir. 2015); *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 834, 28 Cal.Rptr.3d 884 (2005). <u>In fact, fraudulent intent may be found even where no badges of fraud are found, when otherwise supported by the evidence.</u> *In re Beverly*, 374 B.R. at 236.

*In re Fox Ortega Enterprises, Inc.*, 631 B.R. 425, 445 (Bankr. N.D. Cal. 2021) (emphasis added).

Further, "once a trustee establishes indicia of fraud in an action under section 548(a)(1), the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at

issue." *In re Acequia*, 34 F.3d at 806. Applicable badges of fraud listed in the statute, as well as other factors (given that the statute explicitly permits considering "other factors") are discussed below.

### ***a.*** **The Defendants Were Insiders of the Debtor**

As discussed below, Mudmonth and Proto qualify as statutory insiders of the Debtor, and also qualify as non-statutory insiders. First, under 11 U.S.C. § 101(31), Mudmonth was an affiliate of the Debtor and Proto was an insider of an affiliate of the Debtor, thereby each qualifying as statutory insiders of the Debtor. As set forth in Section 101(31)(E), an insider includes an "affiliate, or insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(2)(A) defines an "affiliate" as an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities--(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote."[9]

Mudmonth is a statutory insider of the Debtor given that Mudmonth owned 40% of VoIP Management, which in turn wholly owned the Debtor. **UMF Nos. 10, 43**. Mudmonth is therefore an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor" and qualifies as an affiliate of the Debtor under 11 U.S.C. § 101(31)(E) and 11 U.S.C. § 101(2)(A). Proto is an insider of Mudmonth, an affiliate of the Debtor, given that Proto was the sole member and manager of Mudmonth, which owned 40% of VoIP Management, which wholly owned the Debtor. Proto therefore qualifies as an "insider of an affiliate as if such affiliate were the debtor" under 11 U.S.C. § 101(31)(E) and 11 U.S.C. § 101(2)(A).

In addition, insiders include non-statutory insiders "who have a 'sufficiently close relationship with a debtor to warrant special treatment.'" *In re Rexford Properties, LLC*, 557 B.R. 788, 794 (Bankr. C.D. Cal. 2016) (citing to *In re The Vill. at Lakeridge, LLC*, 814 F.3d 993, 999 (9th Cir. 2016)). *See also, In re Lull*, 2011 WL 6941487, at *6. As set forth in *Rexford Properties*:

---

[9] Section 101(31)(B), which relates to corporations, also applies to limited liability companies. See, e.g., *In re Palmdale Hills Property, Inc.*, 2017 WL 4573691, at *5 (Bankr. C.D. Cal., Oct. 12, 2017, No. 1:16-AP-01120-GM) ("SCM was a statutory insider of the Debtor, i.e., an insider specifically identified in the Bankruptcy Code definition of 'insider.' This definition—in the case of a Limited Liability Company such as the Debtor—is found in Bankruptcy Code § 101(31)(B), (E), and (F).")

> Determination of non-statutory insider status is a two-step process and made on a case-by-case basis, from the totality of the circumstances. The Vill. at Lakeridge, 814 F.3d at 1000. A creditor is a non-statutory insider if: (i) the closeness of its relationship with the debtor is comparable to that of the enumerated insider classifications in section 101(31), and (ii) the relevant transaction is negotiated at less than arm's length. Id. at 1001.

*Rexford Properties*, 557 B.R. at 797.

Here, the first part of the test is met because Mudmonth and Proto had, among other things, access to the Debtor's inside information, a key factor in determining the closeness of the relationship. *Rexford Properties*, 557 B.R. at 797 (citing to *The Vill. at Lakeridge, 814 F.3d at 1001–02*). Proto continuously received e-mails from Omanoff as to updates on the operations of the Debtor even though Proto asserts that he did not open the e-mails. **UMF No. 59.** Proto also generally spoke with Omanoff numerous times each day regarding the Debtor. **UMF Nos. 60.** In addition, as discussed below, Proto was also copied on e-mails from Brendan Ross, the CEO of the Debtor's lender, DLI, transmitting notices of events of default, as well as draft tolling agreements and side letters. **UMF No. 60.** Meanwhile, Proto was indirectly a 40% owner of the Debtor. **UMF Nos. 10, 43.** "An arm's length transaction requires a transaction between two parties, however closely related they may be, to be conducted as if the parties were strangers, so that no conflict of interest arises. *Id.* at 1001 n. 11 (citing Black's Law Dictionary (10th ed. 2014))." *Rexford Properties*, 557 B.R. at 797. The second part of the test is met because Mudmonth received its ownership interest in the Debtor for no consideration and then received over $11.2 million in transfers for no consideration based solely on distributions of purported profits. **UMF Nos. 37, 43-50.** In addition to qualifying as statutory insiders, Mudmonth and Proto qualify as non-statutory insiders based on having a sufficiently close relationship including transactions that were not at arm's-length.

### ***b.*** **The Debtor Had Been Sued or Threatened with Suit**

Potential claims, investigations and litigation were pending against the Debtor and the Defendants beginning at latest in early 2017, two years before the Debtor filed its bankruptcy petition on March 11, 2019. **UMF Nos. 21-22.** Nearly all of the over $11.2 million in transfers to Mudmonth that are the subject of this Motion took place after the Debtor was on notice of investigations and potential claims. **UMF Nos. 21-22.** Of the over $11.2 million in transfers to

Mudmonth, only about $1.4 million took place before a letter dated March 15, 2017 was sent by British Telecom ("BT") to the Debtor and to one of the entities factored by the Debtor in regard to fraudulent traffic patterns detected. **UMF Nos. 21-22.** The remaining amount of over $9.7 million in transfers took place after the BT letter was sent. **UMF Nos. 21-22.** The letter from BT provided notice of, among other things, discussion of "our initial assessment of fraudulent traffic," discussion of "the complexity of the fraud and volumes involved," that "traffic patterns clearly indicate a computer generated traffic pattern for the entire traffic," "spoofed A-numbers," "[s]poofing of B-party numbers," that "[m]ore than 80% of the calls last only between 0-6 seconds, which we suspect may be intentional to hide certain traffic patterns and/or it is connected to payment triggers in various networks," and that "[c]omputer generated calls are mainly focused on four fraud sensitive international destinations (Chad, Tunesia, Kosovo and Zimbabwe)." **UMF No. 21.** BT's letter further stated that "based on the traffic patterns and flows, this traffic may be connected to illicit activities," that "BT will notify this matter to the relevant authorities," and that "BT shall withhold payments due to the apparent fraudulent traffic nature of these calls for the total open amount of $21,939,447.42." **UMF No. 21.** Following on the BT letter, in 2017, the Netherlands government initiated an investigation into money laundering, carousel or VAT fraud and fake minutes, which investigation included the Debtor, Proto, Zoom, Rahman and other defendants in this adversary proceeding. **UMF No. 21.** That investigation focused not only on BT, but on Indigo11 Services Limited ("Indigo11") and I Karim Business Services, Limited ("IKarim") with findings that both were empty shells. ***Id***.

In addition, on June 16, 2017, a suit titled *Talking Capital, LLC, et al. v. Omanoff, et al.*, Case No. 650973/2017 was filed in the Supreme Court of the State of New York, with a verified complaint that included the Debtor, Omanoff, Proto, Mudmonth, Rahman and Brendan Ross of DLI, as defendants, and which sought damages not less than $25 million. **UMF No. 21.**

In addition, on June 12, 2018, and on June 18, 2018, the Debtor's lender, DLI, served the Debtor, Omanoff, Proto and Rahman, notices of events of default. **UMF No. 21.** On June 12, 2018, DLI transmitted a tolling agreement to Proto and Rahman, which included Mudmonth and Proto as parties to the tolling agreement. **UMF No. 21.** On June 13, 2018, DLI transmitted a forbearance



3124696

agreement to Omanoff, Proto and Rahman. **UMF No. 21.** On June 18, 2018, DLI sent a side letter agreement to Omanoff, Proto and Rahman, and on June 19, 2018, DLI rescinded the notice of default after a call between Brendan Ross and Omanoff. **UMF No. 21.** Yet, even after the issues with the notices of default, Mudmonth received distributions of purported profits of $760,0000 on July 6, 2018, $720,000 on August 10, 2018, $509,296.32 on October 10, 2018, $800,000 on October 15, 2018, $446.666.68 on October 28, 2018, another $446,666.68 on October 26, 2018, and $35,000 on October 26, 2018, or a total of over $3.7 million after the issues regarding notices of events of default arose. **UMF Nos. 37.**

Notwithstanding the foregoing investigations, potential claims and actual claims, the transfers continued to be made to Mudmonth for distributions of purported profits. **UMF Nos. 37, 43-44.**

***c.*** **The Value of the Consideration Received by the Debtor Was Not Reasonably Equivalent to the Value of Assets Transferred**

Over $11.2 million was transferred to Mudmonth consisting solely of distributions of the purported profits of the Debtor between 2016 and 2019. **UMF Nos. 37, 43-44.** Omanoff admitted in his response to Requests for Admission that VoIP Management's only source of income was from the Debtor's business activities. **UMF No. 35.** As discussed in the section below, the tax returns of VoIP Management (which operated the Debtor and reflected the Debtor's assets and liabilities) disclose that VoIP Management and the Debtor were insolvent when the purported profits were distributed to Mudmonth. **UMF Nos. 33-35.**

The Debtor did not receive any consideration in exchange for the transfers to Mudmonth. **UMF Nos. 37, 43-50**. Mudmonth owned 40% of VoIP Management, which wholly owned the Debtor. **UMF Nos. 10, 43**.

Proto unequivocally testified that neither he, as the 100% owner of Mudmonth, nor Mudmonth provided any consideration to the Debtor:

> Q.· … And then you became an owner of VoIP Guardian; correct?
> A.· No.· Mudmonth did.
> Q. … And what was your ownership of Mudmonth?
> A.· 100 percent.
> Q. So Mudmonth, your 100 percent-owned company, became an owner of VoIP Guardian; correct?

A.· · Correct.
[Q.] The management company. The company that ran the Debtor.
Q.· · Correct, Mr. Proto?
A.· · VoIP Guardian, LLC.
Q.· · Okay.· And what did you bring to VoIP Guardian in return for a 40 percent ownership share?
A.· · I didn't bring anything to VoIP·Guardian.
Q.· · This was just another gift from Mr. Omanoff to you?
A.· · He offered me 40 percent -- or he offered Mudmonth 40 percent of the company.
Q.· · And asked for nothing in return; correct?
A.· · There was nothing -- there was no responsibilities, there was no ties, there was ·no agreement for anything that I had to do for that a 40 percent -- or that Mudmonth had to do for that 40 percent.

* * *

THE WITNESS:· I was 40 percent owner -- I was the owner of Mudmonth and had 40 percent of VoIP Guardian.
Q.· · For doing nothing; correct?
A.· · Correct.
Q.· · For bringing nothing to the table?
A.· · Correct.
Q.· · For offering to do nothing?
A.· · I was never asked to do anything.

* * *

Q.· · What did you deserve -- what did you do to deserve $12 million?
Q. I'm asking you what you did for that money.
THE WITNESS:· I was offered 40 percent -- or Mudmonth was offered 40 percent, so I agreed to take it.
Q.· · And you gave nothing in return. That's correct; yes?
A.· · Correct.

**UMF Nos. 45, 46, 47, 49** (objections and lawyer colloquy omitted**).**

Indeed, Mr. Proto conceded that all of the representations made to DLI regarding his substantive role or that of Mudmonth were untrue. **UMF No. 64** (Proto never involved in any deal flow committee, was never a director of business development for the Debtor, and Mudmonth never provided "technology, switching and reporting services for safeguarding the company's financing services offerings to telecom carrier clients."

In Proto's responses to written discovery, Proto stated that the only relationship between Mudmonth and VoIP Management was holding a membership interest, and that:

> Defendant responds that he is unaware of any business in which he held any "financial relationship" that "did business" with the MANAGEMENT COMPANY during the RELEVANT PERIOD. During a portion of the RELEVANT PERIOD, Defendant held an interest in MUDMONTH, but contends that MUDMONTH held a member interest in the MANAGEMENT COMPANY rather than "did business" with the MANAGEMENT COMPANY, and does not understand this Interrogatory to be seeking information of this kind.

**UMF No. 44**.

Proto further stated in his discovery responses that the amounts transferred to Mudmonth were for distributions, and that "Defendant was, during a portion of the RELEVANT PERIOD, a member of MUDMONTH which, in turn, is a member of the MANAGEMENT COMPANY. Defendant further states that the MANAGEMENT COMPANY made distributions to its members, including MUDMONTH." **UMF No. 44**.

### 4. The Debtor Was Insolvent or Became Insolvent Shortly After the Transfers Were Made

Under 11 U.S.C. § 101(32) and California Civil Code § 3439.02(a), the test for insolvency is the same—a balance sheet test that liabilities exceed assets. As stated by the Ninth Circuit, "[t]he Bankruptcy Code defines insolvency, for a corporation, as a 'financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation....' 11 U.S.C. § 101(32)." *In re DAK Industries, Inc.*, 170 F.3d 1197, 1199 (9th Cir. 1999). The test is the same under the California Civil Code. *See In re Prototype Engineering & Manufacturing, Inc.*, 2019 WL 9243004, at *3 (Bankr. C.D. Cal., Dec. 12, 2019, No. 2:17-BK-21018-RK) (citing to in California Civil Code § 3439.02(a)) and *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 277 (9th Cir. BAP 1989).

The transfers to Defendants based solely on purported distributions of profits totaled approximately $11.2 million during the four-year period prior to the Debtor's bankruptcy case. UMF Nos. 37, 43-44. Meanwhile, both the balance sheets in VoIP Management's tax returns, which reflected the Debtor's financial status, and the Debtor's statements and schedules, reflect that the Debtor was insolvent between 2016 and the Debtor's bankruptcy filing in 2019. **UMF Nos. 33-**

**36.** Separate tax returns were not filed in the name of the Debtor as the Debtor was treated as a disregarded entity whose tax issues, if any, were addressed in the tax returns of VoIP Management. **UMF No. 34.** VoIP Management's tax returns indicated the revenues were generated by the Debtor, and Omanoff admitted that VoIP Management's only source of income was from the Debtor's business activities. **UMF No. 35.**

The tax returns filed by VoIP Management disclose, based on the Debtor's reported assets and liabilities in balance sheets within the tax returns, and as shown in the chart below, that VoIP Management was continuously insolvent on a balance sheet basis beginning in 2016 and continuing through the Debtor's bankruptcy filing in 2019, with negative equity of ($246,190) in 2016, ($6,075,045) in 2017, ($5,672,668) in 2018 and ($8,754,579) in 2019:

| | Assets (end of year) | Liabilities (end of year) | Equity (end of year) (negative equity in parentheses) |
|---|---|---|---|
| 2015 | $32,841,209 | $32,827,399 | $13,810 |
| 2016 | $101,318,903 | $101,565,093 | ($246,190) |
| 2017 | $178,312,958 | $184,388,003 | ($6,075,045) |
| 2018 | $212,776,747 | $218,449,415 | ($5,672,668) |
| 2019 | $191,943,465 | $200,698,044 | ($8,754,579) |
| 2020 | $191,008,343 | $200,698,043 | ($9,689,700) |

**UMF No. 33**. VoIP Management's tax return in 2019 showed a staggering loss of over $190 million. **UMF No. 36**. In previous years, the loss was not apparent because the Debtor increased accounts receivables until, as Omanoff explained, the Debtor could not get an additional loans or investments from DLI. **UMF No. 136**.

The Debtor's statements and schedules also reflect that the Debtor was deeply insolvent. The statements and schedules filed on March 11, 2019 (Docket No. 1 in Case No. 2:19-bk-12607-BR) listed $71,284,210.07 in assets and $194,197,354.29 in liabilities, for negative net equity of ($122,913,144.22). **UMF No. 23.** Of the assets listed, the Debtor stated that while the total face amount of the Debtor's notes receivable was $192,117,648.02, the doubtful or uncollectible amount was ($159,171,714.88), leaving a current value of notes receivable of $32,945,933.14. **UMF No. 23.**

Shifting from the balance sheets to the income statements in the tax returns, while certain of the tax returns show a profit (while also showing on the balance sheets that the Debtor was insolvent), Omanoff admitted that the Debtor never generated profits as it was simply recycling amounts from its lender, DLI, which were then being used in a circular manner to repay the loans and were being depleted by payouts to Defendants and others. **UMF Nos. 55-56.** Even Defendants' forensic accounting expert admitted that the Debtor and management company did not correctly book revenues. **UMF Nos. 128.**

As set forth in the evidence showing continuous insolvency between 2016 and the petition date, and as further evidenced based on the concept of retrojection set forth in *Misty Mgmt. Corp. v. Lockwood*, 539 F.2d 1205, 1213 (9th Cir. 1976), the Debtor was insolvent at the time of the transfers. The application of retrojection to establish insolvency based on tax returns and statements and schedules was set forth by the United States Bankruptcy Court for the District of Idaho and affirmed by the Ninth Circuit:

> First, the Schedule L in Debtor's 1999 tax return reflects that as of the last day of 1999, Debtor's liabilities exceeded its assets by $393,114.00, so that as of that date, Debtor was insolvent. Plaintiff's Ex. 11. Another important indicator of Debtor's financial condition is the revised financial statement issued by Debtor's accountant in February, 2000. This financial statement, also intended to reflect financial status as of the end of 1999, shows Debtor's liabilities exceeded assets by $392,115.00. Plaintiff's Ex. 13. Yet another persuasive indicator of Debtor's insolvency is Debtor's bankruptcy schedules. Plaintiff's Ex. 21. These schedules, prepared in connection with the bankruptcy filing on June 1, 2000, show Debtor's liabilities exceeded its assets by $676,373.41. Therefore, as of June 1, 2000, Debtor was still profoundly insolvent. Viewing all of these financial indicators together—the 1999 tax return, the revised financial statement, and the bankruptcy schedules—the Court is persuaded to find that Debtor was continuously insolvent from January 1, 2000, through the date it filed for bankruptcy. [citations] Having proven by a preponderance of the evidence that Debtor was insolvent on March 14, 2000, and all other necessary elements for recovery of the transfer to Defendant under § 548, Plaintiff may avoid the March 14 transfer.

*In re Fox Bean Co., Inc.*, 287 B.R. 270, 282 (Bankr. D. Idaho 2002), s*ubsequently aff'd sub nom. In re Fox Bean Co.*, 144 Fed. Appx. 697 (9th Cir. 2005).

In addition to the evidence in the form of tax returns and statements and schedules showing that the Debtor was insolvent, the Trustee's forensic accounting expert separately determined that the Debtor was insolvent between 2016 and the Debtor's petition date. **UMF No. 127**. While the

Defendants' forensic accounting expert opined that the Debtor was not insolvent until early 2019 based on when two purported Tier 1 carriers, Indigo11 Services Limited and I Karim Business Services, Limited, simultaneously defaulted on amounts due to the Debtor, Defendants' expert admitted that he did not take any steps to analyze the balance sheets within the tax returns and did not take any steps to compare the balance sheets within the tax returns with any other balance sheets he saw for the Debtor or VoIP Management. **UMF Nos. 129**. The Defendants' forensic accounting expert did not even include a balance sheet or income statement in his expert report or discuss anything about a balance sheet or income statement, and the income statement that he relied upon booked revenue incorrectly. **UMF Nos. 129**.

### 5. Other Factors—The Statutory Badges of Fraud Are Non-Exclusive And, As Stated In The Statute, May Be Considered "Among Other Factors"

As set forth in Civil Code § 3439.04(b), the statutory badges of fraud are non-exclusive and, as stated in the statute, may be considered "among other factors." In addition, as stated by the United States Bankruptcy Court for the Northern District of California in *Fox Ortega Enterprises*, "[i]n fact, fraudulent intent may be found even where no badges of fraud are found, when otherwise supported by the evidence. *In re Beverly*, 374 B.R. at 236." *Fox Ortega Enterprises,* 631 B.R. at 445. Other factors evidencing the Debtor's actual intent to hinder, delay or defraud creditors for the Court's consideration are as follows.

#### *a.* The Debtor Did Not Follow Its Stated Business Model and Instead Included Facts in Its Materials to Lenders and Investors That Were, According To Proto, Simply Not True

In its written materials provided to lenders and investors, the Debtor's stated business model was to purchase accounts receivable of Tier 3 carriers (smaller telecom carriers that do not own their own network equipment), thereby providing working capital for Tier 3 carriers to fulfill contracts to terminate calls originating from Tier 1 (carriers such as large telecom companies such as Verizon, AT&T, Sprint and T-Mobile, which own their own network equipment) and Tier 2 carriers (calling card issuers) to countries in Africa. **UMF No. 61.** As discussed below, the purported carriers from which the Debtor purchased hundreds of millions of dollars in accounts receivable were not carriers that terminated calls and instead consisted of empty shell middleman entities that did not originate or terminate calls and entities owned and/or controlled by the Debtor's indirect owners. **UMF Nos. 73-**

**84.** The purported Tier 3 entities factored by the Debtor were never transferring voice traffic, which explains why they did not need bandwidth or have the need for server farms. *See* **UMF No. 140.** The Debtor therefore did not follow its stated business model. Indeed, Zoom purported to provide the switches to these Tier 3 entities, but Zoom's own invoices for equipment reflect that it did not have the requisite servers to transfer millions of minutes of voice calls. **UMF No. 140.**

The Debtor's written materials also represented that the senior management of the Debtor consisted of Omanoff, Proto and Rahman. **UMF No. 62.** However, according to Proto, the experience that the Debtor represented was brought by Proto to the Debtor and VoIP Management, and representations as to Proto's status as senior management, were untrue. **UMF No. 63.** Proto further testified that the Debtor's materials were written by Omanoff and were marketing materials that were not true. **UMF Nos. 64.** To the extent that Proto's representation is accurate, the Debtor's senior management was not consistent with the Debtor's representations in its written materials. Proto made these representations notwithstanding the fact that he received some of these materials and there is no writing from Proto disclaiming the accuracy thereof to DLI. **UMF No. 132.**

The Debtor's written materials also claimed that the Debtor was protected from fraud by requiring the use of Zoom's switches to monitor VoIP call traffic as a precondition to funding Tier 3 carriers. **UMF No. 65.** Zoom was tasked with monitoring and recording the traffic flowing between the Tier 3 carriers factored by the Debtor and the Tier 1 carriers. **UMF No. 65.** As the Debtor explained in its marketing materials, the software and switch "monitors and measures the traffic that passes between them through our switch in the middle and records the event by generating a CDR," "our technology platform and software doubles as a 'risk management' tool ensuring that our Company funds only the traffic that passes through our switch as originated by Tier1 Telecom Carriers and sent to our Tier3 Telecom Carrier Clients for termination." **UMF No. 65.** The Debtor assured potential lenders, investors and customers that Zoom's services limited the potential for fraud, stating in written materials that "[i]n our opinion, this real-time tracking capability drastically reduces costs and financing risks by limiting the potential for fraud and/or disputes that can arise between Telecom carriers." **UMF No. 65.** However, Christopher Lara, who was an independent contractor for Zoom and provided technical back-office expertise, testified that Zoom did not in fact

monitor or root out fraud. **UMF No. 66.** In addition, as set forth in Section III.B.4.c herein, Zoom even generated invoices for millions of dollars in VoIP minutes factored by the Debtor for an entity that was no longer operating and was in an insolvency proceeding. **UMF Nos. 85-86.** The Debtor's representations in its written materials as to fraud prevention were not accurate. Zoom did not root out fraud; it was one of the perpetrators of the fraud.

#### *b.* Two Purported Tier 1 Entities Which Owed Approximately 83% of the Debtor's Accounts Receivable Simultaneously Defaulted on Amounts Due, Then Sent Identical Messages to the Debtor and Initiated Insolvency Proceedings That Did Not List Any Amounts Due to the Debtor or To the Entities That Factored Invoices With the Debtor

As shown in the Debtor's statements and schedules filed with its bankruptcy petition (shown in the chart below), the overwhelming majority of accounts receivable factored by the Debtor were factored for just two purported Tier 3 carriers, Telacme Limited ("Telacme") and Najd Technologies Limited ("Najd"), which purported to provide termination services for just two purported Tier 1 carriers, Indigo11 and IKarim. UMF No. 67-72. Indigo11 and Ikarim (the purported Tier 1 carriers) purportedly owed Telacme and Najd (the Tier 3 entities), respectively, $159,169,586.14 (approximately 83% of the Debtor's accounts receivable in the amount of $192,117,648.02), and the Debtor factored (purchased) those accounts receivable. UMF Nos. 68. Based on the Debtor factoring the accounts receivable, the over $159 million owed was thereby assigned to the Debtor and the amounts shown as owed to the Debtor in the Debtor's schedules are as follows.

**Part 11: All other assets**

| 71. Notes Receivable | GL Account: Wire Transfers - Telecom Loan | | |
|---|---|---|---|
| Description (include name of obligor) | Total face amount | doubtful or uncollectible amount | Current Value of debtor's interest |
| Hilf Telecom BV | $ 20,551,685.41 | $ - | $ 20,551,685.41 |
| Interstach GmbH | $ 9,054,050.74 | $ - | $ 9,054,050.74 |
| LTD Tel | $ 2,128.74 | $ (2,128.74) | $ - |
| Najd Technologies Limited | $ 58,004,470.96 | $ (58,004,470.96) | $ - |
| Plus AMA Plus AG | $ 3,365,356.35 | $ - | $ 3,365,356.35 |
| Telacme Limited | $ 101,165,115.18 | $ (101,165,115.18) | $ - |
| Other | $ (25,159.36) | $ - | $ (25,159.36) |
| **Total** | **$ 192,117,648.02** | **$ (159,171,714.88)** | **$ 32,945,933.14** |

**UMF Nos. 68**.

While Indigo11 and Ikarim were purportedly Tier 1 entities that owed the Debtor over $159 million, they were actually only empty shells **lacking any employees or infrastructure** (a fact confirmed by investigative reports ordered by the Debtor in 2018) [**UMF Nos. 133**] that neither originated nor terminated calls. **UMF No. 73**. Even Rahman conceded that it was "impossible" for

Telacme and Najd to make a profit given that they only had a fraction of a penny margin on each alleged minute bought or sold while they borrowed monies from the Debtor at 4 1/2 to 5 1/2 cents per minute factored. **UMF No. 139.**

When the owner of Zoom, which operated the Debtor's switch, was asked whether Telacme and Najd were actually providers in Africa where the calls were answered and whether they actually terminated the calls, he responded "[n]o. Of course not." **UMF No. 74**. VoIP Traffic between the entities ceased in mid-December 2018. **UMF Nos. 75-76**. Assuming Indigo11 was a legitimate entity, VoIP Traffic sent from Indigo11 to Telacme should have ceased no later than December 11, 2018 (as Indigo11 was handed over to a liquidator on December 12, 2018) and, then on December 21, 2018, VoIP Traffic sent from IKarim to Najd ceased. **UMF Nos. 75-76**. Then, in February 2019, Indigo11 and IKarim, within one day of each other, sent identical generic communications to the Debtor stating that they had entered into liquidation proceedings. **UMF Nos. 77-78**. Indigo11 and Ikarim sent matching e-mails, Indigo11 on February 8 and Ikarim on February 9, 2019 each stating:

> Dear Client,
>
> It is with deep regret and due to circumstances beyond our control that we have unfortunately had to place the company into voluntary liquidation. You will be contacted in due course from the liquidator in regards to this matter. The liquidator has all your contact information along with outstanding monies owed. Under these circumstances there is not much else I can say on the matter.

**UMF Nos. 77-78**.

In late-2018, Indigo11 and Ikarim both defaulted on the payments owed to the Debtor for outstanding invoices factored in connection with the Telacme-Indigo transactions and the Najd-IKarim transactions. **UMF No. 79**. As a result of Indigo11 and IKarim's defaults on the amounts owed to the Debtor, more than $170 million in funds owed to the Debtor on account of factored invoices went uncollected and the Debtor defaulted on the payments due to DLI. UMF No. 80.

Indigo11 and Ikarim were empty shell middleman entities with almost no fixed assets or employees. **UMF Nos. 81-84.** Indigo11 passed a resolution to wind up the company on December 12, 2018 and then entered into a liquidation proceeding in the United Kingdom the same day, which was a couple of months prior to the identical e-mails of February 8 and 9, 2019. **UMF No. 83.** Notwithstanding Indigo11's liquidation, and as direct evidence of the fraud, Indigo11 purported to



3124696

generate VoIP traffic between December 12 through December 20 in the amount of $18,624,419.24, as reflected in Daily Statements sent by the Debtor to Indigo11 Services Limited, as well as a monthly invoice that provided the following payment details:

> Payment to Made as per the Agreement Between Telacme Limited – Indigo11 Services Limited & VoIP Guardian

**UMF Nos. 85, 138.**[10] Indigo11 also purported to generate minutes for a period in January 2019 in the amount of $5,996,089.76, which was documented with the same type of invoice identifying the same agreement between Indigo11 and Telacme. **UMF No. 137**. In other words, a defunct and non-operating entity purported to have voice traffic terminated by Telacme that, in turn, generated an account receivable for the Debtor in the total amount of $24,620,509 at a time when Indigo11 had ceased operations. **UMF No. 85.** That is fraud.

In Indigo11's Notice of Statement of Affairs filed on December 15, 2019, Indigo11's stated assets as of December 6, 2018 were listed at a book value of just £12,500 and an estimated amount to realize of £19,348. **UMF No. 83.** Indigo11 also only listed £9,030,652.06 in creditors (with £9 million of that amount comprised of VAT taxes). **UMF No. 83.** Indigo11's prior balance sheets filed with Indigo11 representing that it was a "micro entity" that "was entitled to exemption under section 477 of the Companies Act 2006 related to small companies" in the United Kingdom similarly list only minimal assets and liabilities: (1) As of March 31, 2017, £222,866 in assets and £75,091 in liabilities for net equity of £147,775; and (2) As of March 31, 2016, £729,097 in assets and £706,750 in liabilities for net equity of £22,347. **UMF No. 83.**

Indigo11 did not list any amounts owed to Telacme (or to the Debtor as Telacme's assignee based on the factoring agreement) as liabilities, let alone the staggering amount of over $101 million owed by Telacme to Indigo11 that was factored by the Debtor. **UMF No. 83.** In its insolvency filings, Indigo11 did not identify Telacme, or the Debtor as their assignee, as creditors and did not

---

[10] Bizarrely, Defendants previously asserted that these later minutes flowed from Indigo11 Services, LLC [Doc. 329, p. 2], the American entity set up by Omanoff and Philipson in order to open a DACA bank account in the United States for Indigo11. **UMF No. 90**. The claim is devoid of evidence. Indigo11 Services, LLC listed its place of business at the Debtor's Santa Monica headquarters, had no employees, no infrastructure and, of critical importance, no services agreement with Telacme.

list any contracts with Telacme. **UMF No. 83.** Indigo11 was formally dissolved following liquidation on May 12, 2026. **UMF No. 83.**

On March 18, 2019, IKarim filed a "striking off" application in the United Kingdom in order to strike its name from the register of companies and to be dissolved. **UMF No. 84.** On April 2, 2019, IKarim filed a "First Gazette notice for voluntary strike-off." **UMF No. 84.** A "Final Gazette Notice" was filed by IKarim with a strike-off date of January 16, 2020 and a dissolution date for the company of January 28, 2020. **UMF No. 84.** Just as with Indigo11, prior balance sheets filed with IKarim represented that it was a "micro entity" that "was entitled to exemption under section 477 of the Companies Act 2006 related to small companies" in the United Kingdom and similarly list only minimal assets and liabilities: (1) As of January 31, 2019, IKarim reported no assets and £11 in liabilities, for negative net equity of (£11); (2) As of January 31, 2018, IKarim reported; £12,746,547 in assets and £12,752,713 in liabilities for negative net equity of (£6,166); (3) As of January 31, 2017, IKarim reported assets of $42,465 and liabilities of £9,559 for net equity of £32,906; and (4) As of January 31, 2016, IKarim reported assets of £19,210 and liabilities of £30,593 for negative net equity of (£11,383). **UMF No. 84.**

Indigo11 and Ikarim purportedly owed Telacme and Najd over $159 million (approximately 83% of the Debtor's accounts receivable), but the balance sheets for the entities and filings in the insolvency proceedings demonstrate that the accounts receivable factored by the Debtor were not reflected in the books and records of the entities. **UMF Nos. 82-84.** Moreover, even Defendants' forensic accounting expert agreed that the chain of events, including the identical communications sent by Indigo11 and IKarim were "fishy," that "I, on the face, agree with you that it looks fishy that we see two e-mails similarly written and they both are unable to pay. On the face of it, I agree," and that "my Spidey senses went up with it and would like to know more." **UMF Nos. 130.**

#### *c.* Notwithstanding That Indigo11 Stopped Operating and Was in an Insolvency Proceeding, Zoom Continued to Generate Invoices for Minutes Purportedly Generated by Indigo11, and the Debtor Then Factored Those Invoices

During the period ***after*** Indigo11 shut down and ***after*** Indigo11's liquidation date of December 12, 2018, Indigo11 and Rahman's company, Zoom, continued to issue invoices reflecting



3124696

that millions of dollars of calls were being connected between Indigo11 and Telacme. **UMF No. 85.** The Zoom invoices generated after Indigo11 stopped operating and was in an insolvency proceeding totaled $24,620,509, and the Debtor purchased the receivables and factored those invoices. **UMF No. 86.** Zoom and Rahman, the principal of Zoom, were unable to explain how Indigo11 continued generating minutes after it stopped operating and was in a liquidation proceeding. **UMF No. 88.** Rahman's only attempted explanation as to how Zoom could reflect millions of dollars of VoIP call traffic for a company that was no longer operating and was in an insolvency proceeding was that a United States-based entity, Indigo11 Services, LLC, which was formed by principals of the Debtor in order to obtain a Deposit Account Control Agreement ("DACA") account, generated those minutes. **UMF Nos. 90-93.** However, the United States-based entity did not have any operations or transmissions of VoIP Traffic, and the two Indigo 11 entities, Indigo11 Services Limited and Indigo11 Services, LLC, collectively had only one switch with Zoom. **UMF Nos. 94.** Indeed, there was never an agreement between Indigo11 Services, LLC with Telacme or anyone else and no factoring agreement with the Debtor. **UMF No. 142.** Meanwhile, Omanoff admitted that the VoIP Traffic from Indigo11 and IKarim consisted of fake call traffic from robocalls. **UMF No. 89.**

#### *d.* The Principal of Another Tier 3 Entity Factored by the Debtor Pleaded Guilty to Generating Fake Invoices for VoIP Minutes

If there was any doubt that the Debtor was factoring fake VoIP call traffic, Interstach GmbH ("Interstach"), a German company, and the Debtor entered into a factoring agreement and the Debtor agreed to purchase Interstach's receivables. **UMF No. 95.** Ewa Barbara Madraszek, the principal of Interstach, recently pleaded guilty and was sentenced in Europe for VAT fraud, with the European court finding that the company was involved in a scheme including the issuance of fictitious invoices for phone minutes. **UMF No. 96.** The court's sentencing memorandum stated that:

> The organisation pretended that the companies in the VAT fraud chains allegedly traded in telephone minutes. In fact, as the organisers of the VAT fraud scheme knew, these services did not exist. Only fictitious invoices were created between the companies involved without these invoices being based on actual services.
>
> * * *
>
> These companies served the sole purpose of VAT evasion during the period of offence. The companies were pure front companies and therefore not companies within the meaning of Section 2 UStG. These companies did not

> actually carry out any business activities. They did not have any infrastructure for carrying out VoIP services.

**UMF No. 96.**

The European court's findings specifically reference that the funds in question subject to the criminal conviction and sentencing were transferred through the Debtor and the escrow entity used by the Debtor, DealDefenders. **UMF No. 96.** DealDefenders was not an arm's-length escrow company, and, instead, Zoom, Rahman's entity that provided switching services and tracking of VoIP minutes for the Debtor, owned 24.9% of DealDefenders. **UMF Nos. 97.**

In addition to the 83% of the Debtor's accounts receivable comprised of Indigo11 and IKarim (entities that lacked the balance sheets to support the purported accounts receivable factored with the Debtor), the Debtor factored another $9,054,050 in accounts receivable from Interstach. **UMF Nos. 68.** Yet, Interstach's principal was convicted and sentenced in Europe to fifty-four months in prison, with the European court finding that Interstach was involved in a scheme including generating fictitious invoices for VoIP phone minutes. **UMF No. 96.** Interstach, Indigo11 and IKarim comprise $168,223,636.88 of the $192,117,648.02, or 87.6% of the Debtor's accounts receivable. **UMF Nos. 68.**

#### *e.* Another Entity That the Debtor Factored Accounts Receivable for Was Owned and Controlled by Proto and Was Just A Small Middleman Entity That Went Out of Business, Transferred Assets and Did Not Maintain Its Books and Records

In addition to Mudmonth, Proto had another entity, Arco, which bought and sold VoIP telecom minutes. **UMF Nos. 98-102.** Even though Proto indirectly owned 40% of the Debtor and there was not an arm's-length relationship between the Debtor and Arco, the Debtor factored Arco's accounts receivable. **UMF Nos. 10, 43, 98-103.** Arco was a foreign-based entity located in Gibraltar even though Arco and Proto had no business location in Gibraltar. **UMF Nos. 98, 109-110.** Proto testified that "Arco didn't do tax returns. It was based in Gibraltar." **UMF No. 104.** When the money was brought back to the United States by Proto, it went through a United States-based entity that filed tax returns, Arco Telecom, LLC. **UMF Nos. 105.** However, that entity was owned by a different foreign entity. **UMF Nos. 106.** Arco Telecom, LLC, the United States-based

entity, is owned by Architect Telecom Limited, a company based in Turks and Caicos that is owned by Proto and his brother. **UMF Nos. 106.** Arco's assets were transferred to Arco, LLC, an entity without any other source of income, and which was owned by the Turks and Caicos entity owned by Proto and his brother. **UMF Nos. 107.** Even though Architect Telecom Limited (which owned Arco Telecom, LLC) was based in Turks and Caicos, neither entity had an office in Turks and Caicos. **UMF Nos. 108.** Arco never had an office anywhere and the business was instead run out of Proto's house in Thousand Oaks, California, far from Gibraltar or Turks and Caicos. **UMF Nos. 108-109.** Arco's only physical assets were two laptops located in either Spain or Gibraltar (Proto did not know which country) and Arco had no other equipment. **UMF Nos. 108-109, 111.** Arco Telecom, LLC and Architect Telecom Limited did not have documents or employees. **UMF Nos. 110.**

Proto shut down Arco in 2019 (the same year that the Debtor filed its bankruptcy case), changed the location of the company to Turks and Caicos and changed the ownership to him and his brother. **UMF Nos. 115-116.** Ownership in Arco and assets of Arco were transferred to the new company. **UMF No. 107.** Proto could not recall any deals he has had in the telecom industry since 2019. **UMF Nos. 117.** Arco did not maintain its books and records, and, instead, Proto testified that Arco gave its computers containing the books and records to a person who did work for Arco "as part of his final payment." **UMF Nos. 115, 118-119.**

As shown in the chart below, both Proto and Rahman testified that their entities, Arco (Proto's entity that factored invoices with the Debtor) and Zoom (Rahman's entity that set up and monitored switches for the Debtor) gave varying excuses as to why they failed to maintain books and records for the entities:

| | **Deposition Testimony** | **Declarations Filed by Defendants on June 11, 2024** |
|---|---|---|
| **Proto (Arco)** | Proto testified that "[a]nd concerning Arco, there was no documents," that the documents ceased to exist "[w]hen Arco ceased trading, which would be 2019, maybe a little bit before," and that "the documents were never in my possession. Richard Willis, who worked there, he had the—took the computers as part of his final payment." **UMF Nos. 115.** | "Every computer that was used for Arco's business was located in Gibraltar or Spain. I am not aware of who would retain any old Arco computers, if any remain in existence." **UMF No. 143 .** |

| | | |
|---|---|---|
| **Rahman (Zoom)** | Rahman testified that for Zoom's CDRs, "There's no dispute, so no need to save them," that he did not save the CDRs and that they do not exist anywhere at this point. **UMF Nos. 120.** | "I do not keep paper files, and do not use any cloud storage service. All responsive documents were stored on my computers." **UMF No. 144.** |

The spoliation by Proto and Rahman of the books and records of Arco and Zoom occurred at the time that Arco, Zoom, Proto and Rahman were on notice of an ongoing criminal investigation in Europe. **UMF No. 21.** Based on the statutory badges of fraud in addition to the "other factors" permitted to be considered in Civil Code § 3439.04(b) and, as "otherwise supported by the evidence," as discussed in *Fox Ortega Enterprises*, the Debtor's actual intent to hinder, delay or defraud creditors has been established.

**6. Given Omanoff's Admissions and the Badges of Fraud, Expert Testimony Is Not Required[11]**

Given Omanoff's admissions that the Debtor was engaged in fraud and the fabrication of VoIP calls, and given the badges of fraud, which include the sentencing of principal of a purported carrier factored by the Debtor based on fabricating VoIP calls, all as discussed herein above, expert reports are not necessary for the Court to determine that the Debtor was engaged in fraud.

**C. Elements for Constructive Fraudulent Transfer Claims**

"Even in the absence of actual fraudulent intent, the trustee can avoid a 'constructively' fraudulent transfer: one that was made in exchange for less than 'reasonably equivalent value' at a time when the debtor was insolvent. *Id.* § 548(a)(1)(B)." *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 570 (9th Cir. 2012), aff'd sub nom., *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014). The prima facie elements of a claim for the avoidance of a constructively fraudulent transfer under both the Bankruptcy Code and the California Civil Code consist of a transfer made for less than reasonably equivalent value and meeting one of the insolvency tests:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was

[11] The Trustee has not proffered the expert report of Dr. Tal Lavian, who separately determined that the Debtor was engaged in fabricating VoIP calls, as it is not necessary given Omanoff's testimony and the indisputable evidence. In any event, Defendants' own expert, while disputing some of Dr. Lavian's findings, did not conduct any independent analysis or give any opinion that any of the minutes were in fact real or that Indigo11, Ikarim, Najd, or Telacme had the wherewithal to provide telephony services rendering his opinion irrelevant to the merits of the Motion.

> made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

There are two alternative tests under the California Civil Code:

> Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either: (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction. (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Civil Code § 3439.04(a)(2).

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Civil Code § 3439.05(a).

**1. Lack of Reasonably Equivalent Value in Exchange for the Transfers**

> In construing the statutory requirement that the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," § 548(a)(1)(B)(i), we must turn to a series of interlocking statutory definitions. The key phrase in § 548(a)(1)(B)(i), "reasonably equivalent value," is not defined in the Code. *BFP,* 511 U.S. at 535, 114 S.Ct. 1757. "Value" is defined, however, and includes the "satisfaction or securing of a present or antecedent debt of the debtor." § 548(d)(2)(A).

*In re Fitness Holdings Intern., Inc.*, 714 F.3d 1141, 1145 (9th Cir. 2013).

As discussed in detail in section III.B.3.c herein above, the transfers to Mudmonth consisted solely of distributions of purported profits based on a 40% ownership interest in the Debtor's parent company, which operated the Debtor. UMF Nos. 37, 43-44. The transfers of over $11.2 million were made via check to Mudmonth from February 2016 through October 2018. **UMF No. 37.**

Mudmonth did not pay anything in exchange for its 40% ownership of the Debtor's parent company, which operated the Debtor, and the ownership interests were instead gifted to Mudmonth.

**UMF No. 45.** Not only did Mudmonth not make a capital contribution, Mudmonth and Proto also did not provide any other value to the Debtor or VoIP Management. **UMF Nos. 45, 47-49.** There was no reasonably equivalent value provided by Mudmonth or Proto in exchange for the transfers.

### 2. The Debtor Meets the Insolvency Tests

As discussed in detail in section III.B.3.d herein above, VoIP Management's tax returns reflect that the parent company was insolvent between 2016 and 2019, during the period when the transfers of purported profits were paid to Mudmonth. **UMF No. 33, 37, 43-44.** Omanoff admitted in his response to Requests for Admission that VoIP Management's only source of income was from the Debtor's business activities. **UMF No. 35.** Thereafter, the Debtor's statements and schedules filed on March 11, 2019 listed $71,284,210.07 in assets and $194,197,354.29 in liabilities, for the staggering amount of negative net equity of ($122,913,144.22). **UMF No. 23.** Meanwhile, the Debtor had an ever-increasing amount of debt obtained from loans from DLI. **UMF Nos. 124-125.** Between 2016 and 2019, the Debtor was insolvent and was also engaged in a business for which remaining assets were unreasonably small and was also incurring debts beyond the Debtor's ability to pay the debts as they became due. The insolvency tests under 11 U.S.C. § 548(a)(1)(B), Civil Code §§ 3439.04(a)(2) and 3439.05(a) have been met.

## IV. PROTO QUALIFIES AS THE IMMEDIATE OR MEDIATE TRANSFEREE OF MUDMONTH, OR THE PASS-THROUGH TRANSFEREE OF MUDMONTH

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

VoIP Management made transfers to revoked entity Mudmonth in the total amount of $12,711,629.68[12] ($11,211,629.68 through checks from VoIP Management to Mudmonth, with the remainder paid through DealDefenders, during the four years prior to the petition date and

[12] For the purposes of this Motion, the Trustee is only seeking the avoidance and recovery of $11,211,629.68 through checks from the Management Company to Mudmonth, plus interest. To the extent that the Court determines that there are triable issues of fact, the Trustee reserves the right to present evidence of additional transfers at trial.

$9,797,629.68 during the two years prior to the petition date). **UMF No. 37.** All of the monies that Mudmonth received were then transferred to Proto or to third parties for Proto's benefit. **UMF No. 38.** Whether or not Mudmonth is disregarded as an entity, Proto is either the initial or immediate or mediate transferee. *See* 11 U.S.C. § 550(a)(1) and (2). While 11 U.S.C. § 550(b) states that, as to immediate or mediate transferees of the initial transferee, the trustee may not recover from "a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided" (11 U.S.C. § 550(a)(1)), Proto did not provide any consideration to Mudmonth in exchange for receiving Mudmonth's assets. **UMF No. 48.**

## V. CONCLUSION

Based on the grounds set forth herein, the Separate Statement, in the Yoo Declaration, Sharp Declaration, and Komorsky Declaration (and exhibits cited therein), and RJN, the Trustee respectfully requests that the Court enter an order:

1. Granting summary adjudication in favor of the Trustee and against the Defendants on the Trustee's third, fourth, fifth, sixth and ninth claims for relief for the avoidance and recovery of actual intent and constructively fraudulent transfers.

2. For such other and further relief as the Cout deems appropriate.

DATED: September 4, 2026

BG LAW LLP

By: /s/ Jason B. Komorsky
Steven T. Gubner
Jason B. Komorsky
Corey R. Weber
Jessica L. Bagdanov
Jessica S. Wellington
Special Litigation Counsel for Plaintiff, Timothy Yoo, Chapter 7 Trustee

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367**.

A true and correct copy of the foregoing document entitled**: TRUSTEE'S NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION ON TRUSTEE'S CLAIMS FOR ACTUAL INTENT FRAUDULENT TRANSFERS AND CONTRUCTIVELY FRAUDULENT TRANSFERS AND RECOVERY OF AVOIDED TRANSFERS AGAINST DEFENDANTS MUDMONTH LLC AND MARK PROTO AS A SUBSEQUENT OR PASS-THROUGH TRANSFEREE OF MUDMONTH LLC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 4, 2026,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Jessica L Bagdanov** jbagdanov@bg.law, ecf@bg.law
- **Michael F Chekian** mike@cheklaw.com, chekianmr84018@notify.bestcase.com
- **Cynthia M Cohen** ccohen@brownwhitelaw.com
- **Aaron E. De Leest** adeleest@marshackhays.com, adeleest@marshackhays.com,alinares@ecf.courtdrive.com
- **Michael I. Gottfried** mgottfried@elkinskalt.com, lwageman@elkinskalt.com,docketing@elkinskalt.com,lmasse@elkinskalt.com
- **Steven T Gubner** sgubner@bg.law, ecf@bg.law
- **Jason B Komorsky** ecf@bg.law, jkomorsky@bg.law
- **Steven N Kurtz** skurtz@lakklawyers.com, ncondren@lakklawyers.com;smcfadden@lakklawyers.com
- **Olaf J Muller** olaf@olafmullerlaw.com
- **David J Richardson** drichardson@bakerlaw.com, jrunner@bakerlaw.com
- **Scott H Siegel** ssiegel@laklawyers.com, smcfadden@laklawyers.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Corey R Weber** cweber@bg.law, ecf@bg.law
- **Jessica Wellington** jwellington@bg.law, ecf@bg.law
- **Timothy Yoo (TR)** tjytrustee@lnbyg.com, tjy@trustesolutions.net
- **Roye Zur** rzur@elkinskalt.com, lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse@elkinskalt.com

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**: On ____**, 2026, I** served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 8, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Personal Delivery**
Honorable Barry Russell
United States Bankruptcy Court
Central District of California
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 4, 2026 | Jessica Studley | /s/ Jessica Studley |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |